## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FURNITURE FACTORY ULTIMATE<br>HOLDING, L.P.,[1]<br><br>    Debtor. | Chapter 11<br><br>Case No. 20-12816 (JKS) |
| STEVEN BALASIANO, NOT<br>INDIVIDUALLY BUT SOLELY IN HIS<br>CAPACITY AS TRUSTEE OF THE<br>LIQUIDATION TRUST OF FURNITURE<br>FACTORY ULTIMATE HOLDING, L.P.,<br>*et al.,*<br><br>    Plaintiff,<br><br>    v.<br><br>JONATHAN H. BORELL, *et al.,*<br><br>    Defendants. | Adv. Pro. No. 22-50390 (JKS)<br><br>**Related Adv. D.I. 27, 29, 30, 31, 32, 33, 34, 35, and 36** |

## <u>OPINION</u>

    Before the Court are two motions seeking dismissal of the amended complaint[2] (the "Complaint") filed by Steven Balasiano (the "Trustee"), solely in his capacity as Trustee of the Liquidation Trust of Furniture Factory Ultimate Holding, L.P., et al. The first motion, brought by the Defendant directors and officers (collectively, the "D&Os"), seeks to dismiss claims of breach of fiduciary duties, fraudulent transfers, and breach of the applicable Limited Liability

---

[1] The Debtor's service address in the chapter 11 case is FFO Liquidation Trust, c/o Province, LLC, 11111 Santa Monica Blvd., Suite 525, Los Angeles, California 90025.

[2] Adv. D.I. 27. The amended Complaint added allegations, counts, and removed two defendants. *Compare* Adv. D.I. 1 *and* Adv. D.I. 27.

Company agreements (the "D&Os Motion to Dismiss").[3]  The second motion, brought by

Defendants Sun Capital Partners, Inc. ("Sun Capital Partners"), Sun Capital Management VI,

LLC ("Sun Management"), and Furniture Factory Note Holding LLC ("Note Holding" and

together with Sun Capital Partners, Sun Management and any other of its affiliates, "Sun

Capital"),[4] seeks to dismiss claims of aiding and abetting breach of fiduciary duties,

recharacterization of debt, equitable subordination, and wrongful distribution (the "Sun Capital

Motion to Dismiss", and together with the D&Os Motion to Dismiss, the "Motions to

Dismiss").[5]  Having considered the parties' submissions, and for the reasons discussed below,

the Motions to Dismiss are granted, in part, and denied, in part.

## PROCEDURAL BACKGROUND[6]

On November 5, 2020 (the "Petition Date"), Furniture Factory Ultimate Holdings, L.P.

and its debtor affiliates and subsidiaries (collectively, "FFO") filed voluntary petitions for relief

under chapter 11 of the Bankruptcy Code.

On September 21, 2021, the Court confirmed the Plan,[7] which became effective on

November 3, 2021 (the "Effective Date").  The Plan provided for the establishment of the

---

[3] Adv. D.I. 31.

[4] The D&Os (Borell, Crosby, Feinberg, Klafter, McConvery, Mullany, Rogalski, and Zigerelli), together with Sun Capital, are the "Defendants."

[5] Adv. D.I. 29.

[6] D.I. references the docket in the main case, *In re Furniture Factory Ultimate Holding, L.P.*, Case No. 20-12816. Adv. D.I. references the docket in this adversary proceeding, *Balasiano, et al. v. Borell, et al.*, Adv. Pro. No. 22-50390.

[7] Findings of Fact, Conclusions of Law, and Order Confirming (D.I. 507) the First Amended Joint Plan of Liquidation of Furniture Factory Ultimate Holding, L.P. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan") (D.I. 430).

Liquidation Trust (the "Trust") on the Effective Date, and the Trustee was approved as the trustee of the Trust.[8]

The Trustee commenced this adversary proceeding on July 12, 2022.[9]

On October 20, 2022, Defendants filed the Motions to Dismiss.[10]  On November 3, 2022, the Trustee filed oppositions to the Motions to Dismiss.[11]  On November 10, 2022, the Defendants submitted replies in support of their Motions to Dismiss.[12]  On November 22, 2022, a Notice of Completion of Briefing was filed.[13]  Oral argument was requested, but the Court determined that argument was unnecessary to rule on the Motions to Dismiss.

---

[8] Pursuant to the Liquidation Trust Agreement and Declaration of Trust, the Trustee has the authority to commence all proceedings and take all actions that could have been taken by any member, officer, director, or shareholder of FFO.  D.I. 481, Ex. A.

[9] The Trustee filed a Complaint (Adv. D.I. 1) on July 12, 2022, and an Amended Complaint (Adv. D.I. 27) on October 6, 2022.

[10] Defendants Sun Capital Partners, Inc., Sun Capital Partners Management VI, LLC, and Furniture Factory Note Holding, LLC's Motion to Dismiss Counts 4, 5, 6, 7, 8, and 10 of the Amended Complaint (Adv. D.I. 29); Former Directors and Officers' Motion to Dismiss Counts 1, 2, 3, and 11 of Plaintiff's Amended Complaint (Adv. D.I. 31). The Trustee refers to the Counts by Arabic numerals and the Defendants refer to the Counts by Roman numerals. For simplicity, the Court refers to the Counts by Arabic numerals.

[11] The Trustee's Opposition to Sun Capital Partners, Inc.'s, Sun Capital Partners Management VI, LLC's, and Furniture Factory Note Holding, LLC's Motion to Dismiss Counts 4, 5, 6, 7, 8, and 10 of Plaintiff's Amended Complaint (Adv. D.I. 33); The Trustee's Opposition to the Former Directors' and Officers' Motion to Dismiss Counts 1, 2, 3, and 11 of Plaintiff's Amended Complaint (Adv. D.I. 34).

[12] Defendants Sun Capital Partners, Inc., Sun Capital Partners Management VI, LLC, and Furniture Factory Note Holding, LLC's Reply Brief in Support of its Motion to Dismiss Counts 4, 5, 6, 7, 8, and 10 of the Amended Complaint (Adv. D.I. 35); Former Directors and Officers Reply Brief in Support of Their Motion to Dismiss Counts 1, 2, 3, and 11 of Plaintiff's Amended Complaint (Adv. D.I. 36).

[13] Adv. D.I. 39.

# FACTUAL BACKGROUND[14]

## I. FFO's Background and Business

FFO operated furniture factory outlet stores primarily in the South Central and Midwest United States and carried prominent home furniture brands, including Serta, Jackson Catnapper and United/Lane, as well as a range of products under its Natural elements brand.[15] FFO provided quality furniture at highly competitive prices with the "everyday low price" guarantee (as opposed to a "high/low" pricing model that encouraged customers to negotiate down from an item's sticker price).[16]

At its peak, FFO had annual revenues of approximately $143 million, operated 68 locations, and employed approximately 675 employees. As of the Petition Date, FFO operated 31 retail locations, a bedding manufacturing facility, and a distribution facility, and employed approximately 270 employees.[17]

As of the Petition Date, FFO had funded-debt obligations in the aggregate principal amount of approximately $49.4 million, comprised of (i) $22 million outstanding under the

---

[14] The Court adopts the facts from the Complaint, accepting all of the Complaint's well-pleaded facts as true and disregarding any legal conclusions. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009).

[15] Amend. Compl. ¶ 29.

[16] Amend. Comp. ¶ 28. *See also* Amend. Compl. ¶ 11. The companies making up the FFO enterprise (the "FFO Entities") are organized as limited partnerships or member-managed limited liability companies under Delaware law. As of the Petition Date, FFO's corporate structure was as follows: Holding LP owns 100% of the interests in Furniture Factory Holding, LLC ("FFH"), which itself owns 100% of the interests in Furniture Factory Intermediate Holding, LLC ("FFIH"), which itself owns 100% of the interests in Furniture Factory Outlet, LLC ("Outlet"), which itself owns 100% of the interests in Furniture Factory Outlet Transportation, Inc. Holding LP also owns 100% of the interests in Bedding Holding, LLC, which itself owns 100% of the interests in Bedding Intermediate Holding, LLC, which itself owns 100% of the interests in Bedding, LLC ("Bedding").

[17] Amend. Compl. ¶ 30.

4

Stellus Credit Agreement (defined below), (ii) $12.7 million outstanding under the Sun Credit

Agreement (defined below) and (iii) $14.7 million outstanding under certain unsecured Grid

Notes (defined below); and trade debt of approximately $14.9 million, excluding lease

termination and rejection claims.[18]

On December 17, 2020, the Bankruptcy Court approved the sale of substantially all of

FFO's assets to American Freight FFO, LLC for approximately $14 million, plus the assumption

of certain liabilities.[19]  The sale closed on December 27, 2020.[20]

## II.    Sun Capital's Acquisition of FFO

The FFO Entities were portfolio companies of Sun Capital.  Sun Capital acquired FFO on

February 3, 2016, at an enterprise valuation of $34 million (the "Sun Acquisition").

Sun Capital acquired all the outstanding equity of FFO and FFO paid for a portion of its

own acquisition.  First, FFO repurchased all of its outstanding limited liability company interests

for approximately $32 million.  Thereafter, Sun Furniture Factory, LP, purchased an aggregate of

one million newly issued common units from FFO for a purchase price of $7.033 per common

unit, or $7,033,826.[21]

To finance the acquisition, Sun Capital (through its affiliate Note Holdings) made an

additional capital investment into FFO in the form of unsecured grid notes, pursuant to a note

---

[18] Amend. Compl. ¶ 31.

[19] Order (A) Approving Asset Purchase Agreement; (B) Authorizing Sale of the Purchased Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; (C) Authorizing the Assumption and Assignment of Certain Executory Contracts and Leases in Connection Therewith; and (D) Granting Related Relief (D.I. 191).

[20] Amend. Compl. ¶ 32.

[21] Amend. Compl. ¶ 34.

purchase agreement, dated February 3, 2016, (the "Grid Notes") in the initial amount of
$9,135,306.[22]

On June 10, 2016, FFO entered into a Credit Agreement (the "Stellus Credit Agreement")
by and among (a) FFO, as borrower, (b) FFH and certain subsidiaries of FFO from time-to-time
party thereto, as guarantors, (c) Stellus Capital Investment Corporation ("Stellus"), and (d) each
of the Lenders (as defined therein) party thereto, in the original principal amount of up to $23
million.

At this time, Sun Capital transferred approximately 3.09% of its ownership interest in
FFH to Stellus and certain of Stellus' affiliates pursuant to that certain Securities Purchase
Agreement, by and among Sun Furniture Factory, LP, FFH, and the purchasers thereto (the
"Stellus Securities Purchase Agreement").  In connection with the Stellus Securities Purchase
Agreement, Stellus also took a participation interest in the Grid Notes, pursuant to that certain
Participation Agreement, by and among Note Holdings and each of the participants thereto (the
"Stellus Participation Agreement").  As a result of the Stellus Participation Agreement, each of
Sun Capital's and Stellus' respective interests in the Grid Notes were correlated to its equity
interests in FFO.[23]

---

[22] Amend. Compl. ¶ 35.  The Grid Notes are unsecured, accrue interest in kind, and can be prepaid prior to maturity
without penalty.  Amend. Compl. ¶ 35.

[23] Amend. Compl. ¶ 37.

Following the Sun Acquisition, FFO's new debt amounted to $32,135,306 – the amount under the Grid Notes and Stellus Credit Agreement. By comparison, as of the date of the acquisition, FFO's funded debt obligations had been just over $2.5 million.[24]

## III.    The Consulting Agreement

On February 3, 2016, FFO and Sun Capital entered into a consulting agreement (the "Consulting Agreement") whereby Sun Capital provided business consulting services to FFO in exchange for an aggregate annual fee, paid in quarterly installments, and success fees upon the consummation of certain transactions. While FFO's management was responsible for day-to-day business operations, the Trustee alleges that Sun Capital closely supervised and regularly directed FFO's management and operations, including through monthly financial reviews attended by the management team and Sun Capital.[25]

After Sun Capital's acquisition of FFO, Sun Capital replaced FFO's respective Boards, each of which were comprised of two Sun Capital appointees on a three-member board, with the third member being Defendant Lawrence Zigerelli, FFO's CEO.[26]

In 2017, the members of each of the Boards consisted of Sun Capital appointees non-defendant Roach and Defendants Borell and Zigerelli.[27] The Trustee asserts that Sun Capital

---

[24] Amend. Compl. ¶ 38.

[25] Amend. Compl. ¶ 39. Certain types of transactions required Sun Capital's explicit approval. Amend. Compl. ¶ 39.

[26] Amend. Compl. ¶ 40.

[27] Amend. Compl. ¶ 41. As of April 2018, Feinberg replaced Borell as a Sun Capital representative on the Boards, and in or around November 2019, non-party Neuman replaced non-party Roach as Sun Capital representative on the Boards. Amend. Compl. ¶ 41.

exercised majority control of the Boards, influenced FFO's management, and controlled FFO's finances to run FFO's business operations and major company transactions.[28]

## IV.    The Kentucky Acquisition

In September 2017, Sun Capital began to consider FFO's acquisition of two Kentucky-based retailers, Mattress & More and Furniture Liquidators (the "Kentucky Acquisition") as part of what was labeled a "Home Add-On Opportunity."[29]

At the time of the Kentucky Acquisition, the Board members of each of the FFO Entities consisted of Roach and Defendants Borell and Zigerelli, and the officers of the FFO Entities consisted of Defendants Zigerelli, Klafter, McConvery, and Rogalski (collectively, the "Kentucky Acquisition D&Os").[30]  The Trustee alleges that these individuals were responsible for, and involved in, considering and conducting due diligence on and approving the Kentucky Acquisition.[31]  In addition to serving on the Boards, at this time, Borell also served on Sun's "Deal Team" that spearheaded the Kentucky Acquisition and presented it to FFO, and non-party Roach served on Sun's "Ops Team" that provided operational support, guidance, and counsel to FFO's management in connection with the Kentucky Acquisition.[32]

---

[28] Amend. Compl. ¶ 41.

[29] Amend. Compl. ¶ 42. Mattress & More was a retail mattress chain operating primarily in the Louisville metropolitan area, and Furniture Liquidators was, like FFO, a value-oriented home furnishing chain, operating in Kentucky and Indiana.  Amend. Compl. ¶ 43.

[30] The "Kentucky Acquisition D&Os" definition does not include Feinberg.  Amend. Compl. ¶ 41.

[31] Amend. Compl. ¶ 44.

[32] Amend. Compl. ¶ 45.

The Trustee alleges that there were cultural and operational differences between FFO and the targeted businesses which were not explored during the due diligence process for the Kentucky Acquisition.

The Complaint alleges Sun Capital – through FFO Board members Borell and Roach, as well as non-defendant Feigenbaum, a senior associate at Sun Capital – pushed the Kentucky Acquisition on FFO, urging the acquisition would "accelerate FFO store growth and market expansion" and that the "improved 'financiability' [sic]" of the combined business should enhance equity returns.[33]  Sun Capital also represented to FFO's management, including Defendants Zigerelli, Klafter, McConvery, and Rogalski, that the Kentucky Acquisition would be a "strong fit with FFO in contiguous market," allowing FFO to expand their store base into surrounding states.[34]

In November 2017, approximately two months after it identified the Kentucky Acquisition as a possible target, Sun Capital (through Feigenbaum and FFO Board members Borell and Roach) recommended FFO offer $6.75 million to purchase Mattress & More and Furniture Liquidators.[35]

The Complaint alleges the only diligence Sun Capital appeared to conduct in connection with the Kentucky Acquisition was limited and based on flawed assumptions.  For example, Sun Capital focused only on historical data related to Mattress & More and Furniture Liquidators and

---

[33] Amend. Compl. ¶ 47.

[34] Amend. Compl. ¶ 47.  The Trustee alleges that representations that were accepted at face value and not challenged by the then-management team.  Amend. Compl. ¶ 47.

[35] Amend. Compl. ¶ 48.

assumed that past revenue and EBITDA would be indicative of future performance. Further, Sun Capital failed to consider market trends, such as decreased in-store traffic and migration to e-commerce, or the economic realities of the industry. The Trustee also argues that Sun Capital ignored that the mattress industry was "softening" at the time of the transaction, leading to aggressive price cuts and several notable bankruptcies by large mattress firms, which flooded the market with inexpensive competing products. The Trustee continues that Sun Capital failed to appreciate or consider the significant cultural differences between FFO and the Kentucky Acquisition target companies that would cause significant, and insurmountable, problems when FFO attempted to integrate the new businesses.[36]

The Trustee alleges that the Boards (of which two of the three members involved in the Kentucky Acquisition, Roach, and Feinberg, were also Sun Capital employees) and management team (comprised of Defendants Zigerelli, Klafter, McConvery, and Rogalski) failed to conduct their own appropriate due diligence with respect to the proposed Kentucky Acquisition and failed to appropriately assess the benefit of the transactions to FFO. The Complaint alleges that neither the Boards, nor management team, sought any advice from third-party advisors or any formal opinions regarding the proposed Kentucky Acquisition.[37]

On or about February 6, 2018, the Boards (comprised of Roach and Defendants Borell and Zigerelli) and the management team (comprised of Defendants Zigerelli, Klafter, McConvery, and Rogalski), at the direction of Sun Capital, approved FFO's purchase of Mattress

---

[36] Amend. Compl. ¶ 49.
[37] Amend. Compl. ¶ 50.

& More and Furniture Liquidators for a base purchase price of approximately $7,250,000.[38]  At this time, FFO's total enterprise value was approximately $60 million.[39]

## V.    FFO's Onboarding of the Kentucky Acquisition

The Complaint also alleges problems associated with the Kentucky Acquisition.  First, Mattress & More stores underperformed expectations under FFO's stewardship, and sales revenues declined.  Operational reviews presented by Sun Capital to FFO in mid-2018, several months after the Kentucky Acquisition closed, revealed this was due to "softness" in the mattress industry.  Mattress & More struggled to compete in the marketplace.[40]

In addition, Sun Capital and the Kentucky Acquisition D&Os initially planned to liquidate certain of Furniture Liquidators' inventory through a "retirement sale," modify inventory investments, and then rebrand the Furniture Liquidators' stores under the FFO banner.[41]  FFO sold Furniture Liquidators inventory as a "retirement sale," while purchasing significant inventory to replenish stores post-conversion.  The Complaint alleges the retirement sale saturated the market and significantly reduced demand for newly acquired full-priced products after the stores reopened, and, as a result, FFO was saddled with excess inventory it was unable to sell.[42]

---

[38]  Amend. Compl. ¶¶ 51-52.

[39]  Amend. Compl. ¶ 53.

[40]  Amend. Compl. ¶ 55.

[41]  Amend. Compl. ¶ 56.

[42]  Amend. Compl. ¶ 57.

Defendants Borell, Zigerelli, Klafter, McConvery, and Rogalski also oversaw FFO's attempt to convert and integrate the acquired Mattress & More and Furniture Liquidators stores. Costs associated with these efforts exceeded initial projections by millions of dollars.[43]

Further, FFO's management team spent considerable time integrating the new businesses acquired in the Kentucky Acquisition and away from FFO's legacy business.[44] The Complaint asserts that the singular focus of Defendants Zigerelli, Klafter, McConvery, and Rogalski on the newly acquired stores meant that critical, existing issues with FFO's core business, such as the need to expand FFO's digital marketing to respond to consumers' migration to online shopping, were largely ignored.[45]

The Trustee maintains that FFO management issues were exacerbated by a leadership void at the top. Defendant Zigerelli, FFO's then-CEO and President, historically had significant latitude and freedom in running FFO. During the conversion and integration of the Kentucky Acquisition, however, Zigerelli was "checked out," "erratic" and "unsystematic," which led to strained relationships among the management team and created confusion around FFO's going-forward strategy.[46]

By early 2019, FFO was unable to pay its vendors.[47]

---

[43] Amend. Compl. ¶ 58.

[44] Amend. Compl. ¶ 59. In mid-to-late 2018, FFO's management team that led the integration effort consisted of Defendants Zigerelli, Klafter, McConvery, and Rogalski. Amend. Compl. ¶ 59.

[45] Amend. Compl. ¶ 60.

[46] Amend. Compl. ¶ 61.

[47] Amend. Compl. ¶ 62.

12

The Complaint alleges internal Sun Capital presentations throughout 2019 indicated that

pre-acquisition diligence was "inadequate" and that Sun Capital habitually "ignored" warning

signs with FFO's business.[48]  For example, the Complaint states:

- FFO and the acquired Kentucky businesses were "too different to combine operationally" and there was a "marked difference in the two models and inadequate consideration given to that."

- Sun Capital "underestimated the complexity of the add-on, as well as the ability to manage and integrate it."

- Going forward, Sun Capital would need to improve its diligence, including by "get[ting] the facts on shifts in the industry . . . and the health of the core business," "spend[ing] more time upfront to understand the local model and market," and conducting "continuous" consumer research.

- "[W]arning signals of declining core business were ignored," Sun Capital "missed that the customer was increasingly influenced by . . . digital marketing, and visiting fewer stores before purchase."

- Zigerelli "was not programmatic and didn't really want help," and "the more complex the issues and unsuccessful he was at resolving them, the more erratic and unsystematic he and the rest of the team became."

- Major key performance indicators "didn't receive adequate attention from [Sun Capital]" and were "habitually dismissed by the CEO."[49]

The Complaint also alleges because FFO failed to conduct its own independent diligence apart

from the deficient Sun Capital diligence, the above failures by Sun Capital equally apply to

FFO's D&Os.

In addition, the Complaint states that, in a quarterly business review between Sun Capital

and FFO, it was admitted that:

- They "did not do a good job" with the Kentucky Acquisition.[50]

---

[48]  Amend. Compl. ¶ 62.

[49]  Amend. Compl. ¶ 62.

[50]  Amend. Compl. ¶ 64.

- They had "lost [their] way," "lost [their] brand identity," "lost [their] core customer with higher price points," and "are confused."[51]
- Zigerelli had been "checked out" and FFO was "[v]oid of leadership." Moreover, the "[s]enior team [did] not work well together," and "[r]elationships are strained. Not communicate with each other. Not sure who is responsible for what."[52]
- FFO had "no strategy – no vision."[53]

By late 2019, FFO's total enterprise value declined by 83% (from approximately $60.2 million to approximately $10.3 million)—a loss in value of almost $50 million over the course of approximately 22 months.[54]

Following this, FFO overhauled the management team, and effectively terminated Zigerelli (vis-à-vis a "voluntary departure") from the Boards and management. FFO's new management team, consisting of, at various times, Defendants Rogalski, Crosby, Klafter, and Mullany, attempted to implement various operational changes to the acquired businesses.

## VI.    FFO's Decline into Bankruptcy

Over the course of 2018 and 2019, FFO approved payment to Sun Capital of millions of dollars in consulting fees, expense reimbursements, and distributions. FFO, strapped for cash, borrowed additional money from Sun Capital to stay afloat, causing it to incur additional secured debt.[55]

---

[51] Amend. Compl. ¶ 64.

[52] Amend. Compl. ¶ 61.

[53] Amend. Compl. ¶¶ 64, 65.  The "senior team" included Borell, Zigerelli, Klafter, McConvery, and Rogalski. Amend. Compl. ¶ 66.

[54] Amend. Compl. ¶ 66.

[55] Amend. Compl. ¶ 68.

Immediately following the close of the Kentucky Acquisition, FFO paid at least $72,500 in management fees to Sun Capital.[56]

Between April 5, 2018, and January 4, 2019, FFO paid Sun Capital more than $665,000 in consulting fees and reimbursement of expenses under the oversight of Defendants Feinberg, Zigerelli, Klafter, McConvery, and Rogalski.[57]

At an August 17, 2018, omnibus special meeting of the Boards, the Boards approved a payoff of the Grid Notes and paid $1,488,781.43 to Sun Capital.  Defendants Feinberg, Zigerelli, and non-party Roach were all members of the Boards at this time.  Defendants Borell and Rogalski also attended the meeting, with Rogalski presenting to the Board the proposed distribution.  Pursuant to a resolution of the Boards, Defendants Zigerelli, Rogalski, and Klafter were authorized to take all actions necessary to implement the payoff of the Grid Notes.[58]

By early 2019, FFO owed at least $4.7 million in outstanding vendor payments.  Between January and March 2019, FFO was undercapitalized and borrowed an additional $4 million from Sun Capital under the Grid Notes.[59]

Despite this borrowing, FFO needed additional liquidity—based in part on sales being down 30%, not "being good in city markets," and stretching vendors.  On May 1, 2019, Sun Capital provided FFO with $1.2 million, and on May 15, 2019, Sun Capital provided FFO with

---

[56] Amend. Compl. ¶ 69.  This was intended to be a "success fee" for completion of the acquisition.  Amend. Compl. ¶ 69.

[57] Amend. Compl. ¶ 70.

[58] Amend. Compl. ¶ 71.

[59] Amend. Compl. ¶ 72.

another $2.5 million (collectively, the "May 2019 Fundings"). At the time of the funding, the
May 2019 Fundings were not documented. Subsequently, on June 28, 2019, Outlet and Bedding,
as borrowers, Holding LP, and certain of its subsidiaries, as guarantors (collectively with Outlet
and Bedding, the "Sun Credit Agreement Loan Parties") and Sun Capital, through Note
Holdings, entered into a Second Lien Credit Agreement (the "Sun Credit Agreement" and
together with all other loan documents related thereto, the "Sun Loan Documents"), for a $6
million loan purportedly secured by a second lien on all of FFO's assets, consisting of the May
2019 Fundings of $3.7 million, as well as $2.3 million in additional funding. Unlike prior
secured debt, the Sun Credit Agreement accrued interest in-kind and could be repaid without any
prepayment premiums or penalties. Rogalski signed the Sun Credit Agreement on behalf of each
of the FFO Entities, as borrowers and guarantors, and on behalf of Note Holdings, as lender.[60]
Neither the Boards, nor anyone un-affiliated with Sun Capital, approved or gave any formal
consideration to either the May 2019 Fundings or entry into the Sun Credit Agreement.[61]

On September 13, 2019, Sun Capital funded an additional $1 million to FFO without any
documentation (the "September 2019 Funding"). On September 18, 2019, the parties amended
the Sun Credit Agreement to provide for an additional $3 million loan to FFO, of which $1
million was previously funded (the "Sun Credit Agreement First Amendment").[62]

---

[60] Amend. Compl. ¶ 73.

[61] Amend. Compl. ¶ 73.

[62] Amend. Compl. ¶ 74.

On November 27, 2019, the parties again amended the Sun Credit Agreement for an additional $2 million in funding to FFO (the "Sun Credit Agreement Second Amendment," and together with the Sun Credit Agreement First Amendment, the "Sun Credit Agreement Amendments").[63] The Trustee alleges that neither the Boards, nor any third party, approved or gave any formal consideration to the Sun Credit Agreement Amendments. Mullany signed the Sun Credit Agreement Amendments on behalf of each of the FFO Entities, as borrowers and guarantors, and on behalf of Note Holdings, as lender. During this time FFO did not seek funding from any source other than Sun Capital. Sun Capital did not record any UCC financing statements on account of the Sun Credit Agreement until October 23, 2020, shortly before FFO filed for bankruptcy.[64]

By November 2020, FFO owed approximately $14.9 million in outstanding vendor payments and trade debt, as well as approximately $27.4 million in outstanding funded-debt obligations to Sun Capital (excluding over $1 million in "consulting fees" owed to Sun Capital).[65]

On November 5, 2020, FFO filed for bankruptcy.

---

[63] Amend. Compl. ¶ 74.

[64] Amend. Compl. ¶ 74.

[65] Amend. Compl. ¶ 75.

## JURISDICTION

The Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C.

§ 1334(b). This matter presents both "core and "non-core" proceedings under 28 U.S.C.

§ 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the factual

allegations in the complaint.[66] Rule 12(b)(6) is related to Rule 8(a)(2), which requires that a

pleading contain "a short and plain statement of the claim showing that the pleader is entitled to

relief."[67] When a complaint is challenged by a motion to dismiss under Rule 12(b)(6), the

complaint "does not need detailed factual allegations, [but] a plaintiff's obligation to provide the

grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do."[68] Two "working principles" underly

this pleading standard:

> First, the tenet that a court must accept a complaint's allegations as
> true is inapplicable to threadbare recitals of a cause of action's
> elements, supported by mere conclusory statements. Second,
> determining whether a complaint states a plausible claim is context
> specific, requiring the reviewing court to draw on its experience
> and common sense.[69]

---

[66] *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).

[67] Fed. R. Civ. P. 8(a)(2) and 12(b)(6), Fed. R. Bankr. P. 7008 and 7012.

[68] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).

[69] *Ashcroft v. Iqbal*, 556 U.S. 662, 663–64 (2009) (citation omitted).

Under this pleading standard, a complaint must nudge claims "across the line from conceivable to plausible."[70] The movant carries the burden of showing that dismissal is appropriate.[71]

In analyzing a motion to dismiss, the Third Circuit instructs courts to follow a three-part analysis. "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"[72] Second, the court must separate the factual and legal elements of the claim, accepting all of the complaint's well-pleaded facts as true and disregarding any legal conclusions.[73] Third, the Court must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief.[74] After conducting this analysis, the court may conclude that a claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct.[75]

A heightened pleading standard is applicable to allegations of fraudulent transfer.[76] Rule 9(b), made applicable by Bankruptcy Rule 7009, supplies this heightened standard:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.[77]

---

[70] *Twombly*, 550 U.S. at 547.

[71] *Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*, 496 F. Supp. 2d 404, 408 (D. Del. 2007).

[72] *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (*quoting Iqbal*, 556 U.S. at 675).

[73] *Id. See also Fowler*, 578 F.3d at 210-11 (*citing Iqbal*, 556 U.S. at 679).

[74] *Santiago*, 629 F.3d at 130.

[75] *Iqbal*, 556 U.S. at 678 (*citing Twombly*, 550 U.S. at 556).

[76] *Pa. Emp. Benefit Tr. Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 478 (D. Del. 2010).

[77] Fed. R. Civ. P. 9(b); Fed. R. Bankr. P. 7009.

Rule 9(b) requires plaintiffs to plead the "who, what, where, when, how, and why" of a fraudulent transfer claim.[78] The purpose of Rule 9(b)'s requirement that plaintiffs plead the "circumstances" of the alleged fraud with particularity is to "place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior."[79] However, Rule 9's "requirements . . . are relaxed in the bankruptcy context, particularly in cases . . . in which a trustee has been appointed."[80]

## THE COMPLAINT

The Complaint asserts eleven counts: (i) D&Os' breaches of their fiduciary duties to FFO (counts 1-3); (ii) Sun Capital's aiding and abetting of those breaches of fiduciary duties (counts 4-6); (iii) recharacterization of the purported debt owed by FFO to Sun Capital to equity (count 7); (iv) equitable subordination of Sun Capital's claims to those of general unsecured creditors (count 8); (v) avoidance and recovery of constructive fraudulent transfers made to Sun Capital (count 9);[81] (vi) wrongful distributions paid to Sun Capital (count 10); and (vii) D&Os' breach of Limited Liability Company agreements (count 11).

---

[78] *See Gerbitz v. ING Bank*, 967 F. Supp. 2d 1072, 1078 (D. Del. 2013). *But see Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984) ("Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud").

[79] *Seville Indus. Mach. Corp.*, 742 F.2d at 791.

[80] *Zazzali v. Mott (In re DBSI, Inc.)*, 445 B.R. 344, 347–348 (Bankr. D. Del. 2011) (citation omitted).

[81] No party moved to dismiss count 9.

## D&Os MOTION TO DISMISS

The D&Os seek to dismiss Counts 1, 2, and 3 of the Complaint for alleged breach of

fiduciary duties (the "Fiduciary Duty Counts") and Count 11 of the Complaint for breach of the

Limited Liability Company Agreements[82] (the "LLC Agreements Count").  Before addressing

these counts, the Court considers two global, threshold arguments made by the D&Os in support

of dismissal of the counts against them.

### I.    Counts 1, 2, 3 and 11: Group Pleading

The D&Os seek to dismiss the Fiduciary Duty Counts on the basis that the Trustee

employs "group pleading" and "improperly groups all of the individual defendants into lists and

advances a theory of 'collective responsibility.'"[83]  The D&Os claim that the Complaint groups

all eight individual defendants together in each allegation, "even though not all eight defendants

served on the board of FFO at the same time."[84]  The D&Os maintain that the purported group

pleading or "collective responsibility" pleading in the Complaint does not satisfy the

requirements of *Twombly* and *Iqbal* because it does not provide any individual defendant the

information needed to properly respond to the allegations.[85]

---

[82] *See* Amend. Compl., Exs. E (Furniture Factory Outlet, LLC, Amended and Restated Limited Liability Company Agreement), F (Bedding, LLC Limited Liability Company Agreement), G (Furniture Factory Holding, LLC, Limited Liability Company Agreement), and H (Furniture Factory Holding, LLC, Amended and Restated Limited Liability Company Agreement) (collectively, the "LLC Agreements").

[83] Adv. D.I. 32 at 2, 14-19.  Pertaining to Counts 1, 2, 3, and 11.

[84] Adv. D.I. 32 at 14-15.

[85] Adv. D.I. 32 at 16-17.

The Trustee denies improper "group pleading" and argues that he has "pleaded extensive details known to it today (and without the benefit of full discovery) concerning the acts and omissions that comprise the breach of fiduciary duty and breach of contract claims and . . ., identified the responsible individuals."[86] The Trustee maintains that "a pleading that 'groups' together particular directors and officers who collectively had responsibility for certain transactions or actions is not per se improper. Rather, under *Iqbal* and *Twombly*, the relevant analysis is whether a particular defendant is given adequate notice of the allegations against them."[87] The Trustee contends "the Amended Complaint provides more than adequate notice under Fed. R. Civ. P. 8 to the [D&Os] of the claims asserted against them."[88]

Under Delaware law, a claim for breach of fiduciary duties may be dismissed where the complaint (1) "lumps all of the individual Defendants together as 'Officers and Directors' . . . without supplying specific facts as to each defendant's wrongdoing;" (2) "has not provided any specific facts as to which transactions a particular defendant authorized;" and (3) does not "allege what authority any particular defendant had to approve such transactions."[89]

Courts in this district have dismissed claims for breach of fiduciary duties against certain individual defendants who allegedly "were involved with" or "participated in [a] certain

---

[86] Adv. D.I. 34 at 8-9.

[87] Adv. D.I. 34 at 9.

[88] Adv. D.I. 34 at 9.

[89] *Stanziale v. Heico Holdings, Inc. (In re Conex Holdings, LLC)*, 514 B.R. 405, 414 (Bankr. D. Del. 2014) (applying Texas law) (cleaned up).

22

transaction," and conclusory allegations were not enough to survive a motion to dismiss.[90]  The

Delaware District Court has also dismissed claims for breach of fiduciary duty where a plaintiff

lumped all the individual defendants together, did not supply specific facts as to each defendant's

wrongdoing, did not provide specific facts as to which transactions a particular defendant

authorized, and did not allege what authority any particular defendant had to approve such

transaction.[91]

The Delaware Courts, however, have rejected defendants' "group" pleading contention

when the complaint identifies the "dates, parties, and actions or inactions" of the defendants

which were "sufficient to put them on notice of the specific conduct that gives rise to the breach

of fiduciary claims asserted against them."[92]

Here, the Complaint identifies the dates, parties, and actions or inaction of each of the

D&Os.  For each of the Fiduciary Duty Counts, the Trustee identifies a separate set of specific

directors and officers involved in the particular Count.  Each Count is tied to a subset of the total

D&Os and coupled with a particular set of facts.  More specifically, in Count 1 the Trustee

alleges that five of the eight D&Os (the Kentucky Acquisitions D&Os) were responsible for

---

[90] *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 682 (N.D. Tex. 2011) (applying Delaware law) ("The Amended Complaint alleges that both 'were involved with' or 'participated in' certain transactions. As the Court has already explained, such conclusory allegations are insufficient to withstand a motion to dismiss.").

[91] *In re Conex Holdings, LLC*, 514 B.R. at 414.

[92] *Buchwald Cap. Advisors LLC v. Schoen (In re OPP Liquidating Co., Inc.)*, Adv. Pro. No. 21-50431 (MFW), 2022 WL 774063, at *8 (Bankr. D. Del. Mar. 14, 2022) (footnote omitted); *UD Dissolution Liquidating Trust v. Sphere 3D Corp. (In re UD Dissolution Corp.)*, 629 B.R. 11, 36-37 (D. Del. 2021) (rejecting "group pleading" argument and finding Amended Complaint contained sufficient detail of actions taken by the Defendants, collectively and individually, in furtherance of the alleged breaches of fiduciary duty); *Hawk Mt. LLC v. Mirra*, Civ. No. 13-2083, 2016 WL 4541032, at *2 (D. Del. Aug. 31, 2016) (permitting group pleading where defendants were alleged to have acted together to facilitate a general scheme).

overseeing and approving the Kentucky Acquisition.[93]  In similar fashion, Count 2 names the

Transfer D&Os and Count 3 names the Insider Loan D&Os and each count is accompanied by a

different set of facts and alleged wrongdoings.  The Complaint contains sufficient dates, details,

and actions or inactions by the D&Os, collectively and individually, and is therefore sufficient to

put the D&Os on notice of the "specific conduct that gives rise to the breach of fiduciary claims

asserted against them."[94]  Based on the allegations of the Complaint, the Court finds that the

Trustee has pleaded sufficient facts to overcome the group pleading argument.

---

[93]  Amend. Compl. ¶¶ 44, 51, 56-60.  More specifically, the Complaint sets forth the following related to each of the
Defendant D&Os:

| Defendant | Involvement with FFO | Board Member of Sun Capital | "Kentucky Acquisition D&Os" (Count 1) | "Transfer D&Os" (Counts 2 and 11) | "Insider Loan D&Os" (Count 3) | Substantive Paragraph References |
|---|---|---|---|---|---|---|
| Borell | Feb 2016 - Feb 2018 | Jun 2006 - May 2019 | X | X | X | ¶¶ 44-45, 47-48, 51, 58, 64-65, 71 |
| Crosby | 2019 | Jun 2008 - Present | | | X | ¶ 67 |
| Feinberg | Apr 2018 - Nov 2019 | Apr 2018 - Nov 2019 | | X | X | ¶¶ 50, 70-71 |
| Klafter | 2016 - 2019 | 2006 - 2021 | X | X | X | ¶¶ 39, 44, 47, 50-51, 58-60, 64-67, 70 |
| McConvery | 2016 – 2019 | N/A | X | X | X | ¶¶ 39, 44, 47, 50-51, 58-60, 64-66, 70 |
| Mullany | Jun 2019 - Dec 2020 | Sept 2019 - Dec 2020 | | | X | ¶¶ 39, 67, 74 |
| Rogalski | Dec 2016 - Aug 2019 | Apr 2019 - Aug 2019 | X | X | X | ¶¶ 39, 44, 47, 50-51, 58-60, 64-67, 70-71 |
| Zigerelli | 2012 – 2019 | Feb 2016 - Mar 2019 | X | X | X | ¶¶ 39, 44, 47, 50-51, 58-62, 64-67, 70-71 |

[94]  *In re OPP Liquidating Co., Inc.*, Adv. Pro. No. 21-50431 (MFW), 2022 WL 774063 at *8.

## II.    Counts 1, 2, 3, and 11: Exculpation

The D&Os also argue that the Fiduciary Duty Counts and the LLC Agreements Count should be dismissed because the LLC Agreements (as defined below) eliminate fiduciary duties and exculpate the D&Os from liability for breach of any duties, including breach of contract.[95]

The Trustee argues that "affirmative defenses, such as exculpation, may not be considered at the motion to dismiss stage"[96] and, even if the Court considered the exculpation clauses, they apply only to "Specified Officers," "Specified Persons," and "current or former Managers."[97]

The Court agrees that it need not address the D&Os' arguments concerning the exculpation clause because affirmative defenses, such as exculpation, may not be considered at the motion to dismiss stage.[98]

## III.    Counts 1, 2, and 3: Failure to State a Claim

The D&Os seek to dismiss each of the three Fiduciary Duty Counts for failure to state a claim.

---

[95] Adv. D.I. 32 at 21-22.

[96] Adv. D.I. 34 at 23.

[97] Adv. D.I. 34 at 26-27.

[98] *Giuliano v. Schnabel (In re DSI Renal Holdings, LLC)*, 574 B.R. 446, 471 (Bankr. D. Del. 2017) (*citing Miller v. McCown De Leeuw & Co., Inc. (In re The Brown Sch.)*, 368 B.R. 394, 401 (Bankr. D. Del. 2007)). *See also Deckard v. Gen. Motors Corp.*, 307 F.3d 556, 560 (7th Cir. 2002) (citations omitted) ("A motion to dismiss was improper since release is an affirmative defense, Fed.R.Civ.P. 8(c), and the existence of a defense does not undercut the adequacy of the claim.").

25

## A. The Fiduciary Duties of Care and Loyalty

Under Delaware law, corporate officers and directors owe the corporations they serve duties of care and loyalty to "strive in good faith and on an informed basis to maximize the value of the corporation for the benefit of its residual claimants, the ultimate beneficiaries of the firm's value."[99] When alleging breach of fiduciary duties, "to survive a motion to dismiss under Rule 12(b)(6), the Trustee must 'plead around the business judgment rule.'"[100] When assessing claims for breach of fiduciary duties, the Court bears in mind that a director does not become "a guarantor of success" by choosing to continue a firm's operations when it may be insolvent.[101]

### i.    The Duty of Care

The duty of care "requires that directors of a Delaware corporation both: (1) 'use that amount of care which ordinarily careful and prudent men would use in similar circumstances'; and (2) 'consider all material information reasonably available.'"[102] "The duty of care has been described as the duty to act on an informed basis."[103] "[D]uty of care violations are actionable only if the directors acted with gross negligence," which is "rarely found."[104] Gross negligence

---

[99] *Quadrant Structured Prods. Co., v. Vertin,* 102 A.3d 155, 172 (Del. Ch. 2014).

[100] *Joseph v. Frank (In Re Troll Commc'ns, LLC),* 385 B.R. 110, 118 (Bankr. D. Del. 2008) (*quoting Stanziale v. Nachtomi (In Re Tower Air, Inc.),* 416 F.3d 229, 238 (3d Cir. 2005)). Furthermore, "[u]nder Delaware law, the business judgment rule presumes that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *Liquidation Trust of Solutions Liquidation LLC v. Stienes (In re Solutions Liquidation LLC),* 608 B.R. 384, 402 (Bankr. D. Del. 2019) (*quoting Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.),* 906 A.2d 27, 52 (Del. 2006)) (cleaned up).

[101] *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.,* 906 A.2d 168, 174 (Del. Ch. 2006), *aff'd,* 931 A.2d 438 (Del. 2007).

[102] *Bridgeport Holdings Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.),* 388 B.R. 548, 568 (Bankr. D. Del. 2008) (quoting *In re Walt Disney Co. Deriv. Litig.,* 907 A.2d 693, 749 (Del. Ch. 2005)).

[103] *Burtch v. Huston (In re USDigital, Inc.),* 443 B.R. 22, 41 (Bankr. D. Del. 2011) (citation and footnote omitted).

[104] *In re Walt Disney,* 907 A.2d at 750 (citations and footnotes omitted).

is "conduct that constitutes reckless indifference or actions that are without the bounds of reason."[105]

### ii.    *The Duty of Loyalty*

"The duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholders and not shared by the stockholders generally."[106]  "A director is interested in a transaction if 'he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders' or if 'a corporate decision will have a material detrimental impact on a director, but not on the corporation and the stockholders.'"[107]  The private benefit to the director must be "of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties . . . without being influenced by her overriding personal interest."[108]

Additionally, "[a]cts taken in bad faith breach the duty of loyalty."[109]

> To state a bad-faith claim, a plaintiff must show either an extreme
> set of facts to establish that disinterested directors were
> intentionally disregarding their duties, or that the decision under
> attack is so far beyond the bounds of reasonable judgment that it

---

[105] *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008).

[106] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) (cleaned up).

[107] *In re Trados Inc. S'holder Litig.*, C.A. 1512-CC, 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009) (quoting *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993)).

[108] *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 617 (Del. Ch. 1999) (citations omitted).

[109] *Ryan v. Gifford*, 918 A.2d 341, 357 (Del. Ch. 2007) (citation and footnote omitted).

27

seems essentially inexplicable on any ground other than bad faith.[110]

A complaint for breach of duty of loyalty may be dismissed where it "is devoid entirely of factual support to establish that the transaction was self-interested."[111]

## B.  Count 1: Kentucky Acquisition D&Os' Breach of Fiduciary Duties[112]

Count 1 alleges that the Kentucky Acquisition D&Os (comprised of Defendants Borell, Zigerelli, Klafter, McConvery, and Rogalski) "breached their fiduciary duties to FFO by failing to inform themselves fully and in a deliberate manner of material and reasonably available information, including failing to conduct sufficient industry, market, and financial due diligence, or retaining appropriate and experienced advisors."[113]  Count 1 further alleges that the Kentucky Acquisition D&Os were grossly negligent (i) in pursuing the acquisition without first informing themselves, and (ii) following the acquisition, with respect to integration and conversion of the stores acquired, as well as substantial neglect of FFO's core business.[114]

The D&Os seek to dismiss Count 1 arguing the alleged "poor decision-making" is protected by the business judgment rule, which should be considered at the motion to dismiss

---

[110] *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, No. 9640-VCG, 2016 WL 3044721, at *7 (Del. Ch. May 20, 2016) (cleaned up and citation omitted).

[111] *In re Solutions Liquidation LLC*, 608 B.R. at 402.

[112] The Complaint lists Fienberg in the heading for Count 1 against the Kentucky Acquisition D&Os.  However, Feinberg is not included in the definition of the Kentucky Acquisition D&Os, nor is he specifically named in the Complaint ¶¶ 78-83.  Additionally, his Board service (April 2018 through November 2019) began *after* the Kentucky Acquisition (February 2018).  *Compare* Amend. Compl. ¶¶ 14 (listing dates of Feinberg's Board service), 44 (definition of Kentucky Acquisition D&Os), *and* 51 (closing of the Kentucky Acquisition).  As a result, the Court will dismiss Count 1 against Feinberg.

[113] Amend. Compl. ¶ 79.

[114] Amend. Compl. ¶¶ 79-81.

stage.[115]  The D&Os contend that the wrongdoing allegations are "vague" and are the types of

claims the business judgment rule protects.[116]  Additionally, the D&Os argue that the Trustee's

hindsight or backwards-looking evaluation of the transactions do not meet the plaintiff's burden

of surmounting the business judgment rule.[117]  They maintain that Delaware law does not

"impose retroactive fiduciary obligations simply because [the fiduciary's] chosen business

strategy did not pan out."[118]

In response, the Trustee argues the Kentucky Acquisition D&Os exceeded more than

"poor decision making" because they acted on an uninformed basis and breached their duty of

care.  The Complaint alleges that the Kentucky Acquisition D&Os:

- Never "sought any advice from third-party advisors or any formal opinions regarding the proposed Kentucky Acquisition."[119]
- "[I]gnored the stark cultural and deep operational differences, and market trends, between FFO and the targeted businesses."[120]

---

[115]  Adv. D.I. 32 at 20.

[116]  Adv. D.I. 36 at 1.

[117]  Adv. D.I. 32 at 17.

[118]  Adv. D.I. 32 at 21 (*citing Trenwick Am. Litig. Tr.*, 906 A.2d at 173).

[119]  Amend. Compl. ¶50.

[120]  Amend. Compl. ¶¶ 46, 50. More specifically, the Complaint alleges the following cultural and operational differences between FFO and the targeted businesses.

> First, Mattress & More operated standalone mattress stores, whereas FFO sold a variety of furniture and accessories under one roof. Thus, FFO would be acquiring an entirely new category of retail stores dedicated to bedding and related accessories. Second, both Mattress & More and Furniture Liquidators utilized a "high/low" pricing strategy which encouraged in-store negotiations over the sticker price, and was fundamentally different than the everyday low price strategy utilized by FFO, where the prices were fixed and non-negotiable. Third, Mattress & More and Furniture Liquidators' customers skewed more middle-income, whereas FFO catered to a lower-to-middle income customer base. Fourth, and relatedly, there was an inventory mismatch among the businesses—specifically, the goods sold by Mattress & More and Furniture Liquidators were not suited to FFO's existing customer base. Finally, the

29

- "[I]gnored that the mattress industry was 'softening' at the time of the transaction, leading to aggressive price cuts and several notable bankruptcies by large mattress firms, which flooded the market with inexpensive competing products."[121]

- "[F]ailed to appreciate or consider the significant cultural differences between FFO and the target companies of the Kentucky Acquisition ... that would cause ... problems when FFO attempted to integrate the new businesses into FFO." [122]

The Complaint further alleges that following the Kentucky Acquisition:

- Mattress & More stores underperformed expectations under FFO's stewardship and sales revenues declined.[123]

- Furniture Liquidators change from a "high/low ('haggling') pricing model to FFO's everyday low price strategy" led to decreased sales and revenue; and the "retirement sale" saturated the market, reducing demand, and, as a result, "FFO was saddled with excess inventory it was unable to sell."[124]

- The Kentucky Acquisition D&Os "oversaw FFO's waste of significant time and resources attempting to convert and integrate" the two businesses.[125]

- "[T]he costs associated with these efforts exceeded initial projections by millions of dollars" and the synergies between the business never materialized."[126]

- The Kentucky Acquisition D&Os' errors surrounding the Kentucky Acquisition were acknowledged in a series of internal FFO/Sun Capital presentations, which demonstrate, the complete failure of the diligence process and the viability of the Trustee's claims.[127]

---

original and acquired businesses utilized different methods of distribution, with Mattress & More and Furniture Liquidators shipping from outside warehouses, and FFO maintaining its inventory solely in stores. In sum, Mattress & More and Furniture Liquidators were fundamentally different in significant, and ultimately incompatible, ways with FFO's existing business.

Amend. Compl. ¶ 46.

[121] Amend. Compl. ¶ 49.

[122] Amend. Compl. ¶ 49.

[123] Amend. Compl. ¶¶ 55-56.

[124] Amend. Compl. ¶¶ 56-57.

[125] Amend. Compl. ¶¶ 58-59.

[126] Amend. Compl. ¶¶ 60-61.

[127] Adv. D.I. 34 at 15.

The Court concludes, based on these allegations, the Complaint states a plausible claim for breach of the duty of care. The facts, when viewed in the light most favorable to the Trustee, give rise to the reasonable inference that the Kentucky Acquisition D&Os failed to use the amount of care ordinarily careful and prudent men would use in similar circumstances and failed to inform themselves when undertaking the Kentucky Acquisition.

Additionally, the Court rejects the D&Os' argument regarding retroactive fiduciary obligations. The Complaint alleges the lack of action or inaction by the Kentucky Acquisition D&Os in conducting due diligence in relation to the acquisitions. Although the Trustee asserts wrongdoing against the Kentucky Acquisition D&Os after the fact, the allegations are still within the confines of a duty of care claim.

Finally, the D&Os' argument that the claims against them are protected by the business judgment rule fails. In *Tower Air, Inc.*,[128] the Third Circuit held that although the business judgment rule is a "presumption that directors act in good faith, on an informed basis, honestly believing that their action is in the best interest of the company," it is an affirmative defense that should not be considered at the motion to dismiss stage unless the plaintiff raises the business judgment rule on the face of the complaint. Here, the Trustee did not raise the business judgment rule on the face of the Complaint, and the D&Os acknowledge in their reply brief that "the Complaint does not explicitly reference the business judgment rule."[129] Consequently, the Court will not consider the business judgment rule at the motion to dismiss stage.

---

[128] *In re Tower Air, Inc.*, 416 F.3d at 238 (citations omitted).

[129] Adv. D.I. 36 at 5.

31

Therefore, viewed in the light most favorable to the Trustee, the facts give rise to the reasonable inference that the D&Os have breached their duty of care. The D&Os Motion to Dismiss Count 1 will be denied.

### C. Count 2: Transfer D&Os' Breach of Fiduciary Duties

Count 2 of the Complaint alleges that the Transfer D&Os (Defendants Borell, Klafter, McConvery, Roglaski, Zigerelli, and Feinberg) breached their fiduciary duties by failing to act in good faith and intentionally and knowingly permitted, and in certain instances, gave approval for, FFO to make certain transfers to Sun Capital, which amounted to unlawful fraudulent transfers, improper transfers, and/or a breach of the LLC Agreements.[130] The Complaint alleges these transactions were for the sole benefit of Sun Capital when FFO was insolvent or in the zone of insolvency.[131]

The four alleged fraudulent transfers from FFO to Sun Capital include: (i) from January 2017 through January 2018, at least $750,934 on account of management fees and reimbursement expenses; (ii) on February 6, 2018, a $72,500 management fee in connection with the Kentucky Acquisition; (iii) from April 2018 through January 2019, at least $665,347 on account of management fees and reimbursement expenses; and (iv) on August 17, 2018, $1,488,781 as repayment for the Grid Notes (collectively, the "Transfers").[132]

---

[130] Amend. Compl. ¶ 86.

[131] Amend. Compl. ¶86.

[132] Amend. Compl. ¶ 122.

The D&Os argue that Count 2 should be dismissed for failure to state a claim because the Count fails to "'allege specific conduct by each individual officer or director in authorizing the challenged transaction.'"[133] The D&Os contend that "the well-pled facts that a Trustee must set forth to show that Defendants caused Fraudulent Transfers include (1) the specific facts as to which transactions a particular defendant authorized [and] (2) what authority a particular defendant had to approve such transactions."[134] The D&Os argue the Complaint fails as to all four Transfers.

The Trustee claims that following the Kentucky Acquisition, "Sun Capital continued to profit while burdening FFO with additional financial obligations."[135] The Complaint alleges that the D&Os approved the Transfers, each of which constituted a separate breach of the duty of loyalty by the Transfer D&Os, and that the Transfers were approved due to the "oversight of interested Boards and management teams that lacked independence."[136]

In support of the Trustee's argument, the Complaint alleges a lack of disinterestedness on part of the Transfer D&Os at the time the Transfers were made because at all relevant times "Sun Capital dominated FFO's respective Boards, each of which were comprised by two Sun Capital appointees on a three-member board."[137]

---

[133] Adv. D.I. 32 at 22 (*quoting Miller v. ANConnect LLC (In re Our Alechemy, LLC)*, No. 16-11596 (KG), 2019 WL 4447535, at *6 (Bankr. D. Del. Sept. 16, 2019)).

[134] Adv. D.I. 32 at 22 (cleaned up).

[135] Adv. D.I. 34 at 5-6.

[136] Amend. Compl. ¶¶ 84-87, *see also* D.I. 34 at 18.

[137] Amend. Compl. ¶ 40. At the time, the Board consisted of Roach, Borell, and Zigerelli. Roach and Borell were Sun Capital appointees. Amend. Compl. ¶ 41.

In order to assert a breach of the duty of loyalty claim, a plaintiff need only prove that the defendant was on both sides of the transaction.[138] "When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain."[139] Public policy demands of a corporate officer or director to "protect the interests of the corporation committed to his charge" and "refrain from doing anything that would work injury to the corporation."[140] "The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest."[141]

Viewing the facts alleged in the Complaint in the light most favorable to the Trustee, Sun Capital controlled the FFO Board, making it plausible that the D&Os were on both sides of the transaction and benefitted at the expense of FFO. Therefore, there is a reasonable inference that the Transfer D&Os breached their duty of loyalty in approving the Transfers. The D&Os Motion to Dismiss Count 2 will be denied.

### D.  Count 3: Insider Loan D&Os' Breach of Fiduciary Duties

Count 3 alleges that the Insider Loan D&Os (Defendants Borell, Crosby, Klafter, McConvery, Rogalski, Mullany, Zigerelli, and Feinberg) breached their fiduciary duty by failing to "act in good faith and intentionally and knowingly permitted FFO to incur significant insider

---

[138] *Miller v. McCown De Leeuw & Co. (In re Brown Sch.)*, 386 B.R. 37, 47 (Bankr. D. Del. 2008).

[139] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983) (citation omitted); *In re The Brown Sch.*, 386 B.R. at 47 ("The burden then shifts to the defendant to prove that the transaction was entirely fair.").

[140] *Weinberger*, 457 A.2d at 710 (internal quotations marks omitted, *quoting Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. Supr. 1939).

[141] *Id.* (internal quotations marks omitted; *quoting Guth*, 5 A.2d at 510).

debt to Sun Capital in the form of the Grid Notes and the Sun Credit Agreement, which were in reality equity contributions, for the sole benefit of Sun Capital at the expenses of the estates at a time when FFO was undercapitalized, and was insolvent or in the zone of insolvency."[142]

The D&Os argue that Count 3 should be dismissed for failure to state a claim because it proceeds on a theory of "deepening insolvency" which is not recognized under Delaware law.[143] They contend that the Trustee attempts to convert a "simple business failure into a breach of fiduciary duty through a non-existent theory of 'deepening insolvency.'"[144]

In response, the Trustee acknowledges that a plaintiff may not plead an independent cause of action for deepening insolvency, but argues, based on *In re Brown Schools*, that "the invalidity of that cause of action 'does not absolve directors of insolvent corporations of responsibility. Rather, it remits plaintiffs to the contents of their traditional toolkit, which contains ... causes of action for breach of fiduciary duty.'"[145] The Trustee argues that the Insider Loan D&Os knowingly oversaw FFO's acceptance of insider funding structured as "loans" or "notes" in circumstances where Sun Capital was the only party to benefit from structuring disguised as equity infusions. Further, the Trustee contends that "relevant documents were executed by Insider Loan D&Os standing on both sides of the transaction, despite failing to seek funding from any third-party sources or approval from independent manager or officers, and

---

[142] Amend. Compl. ¶¶ 89-90.

[143] Adv. D.I. 32 at 25.

[144] Adv. D.I. 32 at 26.

[145] Adv. D.I. 34 at 20 (*citing In re Brown Schools*, 386 B.R. at 46).

without any financial or legal consideration."[146]  The Trustee maintains that these facts articulate

self-interested and grossly negligent decision-making by the Insider Loan D&Os in violation of

the fiduciary duties of care and loyalty.

The parties are correct that Delaware law does not recognize the theory of "deepening

insolvency."[147]  "Even when a firm is insolvent, its directors may, in the appropriate exercise of

their business judgment, take action that might, if it does not pan out, result in the firm being

painted in a deeper hue of red."[148]

The Trustee argues that Count 3 is not premised on the theory of deepening insolvency or

that the Insider Loan D&Os "should have filed for bankruptcy rather than enter into challenging

transactions."[149]  The Trustee claims that the Insider Loan D&Os violate the duty of care and

loyalty by the following:

- "Despite sales being down 30%, on May 1, 2019, Sun Capital provided FFO
  with $1.2 million, and on May 15, 2019, Sun Capital provided FFO with
  another $2.5 million . . .  At this time, the May 2019 Fundings were not
  documented."[150]
- "[O]n June 28, 2019, Outlet and Bedding, as borrowers, Holding LP and
  certain of its subsidiaries, as guarantors and Sun Capital, through Note
  Holdings, entered into a Second Lien Credit Agreement, for a $6 million loan
  purportedly secured by a second lien on all of FFO's assets, consisting of the

---

[146]  Adv. D.I. 34 at 21.

[147]  *Trenwick Am. Litig. Trust*, 906 A.2d at 174 ("Refusal to embrace deepening insolvency as a cause of action is
required by settled principles of Delaware law.").

[148]  *Id.*

[149]  D.I. 34 at 20 (*citing Official Comm. Of Unsecured Creditors of Midway Games Inc. v. Nat'l Amusements Inc. (In
re Midway Games Inc.)*, 428 B.R. 303, 315 (Bankr. D. Del. 2010)).

[150]  Amend. Compl. ¶ 73.

May 2019 Fundings of $3.7 million, as well as $2.3 million in additional funding."[151]

- "Unlike prior secured debt, the Sun Credit Agreement accrued interest in kind and could be repaid without any prepayment premiums or penalties."[152]

- "[N]either the Boards, nor anyone un-affiliated with Sun Capital, approved or gave any formal consideration to either the May 2019 Fundings or entry into the Sun Credit Agreement. Rogalski signed the Sun Credit Agreement on behalf of each of the FFO Entities, as borrowers and guarantors, and on behalf of Note Holdings, as lender."[153]

- "On September 13, 2019, Sun Capital funded an additional $1 million to FFO without any documentation."[154]

- "It was not until September 18, 2019, the parties amended the Sun Credit Agreement to provide for an additional $3 million loan to FFO, of which $1 million was previously funded."[155]

- "On November 27, 2019, the parties again amended the Sun Credit Agreement for an additional $2 million in funding to FFO."[156]

- "[N]either the Boards, nor anyone un-affiliated with Sun Capital, approved or gave any formal consideration to the Sun Credit Agreement Amendments. Mullany signed the Sun Credit Agreement Amendments on behalf of each of the FFO Entities, as borrowers and guarantors, and on behalf of Note Holdings, as lender."[157]

- "During this time FFO did not seek funding from any additional sources other than Sun Capital."[158]

At bottom, the Complaint alleges the Insider Loan D&Os knowingly oversaw FFO's acceptance

of insider funding structured as "loans" or "notes" in circumstances where Sun Capital was the

---

[151] Amend. Compl. ¶ 73.

[152] Amend. Compl. ¶ 73.

[153] Amend. Compl. ¶ 73.

[154] Amend. Compl. ¶ 74.

[155] Amend. Compl. ¶ 74.

[156] Amend. Compl. ¶ 74.

[157] Amend. Compl. ¶ 74.

[158] Amend. Compl. ¶ 74.

only party to benefit from structuring the transactions in this manner.[159]  These allegations go to

the Board's decision-making process, the relationship with Sun Capital, and violations of the

duties of care and loyalty, and are not a disguised deepening insolvency claim.

Viewing the facts in the light most favorable to the Trustee, the Complaint gives rise to

the reasonable inference that the Insider Loan D&Os did not exercise the duties of care and

loyalty in entering the transactions with Sun Capital which resulted in the alleged harm to FFO.

Therefore, the D&Os Motion to Dismiss Count 3 will be denied.

### E.  Count 11: LLC Agreements Count

Count 11 alleges that the Transfer D&Os breached Section 9 of the LLC Agreements by

causing wrongful distributions to Sun Capital.[160]  Count 11 alleges, in the alternative, that if Sun

Capital is not a member of the LLCs, then the Transfer D&Os breached Section 9 by causing

unlawful distributions to a non-member.[161]

#### i.    *Sun Capital is not a member under the LLC Agreements*

Section 9 of the LLC Agreements, entitled "Distributions," provides:

> Distributions shall be made to the Members in accordance with
> their Percentage Interests at the times and in the aggregate amounts
> determined by the Board.  Notwithstanding any provision to the
> contrary contained in this Agreement, the Company shall not be
> required to make a distribution to the Members on account of their
> interest in the Company if such distribution would violate Section

---

[159] Amend. Compl. ¶ 90. *See also* Amend. Compl. ¶ 69.

[160] Amend. Compl. ¶¶ 142-149.

[161] Amend. Compl. ¶ 148.

18-607 of the Act [Delaware Limited Liability Company] (the "DLLC") or any other applicable law."[162]

Section 18-607(b) of the DLLC Act "provides that if an LLC member receives a distribution that results in the LLC becoming insolvent, and knew at that time that the LLC would become insolvent as a result of the distribution, the LLC member is liable to the LLC for the amount of the distribution."[163]  The DLLC Act affords parties with broad discretion in drafting LLC agreements and ensures that such agreements will be honored and given maximum effect by a reviewing court.[164]

The D&Os seek to dismiss Count 11 for failure to plead adequately any underlying breach because the Transfers did not constitute "wrongful distributions" under 6 Del. C. § 18-607, and even if they did, Section 9 of the LLC Agreements does not affirmatively bar distributions that could potentially violate section 18-607.  The D&Os further argue that the Complaint fails to identify any relevant contractual obligation that would give rise to a claim against any of the D&Os.[165]

The Trustee argues that to adequately plead a cause of action under the LLC Agreements (and Section 18-607), the Trustee need only plead that the relevant Boards determined to make a distribution to a member which resulted in in the LLC becoming insolvent, and that the member

---

[162] *See* Amend. Compl. ¶ 143; Bedding LLC Agreement, § 9; Outlet LLC Agreement, § 9; FFH LLC Agreement, § 9.

[163] *Pepsi-Cola Bottling Co. of Salisbury, Md. v. Handy*, C.A. 1973-S, 2000 WL 364199, *3 (Del. Ch. Mar. 15, 2000).

[164] *A&J Capital, Inc. v. Law Office of Krug*, C.A. No. 2018-0240-JRS, 2018 WL 3471562, at *5 (Del. Ch. July 18, 2018).

[165] Because it has been determined that the Trustee did not utilize group pleading, the Court will only address the D&Os remaining arguments.

had knowledge that the transfer would render the LLC insolvent. The Trustee also disputes the D&Os interpretation of Section 9 of the LLC Agreements, maintaining that the language that FFO "not be required" to engage in conduct that is otherwise a violation of the law can reasonably be interpreted as prohibiting that conduct.[166]

Section 9 of the LLC Agreements addresses distributions to *members* of the LLC. Section 18-607(b) of the DLLC Act addresses an LLC *member's* receipt of a distribution and a *member's* liability to the LLC for wrongful distributions. As discussed below with respect to the Sun Capital Motion to Dismiss Count 10, Sun Capital was not a member of Bedding, Outlet, or FFH, the LLC's that issued the Transfers.[167] Consequently, because Sun Capital was not a member under the LLC Agreements and Section 9 only relates to members, the Trustee does not plead a plausible claim for breach of Section 9 of the LLC Agreements with regard to a distribution to "member" Sun Capital.

### ii.    *Breach of Contract for Distribution to Non-Member Sun Capital*

The Trustee alleges, in the alternative, that "to the extent Sun Capital is deemed to not be a member of Bedding, Outlet or FFH, then the Transfer D&Os breached Section 9 by causing unlawful distributions to a non-member."[168] As mentioned above, Section 9 states:

---

[166] Adv. D.I. 34 at 23.

[167] *In re Hosp. Acquisition LLC*, 625 B.R. 835, 841 (Bankr. D. Del. 2020) (footnote and citation omitted) ("When interpreting a contract under Delaware law, the contract is construed using the objective theory of contracts. This means that the terms of the contract should be given the meaning which would be understood by an objective, reasonable third-party, and that the terms of a clear and unambiguous contract will be interpreted according to their ordinary meaning.").

[168] Amend. Compl. ¶ 148.

"Distributions shall be made to the Members . . . ."[169] Here, the Transfer D&Os are bound by the

plain meaning of the LLC Agreements.[170] For that reason, it is plausible that the Transfers to

non-member Sun Capital is a violation of Section 9 of the LLC Agreement.

> ### *iii.    Conclusion as to Count 11*

The D&Os Motion to Dismiss Count 11 will be granted, in part, and denied, in part.

## CONCLUSION REGARDING THE D&Os MOTION TO DISMISS

As discussed above, the Complaint pleads plausible claims for breach of fiduciary duty as

to Counts 1 (except as to Feinberg), 2 and 3.  As to Count 11, the Complaint does not state a

plausible claim for breach of the LLC Agreements as to a *member* but does state a plausible

claim for breach of the LLC Agreements as to a distribution to a non-member.  As a result, the

D&Os Motion to Dismiss will be granted in part, and denied, in part, as to Counts 1 and 11; and

denied as to Counts 2 and 3.

## SUN CAPITAL MOTION TO DISMISS

Sun Capital requests the Court dismiss Counts 4, 5, and 6 of the Complaint for aiding and

abetting breach of fiduciary duty (the "Aiding & Abetting Counts"); Count 7 of the Complaint

for recharacterization of various "notes" that Sun Capital made to FFO (the "Recharacterization

Count"); Count 8 of the Complaint for equitable subordination of Sun Capital's claims (the

"Equitable Subordination Count"); and Count 10 of the Complaint for wrong distribution of

---

[169] LLC Agreements, § 9.

[170] *In re Sols. Liquidation LLC*, 608 B.R. at 406 (holding that "the Parties are bound by [the LLC Agreement] plain meaning").

various transfers made by FFO to Sun Capital (the "Wrongful Distribution Count"). The allegations stem from Sun Capital's acquisition of FFO in 2016 and the events that followed, including Sun Capital's purported substantial control over FFO's businesses, the Kentucky Acquisition, and the alleged strain that was put on FFO's liquidity – including various "loans" made from Sun Capital to FFO and fees paid from FFO to Sun Capital. As set forth in detail below, the Complaint alleges plausible claims for aiding and abetting breach of fiduciary duty, recharacterization, and equitable subordination, but not a plausible claim for wrong distribution.

## I.   Counts 4, 5, 6: Aiding & Abetting Counts

To state a claim for aiding and abetting a breach of fiduciary duty, the plaintiff must allege: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach."[171]

Sun Capital argues that the Trustee did not adequately plead that the D&Os breached any fiduciary duty, thereby failing to establish that Sun Capital aided and abetted such breach. Sun Capital further asserts that the Trustee failed to plead specific facts that any particular Sun Capital entity knowingly participated in the D&Os' alleged breach of their fiduciary duties. Sun Capital maintains that the Trustee must demonstrate that the aider and abettor had actual or

---

[171] *NHB Assignments LLC v. Gen. Alt. LLC (In re PMTS Liquidating Corp.)*, 526 B.R. 536, 546 (D. Del. 2014) (cleaned up) (*quoting Shamrock Holdings v. Arenson*, 456 F.Supp.2d 599, 610 (D. Del. 2006) (further citation omitted)).

constructive knowledge that their conduct was legally improper and that the Trustee's conclusory statements fail to adequately plead scienter or improper motive.

In response, the Trustee alleges that Sun Capital held a sufficiently high position, and participated in the Boards' decisions, so that the Boards' knowledge could be imputed to Sun Capital. The Trustee continues that Sun Capital directed the Boards' breach of fiduciary duty both through its representatives on FFO's Boards and management teams, and as FFO's consultant. More specifically, the Trustee claims that (i) Sun Capital and FFO Board member Borell served on Sun Capital's "Deal Team" that led the Kentucky Acquisition and presented the transaction to FFO; (ii) non-party Board member Roach served on Sun Capital's "Ops Team" which provided operational support, guidance, and counsel to FFO's management in connection with the transaction; and (iii) two of Sun Capital's representatives, Defendants Klafter and McConvery, were involved in conducting "flawed" diligence on, and ultimately approving, the transaction.[172] In addition, the Trustee alleges Sun Capital exercised significant control over FFO through its consulting arrangement, whereby Sun Capital closely supervised and regularly directed FFO's managements and operations. In sum, the Trustee alleges that Sun Capital was effectively the Board, controlled management, and had complete control over FFO's direction and strategy.

Sun Capital replies that the alleged conduct must purposely induce a breach of the Board's duty of care and that the Trustee did not allege such conduct in the Complaint. It argues

---

[172] Adv. D.I. 33 at 10-11.

the Trustee must allege something more than Sun Capital simply "dominated" or "ran" FFO through its D&Os.

Sun Capital challenges two of the four elements of the claim for aiding and abetting a breach of fiduciary duty. The Court first considers whether the Trustee's claims for breach of fiduciary duty by the D&Os meet the pleading standard to survive a motion to dismiss.[173] As discussed above, the Court finds that the Trustee has met his pleading burden as to Counts 1 (except as to Feinberg), 2, and 3. Because the Court finds that these counts for breach of the fiduciary duty of care and loyalty are plausible, the Trustee can maintain claims against Sun Capital for aiding and abetting such breaches.

Next, the Court addresses Sun Capital's argument that the Trustee has not alleged that Sun Capital "knowingly participated" in the D&Os' alleged breach of their fiduciary duties. "To establish *scienter*, the plaintiff must demonstrate that the aider and abettor had 'actual or constructive knowledge that their conduct was legally improper.' Accordingly, the question of whether a defendant acted with scienter is a factual determination."[174] At this stage of the litigation, it is enough for the Trustee to plead that Sun Capital had material information that it purposely failed to disclose.[175]

---

[173] Sun Capital has not raised whether a fiduciary relationship existed or whether the Trustee sufficiently pleaded that damages were proximately caused by the (alleged) breach. Thus, the Court will not address these two factors in the Counts for aiding and abetting breach of fiduciary duty.

[174] *RBC Cap. Markets, LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015) (citations and footnotes omitted). *Neurvana Med., LLC v. Balt USA*, LLC, No. CV 2019-0034-KSJM, 2020 WL 949917, at *14 (Del. Ch. Feb. 27, 2020) (citations and footnote omitted) (Well-pleaded facts must allege that the "aider and abettor acted with 'scienter,' or 'knowingly, intentionally or with reckless indifference.'").

[175] *In re Tribune Co. Fraudulent Conv. Litig.*, No. 11MD2296 (DLC), 2019 WL 294807, at *27 (S.D.N.Y. Jan. 23, 2019), *aff'd in part, vacated in part, remanded*, 10 F.4th 147 (2d Cir. 2021); *Almond for Almond Fam. 2001 Tr. v.*

The Trustee alleges that Sun Capital's own employees comprised over half of the individual board members who allegedly breached fiduciary duties.[176] Sun Capital held two seats on each of FFO's three-member Boards.[177] The Trustee alleges that, through its representatives on the FFO Boards and management teams, as well as its role as "consultant," Sun Capital directed the breaches of fiduciary duty. In other words, the Trustee claims that the members of the Boards were the primary wrongdoers, and their knowledge was imputed to Sun Capital.

The Delaware Court of Chancery has held:

> When the fiduciary and primary wrongdoer is also a representative of the secondary actor who either controls the actor or who occupies a sufficiently high position that his knowledge is imputed to the secondary actor, then the test is easier to satisfy. For example, this court has recognized that the acquisition vehicles that a controlling stockholder uses to effectuate an unfair freeze-out merger are liable as aiders and abettors to the same degree as the controller, because the controller's knowledge is imputed to those entities. This court also has employed the same reasoning to recognize that an investment fund can be liable for aiding and abetting when "the same individuals who have made the Fund's investment decisions" are also the fiduciaries who engaged in misconduct.[178]

Here, the Trustee argues that Sun Capital wielded substantial control over the FFO operations and was not merely involved in the (alleged) breaches of fiduciary duties but directed

---

*Glenhill Advisors LLC*, C.A. No. CV 10477-CB, 2018 WL 3954733, at *32 (Del. Ch. Aug. 17, 2018), *aff'd sub nom. Almond as Tr. for Almond Fam. 2001 Tr. v. Glenhill Advisors, LLC*, 224 A.3d 200 (Del. 2019) (citations, footnotes, and quotation marks omitted) ("Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach.").

[176] *See* Amend. Compl. ¶¶ 12-15, 41, 50.

[177] *See* Amend. Compl. ¶¶ 40-41.

[178] *In re PLX Tech. Inc. S'holders Litig.*, No. CV 9880-VCL, 2018 WL 5018535, at *49 (Del. Ch. Oct. 16, 2018), aff'd, 211 A.3d 137 (Del. 2019) (citations and footnotes omitted).

45

them. For example, the Trustee alleges Sun Capital pitched the Kentucky Acquisition to FFO in the first instance and provided the "due diligence."[179] The Trustee contends that Sun Capital worked through the FFO Boards and management team to steer the integration and conversion efforts of the Kentucky Acquisition.[180]

Both parties rely on *Morrison v. Berry* in support of their position. In that case, the plaintiff alleged breach of fiduciary duty and aiding and abetting breach of fiduciary duty against the company's financial advisor, counsel, and the acquiror.[181] The plaintiff alleged that the law firm aided and abetted the board's breach of fiduciary duty by causing the board to carelessly draft and release a schedule with material omissions.[182] The Chancery Court held that the allegations fell well-short of well-pled allegations of scienter.[183]

The Trustee alleges the current facts are distinguishable because in *Morrison* the law firm did not hold board or management positions. Sun Capital argues the holding in *Morrison* did not revolve around the law firm's position but the allegations of "intentionally and knowingly" causing the *Morrison* board to be careless in their drafting.

The Court finds the *Morrison* Court's analysis regarding the financial advisor's role more analogous to the allegations pleaded here. In *Morrison*, the advisor was alleged to use

---

[179] *See* Amend. Compl. ¶¶ 42, 45, 46-49, 51.

[180] *See* Amend. Compl. ¶¶ 39, 54-62.

[181] *Morrison v. Berry*, C.A. No. 12808-VCG, 2020 WL 2843514, at *1-2 (Del. Ch. June 1, 2020).

[182] *Id.* *11.

[183] *Id.*

46

backchannel conversations with the acquiror to gain insight and favorable treatment for the

acquiror.[184]

Similarly, here, Sun Capital is alleged to have:

- Used its own Board members and exercised majority control over the FFO Boards to make the Kentucky Acquisition.[185]
- Used its consulting agreement with FFO to not only exercise significant control over FFO's operations but also collect a management fee.[186]
- Pushed through the Kentucky Acquisition without proper due diligence for its own gain.[187]
- Created an information vacuum by not performing due diligence with regard to the Kentucky Acquisition.[188]
- Failed to consider the differing business models between FFO and the Kentucky Acquisition companies.[189]
- Closely supervised and regularly directed FFO's management and operations, including through monthly financial reviews attended by the management team and Sun Capital.[190]
- Put significant debt on FFO through the Grid Notes and Sun Credit Agreement.[191]

Between making up a majority of each FFO Board, being involved in the day-to-day FFO

business, serving as lender on the Grid Notes and the Sun Credit Agreement, as well as

orchestrating and consulting on the Kentucky Acquisition, it is reasonable to infer that Sun

Capital knew the FFO Boards were breaching their fiduciary duties and committing these acts

---

[184] *Id.* at *10.

[185] Amend. Compl. ¶¶ 39-40, 42-53.

[186] Amend. Compl. ¶¶ 42-53.

[187] Amend. Compl. ¶¶ 47-49.

[188] Amend. Compl. ¶ 95.

[189] Amend. Compl. ¶¶ 42-53.

[190] Amend. Compl. ¶ 39.

[191] Amend. Compl. ¶¶ 54-67.

intentionally and knowingly.  As such, the Sun Capital Motion to Dismiss Counts 4, 5, and 6 will be denied.

## II.    Count 7: Recharacterization Count

In Count 7 of the Complaint, the Trustee seeks to recharacterize the Grid Notes and the Sun Credit Agreement (amounting to approximately $28 million in outstanding principal and interest) as equity.

"The Third Circuit has held that the overarching inquiry with respect to recharacterizing debt as equity is whether the parties to the transaction in question intended the loan to be a disguised equity contribution."[192]  While "[n]o mechanistic scorecard suffices," the parties' intent "may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstance."[193]  "No one factor is dispositive of either the intent of the parties or whether a loan should be recharacterized as equity.  And a court can find recharacterization to be appropriate even if less than all of the factors weigh in favor of a capital contribution."[194]  Furthermore "in characterizing an instrument as debt or equity, a court must focus its inquiry to a point at the very beginning of the parties' relationship."[195]

---

[192]  *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.),* 405 B.R. 527, 554 (Bankr. D. Del. 2009) (citing *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.),* 432 F.3d 448, 455–56 (3d Cir. 2006)).

[193]  *SubMicron,* 432 F.3d at 456; *In re Optim Energy, LLC,* No. 14–10262 (BLS), 2014 WL 1924908 at *7 (Bankr. D. Del. 2014).

[194]  *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.),* 544 B.R. 75, 94 (Bankr. S.D.N.Y. 2016) (footnotes and citations omitted).

[195]  *United States v. State St. Bank & Tr. Co.,* 520 B.R. 29, 74 (Bankr. D. Del. 2014) (citations omitted).

Courts have considered the following factors in considering recharacterization, commonly referred to as the *Autostyle* test: (a) names given to the instruments, if any, evidencing the indebtedness; (b) presence or absence of a fixed maturity date and a schedule of payments; (c) no fixed rate of interest and interest payments; (d) whether repayment depended on success of the business; (e) inadequacy of capitalization; (f) identity of interests between creditor and stockholder; (g) security, if any, for the advances; (h) ability to obtain financing from outside lending institutions; (i) extent to which the advances were subordinated to the claim of outside creditors; (j) the extent to which the advances were used to acquire capital assets; (k) presence or absence of a sinking fund; (l) presence or absence of voting rights; and (m) other considerations.[196]

As instructed by the Third Circuit, the Court will look at the totality of the facts in evaluating the Grid Notes and Sun Credit Agreement[197]

## A. Names Given to Instruments, if any, Evidencing the Indebtedness

"The absence of notes or other instruments of indebtedness is a strong indication that the advances were capital contributions and not loans."[198]

---

[196] *In re Our Alchemy, LLC*, No. 16-11596 (KG), 2019 WL 4447535 at *6 (*quoting Lipscomb v. Clairvest Equity Partners Ltd. P'ship (In re LMI Legacy Holdings, Inc.)*, No. 13-12098 (CSS), 2017 WL 1508606, at *14 (Bankr. D. Del. Apr. 27, 2017), *aff'd*, 625 B.R. 268 (D. Del. 2020) (further citation omitted); *see also Youngman v. Yucaipa Am. Alliance Fund I, L.P. (In re Ashinc Corp.)*, 629 B.R. 154, 225 (Bankr. D. Del. 2021), *order adopted in part, rejected in part sub nom. In re ASHINC Corp.*, No. 1211564, 2022 WL 2666888 (D. Del. July 11, 2022) (considering seven factors "(1) the name given to the instrument; (2) the intent of the parties; (3) the presence or absence of a fixed maturity date; (4) the right to enforce payment of principal and interest; (5) the presence or absence of voting rights; (6) the status of the contribution in relation to regular corporate contributors; and (7) certainty of payment in the event of the corporation's insolvency or liquidation.").

[197] *In re Our Alchemy, LLC*, No. 16-11596 (KG), 2019 WL 4447535 at *6 (citations omitted).

[198] *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 750 (6th Cir. 2001) (*citing Roth Steel Tube Co. v. Comm'r*, 800 F.2d 625, 631 (6th Cir. 1986) (further citation omitted)).

49

###### i.    *Grid Notes*

Sun Capital claims that the Grid Notes include principal amounts, interest rates, payment terms, events of default, and remedies. The Trustee responds that this factor should not be given much weight due to Sun Capital's sophisticated nature and knowledge of recharacterization. This factor weighs against recharacterization of the Grid Notes.

###### ii.    *Sun Credit Agreement*

Sun Capital claims that the Sun Credit Agreement contains an interest rate, borrowing conditions, and is referred to as a loan. The Trustee alleges that because Sun Capital dominated the FFO Boards, the Sun Credit Agreement and advances thereunder were all executed by the same FFO individuals on behalf of the "lender" and "borrower."[199] Moreover, the Trustee alleges that the May 2019 Fundings and the September 2019 Fundings were made initially without documentation.[200] Although the Trustee adequately pleads timing and execution issues, the name of the instrument, Sun Credit Agreement, indicates a loan.[201] This factor weighs against recharacterization of the Sun Credit Agreement.

### B. Presence or Absence of a Fixed Maturity Date and a Schedule of Payments

"The lack of a fixed maturity date or a fixed obligation to repay suggests the advances were not loans but equity contributions."[202]

---

[199] Amend. Compl. ¶¶ 40, 73-74.

[200] Amend. Compl. ¶¶ 73-74.

[201] See *Official Committee of Unsecured Creditors v. Comvest Group Holdings, LLC (In re HH Liquidation, LLC)*, 590 B.R. 211, 292 (Bankr. D. Del. 2018) ("The instrument's name clearly evidences a secured loan.").

[202] *In re Our Alchemy, LLC*, No. 16-11596 (KG), 2019 WL 4447535 at *7 (citations omitted).

50

### i.    Grid Notes

Sun Capital acknowledges that the Grid Notes do not contain an interim, periodic

payment schedule.[203]  The Grid Notes do contain a maturity date, allowance for prepayment –

however, such prepayment is "without premium or penalty."[204]  In *In re Friedman's Inc.*, the

note was payable over four years after entry into the notes with no interim payment of

principal.[205]  Although there was a fixed maturity date, the company was not required to make

any principal payments over the four-year life of the notes, thus, the *Friedman's Inc.* court found

that this factor was neutral.[206]  Here, although there is a fixed maturity date, FFO was not

required to make any principal payments for over four years.  Therefore, this factor is neutral.

### ii.    Sun Credit Agreement

The Sun Credit Agreement specifies a "Term Loan Maturity Date" and contemplates a

schedule of "pre-payments" under particular circumstances.[207]  Like the Grid Notes, although

there is a maturity date, the [borrowers] Debtors were not required to make any principal

payments.[208]  Therefore, this factor is neutral.[209]

---

[203] *See* Adv. D.I. 30, Ex. B, § 2, at A005-006.

[204] *See* Adv, D.I. 30, Ex. B § 2(b), at A005.

[205] *Friedman's Liquidating Tr. v. Goldman Sachs Credit Partners, L.P. (In re Friedman's Inc.)*, 452 B.R. 512, 520 (Bankr. D. Del. 2011).

[206] *In re Friedman's Inc.*, 452 B.R. at 520.

[207] *See* Adv. D.I. 30, Ex. C, § 1.01, A044 and § 2.03(b), A048-A049.

[208] *See* Adv. D.I. 30, Ex. C, § 2.03(a), A048.

[209] *See In re Friedman's Inc.*, 452 B.R. at 520.

### C.  No Fixed Rate of Interest and Interest Payments

The absence of a fixed rate of interest and interest payment "is a strong indication the investment was a capital contribution, rather than a loan."[210]

#### i.    Grid Notes

The Grid Notes bore interest and such interest was payable-in-kind and was deferred until the "schedule payment" date.[211] So although there was an interest rate, the interest accrued and was added to the principal amount of the Grid Note.[212] "[D]eferral of interest payments does not by itself mean that the parties converted a debt transaction to equity since the defendants still expected to be repaid."[213] Therefore, this factor is neutral.

#### ii.    Sun Credit Agreement

The Sun Credit Agreement bore interest and such interest was payable-in-kind (not in cash) and was deferred until the payment date.[214] So although there was an interest rate, the interest accrued and was added to the principal amount of the Sun Credit Agreement.[215] Therefore, this factor is neutral.

---

[210] *Id.* at 521.

[211] Adv. D.I. 30, Ex. B, § 1, A005.

[212] Adv. D.I. 30, Ex. B, § 1, A005 ("Interest shall accrue on a daily basis at the rate of eleven percent (11%) per annum, compounded annually, on the unpaid principal amount of this note then outstanding.").

[213] *AutoStyle*, 269 F.3d at 751; *Off. Unsecured Creditors Comm. of Broadstripe, LLC v. Highland Cap. Mgmt, L.P. (In re Broadstripe, LLC)*, 444 B.R. 51, 96 (Bankr. D. Del. 2010) ("presence of PIK interest is not decisive" of the recharacterization analysis "especially in a distressed investment context."). *See also State Street Bank*, 520 B.R. at 79 ("The Junior PIK Notes reflect all indicia of indebtedness, including the issuance of notes with payment at a fixed interest rate (although payment of interest was deferred). . . .").

[214] *See* Adv. D.I. 30, Ex. C, § 2.05, A049-A050.

[215] Adv. D.I. 30, Ex. C, § 2.06(c), A050 ("Interest on each term Loan shall be due and payable in kind (and not in cash) in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein."); § 1.01, A035 ("'Interest Payment Date' means the last day of each calendar quarter, beginning with the calendar quarter ending on September 30, 2019, and the Term Loan Maturity Date.").

### D. Whether Repayment Depended on Success of the Business

"If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution."[216] However, courts look to the "underlying economic reality and the general tie between the loan's repayment and the success of the business;" such that a second source of repayment (security interest) would mitigate against finding that the repayment depended on the success of the business.[217]

#### i.    Grid Notes

Sun Capital argues that the Grid Notes do not limit repayment to FFO's future profits. The Trustee responds that the Grid Notes were unsecured. In *In re Autobacs Strauss, Inc.*, the lender conceded that the loans were unsecured and did not suggest an alternative source of repayment existed, and as a result, the bankruptcy court found that the fourth factor weighed in favor of recharacterization.[218] Similarly, here, the Grid Notes were unsecured, and Sun Capital offered no alternative source of repayment other than the success of FFO. Thus, this factor weighs in favor of recharacterization of the Grid Notes.

#### ii.    Sun Credit Agreement

Sun Capital also argues that the Sun Credit Agreement did not limit repayment to FFO's future profits, thus the repayment of the Sun Credit Agreement was not "solely dependent" on FFO's success. The Trustee responds that the Sun Credit Agreement was supported by a

---

[216] *In re Friedman's Inc.*, 452 B.R. at 521 (citations and footnote omitted).

[217] *Autobacs Strauss, Inc. v. Autobacs Seven Co., Ltd. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 575 (Bankr. D. Del. 2012).

[218] *Id.* at 576.

subordinated security agreement and, at the time the agreement was entered into, FFO did not

have sufficient assets to repay the Sun Credit Agreement.[219]  Furthermore, Sun Capital did not

file UCC statements for the Sun Credit Agreement for over a year after the Sun Credit

Agreement was made.[220]  As pleaded, at the time the Sun Credit Agreement was entered into

and, as amended, funded with additional draws, there was no alternative to payment besides the

success of FFO's business.  Consequently, this factor weighs in favor of recharacterization of the

Sun Credit Agreement.

### E.  Inadequacy of Capitalization

"Thin or inadequate capitalization is strong evidence that the advances are capital

contributions rather than loans.  Undercapitalization is particularly relevant when a corporation is

started by the shareholders with a minimal amount of capital who then make a large loan of

money to the newly formed corporation.  Capitalization is assessed both at the times of initial

capitalization and subsequent transactions."[221]  In the context of a pre-existing lender (Sun

Capital) to a distressed company (FFO), "it is legitimate for the lender to take actions to protect

existing loans, including extending additional credit.  Under similar circumstances, courts have

---

[219] Amend. Compl. ¶ 74 ("FFO would subsequently lean on this loan [Sun Credit Agreement] to try to dig out of the hole created by the Kentucky Acquisition, periodically incurring more debt with FFO could not afford to repay.").

[220] Amend. Compl. ¶¶ 73-74.  The Sun Credit Agreement, as amended, was entered into on June 28, 2019. Amend. Compl. ¶ 73.  "Sun Capital did not record any UCC financing statement on account of the Sun Credit Agreement until October 23, 2020, shortly before FFO filed for bankruptcy." Amend. Compl. ¶ 74.

[221] *In re Autobacs Strauss, Inc.*, 473 B.R. at 576 (citations, footnotes and internal quotations marks omitted).

54

found that existing lenders are often the only source of funding when a debtor faces distress and that the inability to obtain alternative financing is insufficient to support recharacterization."[222]

### i.    Grid Notes

The Trustee alleges that the Grid Notes were made at a time that FFO was undercapitalized, and no other creditor was willing to extend credit to FFO.[223]  Sun Capital claims that these allegations are conclusory and should weigh in favor of dismissal.  The Complaint alleges that Sun Capital required FFO to pay for a substantial portion of its own acquisition whereby it repurchased $32 million in equity interests, and then sold all of its outstanding equity to Sun Capital for approximately $7 million.[224]  The Trustee claims it is simple math to establish undercapitalization, given that Sun Capital financed the acquisition with the Grid Notes to "make up the financing gap" and "further finance[d] the Sun Acquisition" with the Stellus Credit Agreement.[225]

The allegations in the Complaint are sufficiently plausible to find that FFO was undercapitalized at the time of the Grid Notes issuance.  As a result, this factor weighs in favor of recharacterization of the Grid Notes.

---

[222] *Burtch v. Salem Investment Partners, III, LP (In re Parker Sch. Uniforms, LLC)*, No. 18-10085 (CSS), 2021 WL 4553016, at *12 (Bankr. D. Del. Oct. 5, 2021) (citations, footnotes, quotation marks, and modifications omitted).

[223] Amend. Compl. ¶ 112. *See also* Amend. Compl. ¶ 72 ("By early 2019, FFO owed at least $4.7 million in outstanding vendor payments.  Between January and March 2019, FFO was clearly undercapitalized and had no choice but to borrow an additional $4 million from Sun Capital under the Grid Notes.").

[224] Amend. Compl. ¶ 34.

[225] Amend. Compl. ¶¶ 35-36; Adv. D.I. 33 at 19.

Additionally, here, as alleged in the Complaint, Sun Capital was not a third-party lender with an unchallenged existing loan. Sun Capital was the controlling shareholder of FFO and its only purported "debt" is subject to recharacterization in the Complaint.[226] This is not the situation in which a pre-existing lender is trying to protect its interest; rather, all of Sun Capital's investments are challenged in the Complaint, so the "existing lender" becoming a "rescue lender" argument does not have weight under the circumstances.

### ii.    Sun Credit Agreement

The same is true for the Sun Credit Agreement, but by the time Sun Capital was making advances under the Sun Credit Agreement, FFO's financial distress and undercapitalization had worsened.[227] Thus, based on the factual assertions, this factor weighs in favor of recharacterization of the Sun Credit Agreement.

### F. Identity of Interests Between Creditor and Stockholder

"Another factor in the *AutoStyle* test is the identity of interest between the creditor and the stockholder. If stockholders make advances in proportion to their respective stock ownership, an equity contribution is indicated. On the other hand, a sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is indicative of bona fide debt. Where there is an exact correlation between the ownership interests of the equity holders and

---

[226] Amend. Compl. ¶¶ 109-14.
[227] Amend. Compl. ¶¶ 71-75.

their proportionate share of the alleged loan this evidence standing alone is almost overwhelming."[228]

### i.   *Grid Notes*

The Trustee asserts that "all advances made under the Grid Note[s] were in proportion to Sun Capital's equity interest in FFO" as a result of the Stellus Participation Agreement which accorded Stellus certain participant interests in the original (2016) Grid Note.[229]  Sun Capital asserts that this allegation ignores the party who made the Grid Note loans – Note Holdings – who held *no* equity in FFO at, or after, the initial Grid Note issuance.  The Trustee responds that Note Holding is wholly owned by Sun Furniture Factory, LP, FFO's majority equity owner, and, at the time the advances under the 2016 Grid Notes were issued, Sun Capital owned 100% equity interests in FFO and 100% of the loans under the Grid Notes (through its 100% ownership interest in Note Holdings).[230]  The Trustee argues that as a result of the Stellus Participation Agreement, each of Sun Capital's and Stellus' respective interests in the Grid Notes were correlated to its equity interests in FFO.[231]

The Court finds that the Trustee has pleaded sufficient facts, taken as true, to show identity of interests between FFO and Sun Capital for purposes of recharacterization.  Thus, this factor weighs in favor of recharacterization of the Grid Notes.

---

[228] *In re Autobacs Strauss, Inc.*, 473 B.R. at 577–78 (internal quotation marks omitted; *quoting to In re AutoStyle Plastics, Inc.*, 269 F.3d at 751 (citations, footnote, and quotation marks omitted).

[229] Amend. Compl. ¶¶ 35, 37, 111.

[230] Amend. Compl. ¶¶ 34-35.

[231] Amend. Compl. ¶ 37.

### ii.    Sun Credit Agreement

Sun Capital asserts that neither the Complaint nor the Sun Credit Agreement indicate that the term loan advances were proportionate to Note Holding's stock ownership in FFO. The Trustee did not respond nor does the Complaint make such an allegation. Thus, this factor weighs against recharacterization of the Sun Capital Agreement.

### G.  Security, If Any, for the Advances

"If an advance is made on an unsecured basis, it is likely a capital contribution as opposed to a loan."[232]

### i.    Grid Notes

The parties agree that the Grid Notes were unsecured. As a result, this factor weighs in favor of recharacterization of the Grid Notes.

### ii.    Sun Credit Agreement

The Trustee alleges that, while on its face the Sun Credit Agreement was "secured," the agreement was actually either unsecured or unperfected.[233] In support, the Trustee argues the following facts: (i) the May 2019 Fundings were not documented until June 28, 2019;[234] (ii) Sun Capital made an additional loan on September 13, 2019 that was not documented until September 18, 2019;[235] and (iii) "Sun Capital did not record any UCC financing statements on

---

[232] *In re Our Alchemy, LLC*, No. 16-11596 (KG), 2019 WL 4447535 at *8 (*citing In re AutoStyle Plastics*, 269 F.3d at 752 (further citations omitted).

[233] Amend. Compl. ¶ 111; Adv. D.I. 33 at 21.

[234] Amend. Compl. ¶ 73.

[235] Amend. Compl. ¶ 74.

account of the Sun Credit Agreement until October 23, 2020."[236]  Sun Capital responds that the

Sun Security Agreement specified how the terms of Sun Capital's security interest was to be

perfected.[237]

As alleged, Sun Capital did not file UCC statements for 16 months following the funding

to FFO (two weeks prior to the Petition Date).  In other words, Sun Capital did not take any

measures to secure its claims vis-à-vis third parties.  As a result, this factor weighs in favor of

recharacterization of the Sun Credit Agreement.

### H.  Ability to Obtain Financing from Outside Lending Institutions

"Yet another factor in the *AutoStyle* test is the debtor's ability to obtain outside financing.

When there is no evidence of other outside financing, the fact that no reasonable creditor would

have acted in the same manner is strong evidence that the advances were capital contributions

rather than loans."[238]  The question in evaluating this factor is "whether a reasonable outside

creditor would have made a loan to the debtor on similar terms."[239]

### i.   Grid Notes

With respect the to 2016 Grid Notes, within months of entry into the 2016 Grid Notes,

Stellus and FFO entered the Stellus Credit Agreement (which included a participation interest in

---

[236] Amend. Compl. ¶ 74.

[237] Adv. D.I. 30, Ex. D (Second Lien Security and Pledge Agreement), §3(b), A150-151.

[238] *In re Autobacs Strauss, Inc.*, 473 B.R. at 579 (citations and quotations marks omitted).

[239] *Id.* (citations and quotation marks omitted).

the 2016 Grid Notes).[240]  As such, FFO was able to obtain outside financing.  This factor weighs

against recharacterization of the 2016 Grid Notes.

With respect to the 2019 Grid Notes, Sun Capital argues that as an existing lender it was

issuing the loan to FFO at a time of financial distress to protect existing loans.  In *In re Parker*

*School Uniforms, LLC*, the court held:

> [I]n the context of pre-existing lenders lending to a distressed
> company, it is legitimate for the lender to take actions to protect
> existing loans, including extending additional credit.  Under
> similar circumstances, courts have found that existing lenders are
> often the only source of funding when a debtor faces distress, and
> that the inability to obtain alternative financing is insufficient to
> support recharacterization.[241]

Again, the question is "whether a reasonable outside creditor would have made a loan to

the debtor on similar terms."[242]

The Trustee alleges that by early 2019, FFO owed at least $4.7 million in outstanding

vendor payments, which necessitated the 2019 Grid Notes.[243]  The Trustee further alleges that

FFO was undercapitalized during early 2019.[244]  Taking these allegations as true, it is plausible

that no reasonable outside creditor would have made the loan on similar terms.  As a result, this

factor weighs in favor of recharacterization of the 2019 Grid Notes.

---

[240] Amend. Compl. ¶¶ 36-37.

[241] *In re Parker Sch. Uniforms, LLC*, No. 18-10085 (CSS), 2021 WL 4553016 at *12 (citations, footnotes, quotation marks, and modifications omitted).

[242] *In re Autobacs Strauss, Inc.*, 473 B.R. at 579 (citations and quotation marks omitted).

[243] Amend. Compl. ¶ 72.

[244] Amend. Compl. ¶ 72.

### ii.    *Sun Credit Agreement*

With regard to the Sun Credit Agreement, FFO needed additional liquidity because sales were down 30% and vendors were being "stretched."[245]  Sun Capital provided FFO financing without documentation on May 1, May 15, and September 13, 2019.[246]  The Trustee alleges that "during this time FFO did not seek funding from any additional sources other than Sun Capital."[247]  Additionally, the Trustee asserts that "no other creditor was willing to extend credit."[248]

Sun Capital argues that, as existing lender, they continued to make advances to protect their existing loans and "traditional factors that lenders consider (such as capitalization, solvency, collateral, ability to pay cash interest and debt capacity rations) do not apply when lending to a financially healthy company."[249]  For the purposes of this motion, the Court disagrees.  At the time of the Sun Credit Agreement, there were allegations that FFO did not solicit other lenders, nor did they even document the loan before advancing cash.  The Sun Credit Agreement was not advanced on the basis that a "typical" lender would make advances.  As a result, this factor weighs in favor of recharacterization of the Sun Credit Agreement.

---

[245] Amend. Compl. ¶ 73.

[246] Amend. Compl. ¶ 73.

[247] Amend. Compl. ¶¶ 73-74.

[248] Amend. Compl. ¶ 112.

[249] *In re Parker Sch. Uniforms, LLC*, No. 18-10085 (CSS), 2021 WL 4553016 at *12 (footnote omitted).

## I.   Extent to Which Advances were Subordinated to Claims of Outside Creditors

Another factor "is the extent to which the payments to be made are subordinated to the claims of outside creditors.  Subordination of advances to claims of all other creditors indicates that the advances were capital contributions, not loans."[250]

Here, there are no allegations that either the Grid Notes or the Sun Credit Agreement were subordinated to all other creditors.  This factor weighs against recharacterization of the Grid Notes and the Sun Credit Agreement.

## J.   The Extent to Which the Advances were Used to Acquire Capital Assets

The next factor "is whether the advances were used to acquire capital assets.  Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness."[251]

### i.   Grid Notes

The Complaint alleges that the 2016 Grid Notes were advanced by Sun Capital in connection with its buy-out of existing equity.[252]  Thus, this factor weighs in favor of recharacterization of the 2016 Grid Notes.

The Complaint alleges that the 2019 Grid Notes were used for FFO's working capital (and not capital assets).[253]  This factor weighs against recharacterization of the 2019 Grid Notes.

---

[250] *In re Friedman's Inc.*, 452 B.R. at 523 (quotation marks omitted, *quoting In re AutoStyle Plastics, Inc.*, 269 F.3d at 752).

[251] *Id.* (quotation marks omitted; *In re AutoStyle Plastics, Inc.*, 269 F.3d at 752).

[252] Amend. Compl. ¶¶ 33-35.

[253] Amend. Compl. ¶ 72.

### ii.   Sun Credit Agreement

Similarly, the Trustee alleges the Sun Credit Agreement term loans were used to pay down debts to its vendors.[254] This factor weighs against recharacterization of the Sun Credit Agreement.

## K. Presence or Absence of a Sinking Fund

"The failure to establish a sinking fund for repayment is evidence that the advances were capital contributions[.]"[255] The Complaint does not allege the presence of a sinking fund for the Grid Notes or the Sun Credit Agreement. As a result, this factor weighs against recharacterization of the Grid Notes and the Sun Credit Agreement.

## L. Presence or Absence of Voting Rights

The Third Circuit identified the presence or absence of voting rights as a factor in reconsidering the recharacterization of a claim.[256] "Where the Complaint does not allege nor do the primary notes grant any voting rights, the advance is likely a loan."[257] The Trustee does not allege that the Grid Notes or the Sun Credit Agreement granted any voting rights. As a result, this factor weighs against recharacterization of the Grid Notes and the Sun Credit Agreement.

---

[254] Amend. Compl. ¶¶ 72-74.

[255] *In re Our Alchemy, LLC*, No. 16-11596 (KG), 2019 WL 4447535 at *9 (*citing In re AutoStyle Plastics, Inc.*, 269 F.3d at 753 ("The bankruptcy court noted the absence of a sinking fund and concluded that this factor weighed toward equity.") (further citations omitted)).

[256] *In re SubMicron Sys. Corp.*, 432 F.3d at 456 n. 8 (citations omitted).

[257] *In re Our Alchemy, LLC*, No. 16-11596 (KG), 2019 WL 4447535 at *9 (citations omitted).

### M. Other Considerations

### *i. Acceleration Provision*

In *SubMicron*, the Third Circuit identified the certainty of payment in the event of the corporation's insolvency or liquidation as a relevant factor for recharacterization claims.[258] "The 'certainty of payment' factor cuts straight to what a lender cares about when making a loan, especially in a distressed situation."[259]

For example, in *In re Our Alchemy, LLC*, the short-term maturity of the loan (75 days) weighed in favor of treating the loan as debt, rather than equity.[260] In contrast, here, the Grid Notes had a 2-5-year maturity and the Sun Credit Agreement had a 25-31-month maturity. Both the Grid Notes and the Sun Credit Agreement were unsecured or unperfected and, as alleged, during a time when FFO was undercapitalized. Additionally, as alleged, Sun Capital never sought to accelerate and has asserted claims for $14.89 million on account of the Grid Notes and $12.8 million on account of the Sun Credit Agreement.[261] The lack of acceleration provisions and the lengthy terms of each of the loans favors recharacterization at this stage of the proceeding.

---

[258] *In re SubMicron Sys. Corp.*, 432 F.3d at 456 n. 8 (citations omitted).

[259] *In re HH Liquidation, LLC*, 590 B.R. at 296.

[260] *In re Our Alchemy, LLC*, No. 16-11596 (KG), 2019 WL 4447535 at *9.

[261] Amend. Compl. ¶ 76.

### ii.    Insider Status

The Trustee alleges that Sun Capital was an insider at all relevant times during the issuance of the Grid Notes and the Sun Credit Agreement.[262] "[A] claimant's insider status and a debtor's undercapitalization alone will normally be insufficient to support the recharacterization of a claim."[263] "For struggling businesses, an insider is often the only party willing to lend and so recharacterization should not be used to discourage good-faith loans."[264]

Sun Capital asserts that its insider status is insufficient to support recharacterization. The Trustee responds that Sun Capital's insider status is not the *only* factor; it is one of many factors that favors recharacterization at this point in the proceedings. The Court will consider Sun Capital's insider status, at this stage of the proceedings. Thus, this factor weighs in favor of recharacterization of the Grid Notes and the Sun Credit Agreement.

### iii.    Lack of Formalities

Another factor considered by courts is whether the loan was made with a "troubling lack of formalities."[265]

Sun Capital minimizes this factor, arguing that in *Autobacs Strauss* the court was concerned that the board had violated the company's bylaws and accounting rules in approving

---

[262] Amend. Compl. ¶¶ 33-74.

[263] *In re Our Alchemy, LLC*, No. 16-11596 (KG), 2019 WL 4447535 at *10 (*citing Fairchild Dornier GMBH v. Off. Comm. of Unsecured Creditors (In re Dornier Aviation (N. Am.), Inc.)*, 453 F.3d 225, 234 (4th Cir. 2006)).

[264] *In re Our Alchemy, LLC*, No. 16-11596 (KG), 2019 WL 4447535 at *10 (citations and quotation marks omitted).

[265] *In re Autobacs Strauss, Inc.*, 473 B.R. at 581 (footnote and citation omitted); *In re Cold Harbor Assocs., L.P.*, 204 B.R. 904, 916 (Bankr. E.D. Va. 1997).

65

certain agreements.[266] The *Autobacs Strauss* court's analysis, however, related to a breach of the

allegation of duty of care. With regard to recharacterization, the *Autobacs Strauss* court stated:

> ABST alleges that the loan agreements were never approved or
> discussed in any meetings by ABST's board of directors, and that
> no minutes exist regarding any such meeting. ABST alleges that
> two of the directors of ABST, the two that were not AB7–related,
> were purposefully excluded from finance discussions, including
> those related to the loans. Finally, ABST alleges that these actions
> violated ABST by-laws and Accounting Rules. Thus, the
> additional factor of a lack of formalities favors ABST and weigh in
> favor of recharacterization.[267]

Here, the Trustee alleges that at the time Sun Capital started making advances in May

2019, the fundings "were not documented" and "neither the Boards, nor anyone un-affiliated

with Sun Capital, approved or gave any formal consideration to either the May 2019 Fundings or

entry into the Sun Credit Agreement. Rogalski signed the Sun Credit Agreement on behalf of

each of the FFO Entities, as borrowers and guarantors, and on behalf of Note Holdings, as

lender."[268] The allegation in *Autobacs Strauss* and here are similar. As a result, this factor

weighs in favor of recharacterization of the Grid Notes and the Sun Credit Agreement.

### N. Conclusion

As mentioned above, "[n]o one factor is dispositive of either the intent of the parties or

whether a loan should be recharacterized as equity. And a court can find recharacterization to be

appropriate even if less than all of the factors weigh in favor of a capital contribution."[269]

---

[266] *In re Autobacs Strauss, Inc.*, 473 B.R. at 560.

[267] *Id.* at 581.

[268] Amend. Compl. ¶ 73.

[269] *In re Lyondell Chem. Co.*, 544 B.R. at 94 (footnotes and citations omitted).

Having evaluated the foregoing factors to determine whether the Trustee has alleged enough

facts, taken as true, to establish a plausible claim for recharacterization, the Court finds that the

following weigh in favor of recharacterization: repayment; inadequacy of capitalization; identity

between the creditor and stockholders (Grid Notes); security interest; ability to obtain outside

financing (2019 Grid Notes and Sun Credit Agreement); advances used to acquire capital assets

(2016 Grid Notes); and acceleration of the loan, insider transaction; and lack of formalities.  The

Court will deny the Sun Capital Motion to Dismiss as to Count 7 of the Complaint because the

Trustee has pleaded a plausible claim for recharacterization of both the Grid Notes and the Sun

Credit Agreement.

## III.    Count 8: Equitable Subordination Count

The Bankruptcy Code provides that a court may, under principles of equitable

subordination, subordinate for the purposes of distribution all or part of an allowed claim to all or

part of another allowed claim.[270]  Under the *Mobile Steel* framework,[271] equitable subordination

requires proof of three elements: "(i) the defendant engaged in some type of inequitable conduct;

---

[270] Section 510(c) of the Bankruptcy Code states, in pertinent part:

> (c) Notwithstanding subsections (a) and (b) of this section, after notice and a
> hearing, the court may—
>
> > (1) under principles of equitable subordination, subordinate
> > for purposes of distribution all or part of an allowed claim to
> > all or part of another allowed claim or all or part of an allowed
> > interest to all or part of another allowed interest.

11 U.S.C. § 510(c).  *See also The Bank of New York v. Epic Resorts-Pal Springs Marquis Villas, LLC (In re Epic Cap. Corp.)*, 290 B.R. 514, 523 (Bankr. D. Del. 2003), *aff'd*, 307 B.R. 767 (D. Del. 2004).

[271] *Benjamin v. Diamond (In the Matter of Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir. 1977).

(ii) the misconduct caused injury to the creditors or conferred an unfair advantage on the defendant; and (iii) equitable subordination of the claim is consistent with bankruptcy law."[272]

"The [Plaintiff's] burden depends on whether the [lender], whose claim might be subordinated, is an insider or non-insider.  The burden of proof is less demanding when the respondent is an insider."[273]  "Insiders, those in a position of influence over the Debtor, are held to a higher standard than non-insider claimants, that is to say, their claims may be subordinated more easily than those of parties who dealt with the Debtor at arm's length." [274]

For the purposes of a claim for equitable subordination, a party is an insider if it "(i) meets the statutory definition of insider, or (ii) is in a close relationship with the debtor to such an extent as to suggest transactions were not conducted at arms length."[275]  The statutory definition of an insider under the Bankruptcy Code includes an "affiliate, or insider of an affiliate

---

[272]  *In re Autobacs Strauss, Inc.*, 473 B.R. at 582 (footnotes and further citation omitted).

[273]  *In re Epic Cap. Corp.*, 290 B.R. at 524.  *In re HH Liquidation, LLC*, 590 B.R. at 298 (citations, quotation marks, and modifications omitted) (holding that "it is axiomatic that insider status alone is insufficient to warrant subordination").

[274]  *Salkin v. Chira (In re Chira)*, 353 B.R. 693, 723–24 (Bankr. S.D. Fla. 2006), *aff'd*, 378 B.R. 698 (S.D. Fla. 2007), *aff'd*, 567 F.3d 1307 (11th Cir. 2009) (*citing Matter of Mobile Steel Co.*, 563 F.2d at 701 (further citation omitted)).  As described in *In re Winstar Communications, Inc.*:

> When the creditor is an insider, the proof is not demanding.  In such cases, a bankruptcy trustee need only show "material evidence" of unfair conduct.  For non-insider claimants, egregious conduct must be established to justify equitable subordination.  The degree of non-insider misconduct has been variously described as very substantial" misconduct involving "moral turpitude or some breach of duty or some misrepresentation whereby other creditors were deceived to their damage" or as gross misconduct amounting to fraud, overreaching or spoliation.  Nevertheless the test is the same; only the standard of proof required differs.

*Shubert v. Lucent Technologies Inc. (In re Winstar Commc'ns, Inc.)*, 348 B.R. 234, 284 (Bankr. D. Del. 2005), *aff'd*, No. 01 01063 KJC, 2007 WL 1232185 (D. Del. Apr. 26, 2007), *aff'd in part, modified in part*, 554 F.3d 382 (3d Cir. 2009) (citations, modifications, and quotation marks omitted).

[275]  *In re Autobacs Strauss, Inc.*, 473 B.R. at 582-83.

as if such affiliate were the debtor."[276] An affiliate includes a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor."[277] Because Sun Capital owned more than 20% of FFO's shares, Sun Capital is a statutory insider of FFO.[278] Furthermore, the Complaint alleges a sufficiently "close relationship" with Sun Capital to suggest that the transactions were not conducted at arms' length.[279] As a result, and for the purposes of the Sun Capital Motion to Dismiss, the Court will rigorously scrutinize Sun Capital's conduct (within the confines of the motion to dismiss standard) and the Plaintiff "need not plead inequitable conduct with the level of particularity required for an outsider."[280]

The Trustee seeks to subordinate the Sun Capital debt related to three instruments: (i) "outstanding consulting and reimbursement obligations totaling approximately $1.2 million" pursuant to the Consulting Agreement; (ii) "outstanding principal and interest payments totaling approximately $14.9 million" in Grid Notes; and (iii) "outstanding principal and interest payments totaling approximately $12.8 million under the Sun Credit Agreement."[281]

The Trustee alleges the following inequitable conduct: (i) "aiding and abetting breaches of fiduciary duties . . . to FFO;" (ii) "entering into multiple loans and credit agreements with FFO

---

[276] 11 U.S.C. § 101(31)(E).

[277] 11 U.S.C. § 101(2)(B).

[278] Amend. Compl. ¶ 34.

[279] Amend. Compl. ¶¶ 72-74.

[280] *Burtch v. Owlstone, Inc. (In re Advance Nanotech, Inc.)*, No. 11-10776 (MFW), 2014 WL 1320145, at *8 (Bankr. D. Del. Apr. 2, 2014).

[281] Amend. Compl. ¶¶ 35, 39, 73, 76.

despite being aware of its declining financial health and undercapitalization as well as multiple

bankruptcies of comparable business in the industry;" and (iii) "exercis[ing] a high degree of

control and influence over FFO's business decisions" as a "96% equity owner of the FFO

Entities."[282]

The Trustee asserts that a breach of fiduciary duty is considered inequitable conduct that

may support a claim for equitable subordination.  Courts recognize three general categories of

behavior that may constitute inequitable conduct: "1) fraud, illegality, or breach of fiduciary

duties; 2) undercapitalization; and 3) claimant's use of the debtors as a mere instrumentality or

alter ego."[283]

The Court has already addressed the sufficiency of the Trustee's claims, at this stage of

the proceeding, for aiding and abetting breach of fiduciary duties.[284]  Therefore, the Court will

turn to whether the allegations of Sun Capital's use of FFO as a mere instrumentality or alter ego

are sufficiently pleaded.

> The Third Circuit uses the following multi-factor test for
> determining whether a "single economic entity" exists between
> entities: (1) undercapitalization; (2) failure to observe corporate
> formalities; (3) nonpayment of dividends; (4) the insolvency of the
> debtor corporation at the time; (5) siphoning of the corporation's
> funds by the dominant stockholder; (6) absence of corporate
> records; and (7) the fact that the corporation is merely a facade for
> the operations of the dominant stockholder or stockholders.
> However, while no single factor justifies a decision to disregard

---

[282] Amend. Compl. ¶¶ 116-117.

[283] *In re Advance Nanotech, Inc.*, No. 11-10776 (MFW), 2014 WL 1320145 at *8 (internal quote marks omitted; quoting *In re Epic Cap. Corp.*, 290 B.R. at 524).

[284] *In re Advance Nanotech, Inc.*, No. 11-10776 (MFW), 2014 WL 1320145 at *8 (finding that plausible claims for aiding and abetting breach of fiduciary duty is sufficient to support a claim for equitable subordination).

the corporate entity, some combination of the above is required, and an overall element of injustice or unfairness must always be present, as well.[285]

Sun Capital concedes the Trustee has sufficiently pleaded undercapitalization, but undercapitalization alone is insufficient to constitute inequitable conduct.[286]  The Trustee argues that such undercapitalization allegations support the claim that Sun Capital was working towards its own personal gain to the determent of FFO.  The Trustee continues that Sun Capital's actions resulted in using FFO as a mere instrumentality to gain an economic benefit not shared with others.[287]  The Court finds that the Trustee has pleaded sufficient allegations (taken as true) to establish undercapitalization *plus* mere instrumentality.  For example:

- "Each [FFO Board] was comprised of two Sun Capital appointees on a three member board."[288]

- "FFO owed at least $4.7 million in outstanding vendor payments . . . and [FFO] has no choice but to borrow an additional $4 million from Sun Capital under the Grid Notes."[289]

- "On May 1, 2019, Sun Capital provided FFO with $1.2 million, and on May 15, 2019, Sun Capital provided FFO with another $2.5 million . . . At this time, the May 2019 Fundings were not documented."[290]

---

[285] *In re Broadstripe, LLC*, 444 B.R. at 102 (footnotes, internal modifications, quotations marks, and citations omitted).

[286] *Matter of Lifschultz Fast Freight*, 132 F.3d 339, 345 (7th Cir. 1997) (holding that "while undercapitalization may indicate inequitable conduct, undercapitalization is not in itself inequitable conduct.").  Am. Compl. at ¶ 34 ("Sun Capital required FFO to pay for a substantial portion of its own acquisition"); ¶ 38 ("This aggregate indebtedness allowed Sun Capital to wield significant financial leverage over FFO, which allowed them to effectively exercise *de facto* control over FFO's decision-making process"); ¶ 68 ("Sun Capital continued to profit while burdening FFO with additional financial obligations"), ¶ 95 ("Sun Capital . . . create[ed] an informational vacuum and actively [encourage[ed] the Kentucky Acquisition . . . without itself conducting any meaningful due diligence").

[287] *See, e.g., In re LMI Legacy Holdings, Inc.*, No. 13-12098 (CSS), 2017 WL 1508606 at *13 (citation and footnote omitted).

[288] Amend. Compl. ¶ 30.

[289] Amend. Compl. ¶ 72.

[290] Amend. Compl. ¶ 73.

71

- "[N]either the [FFO] Boards, nor anyone un-affiliated with Sun Capital, approved or gave any formal consideration to either the May 2019 Fundings or entry into the Sun Credit Agreement."[291]

- "Rogalski signed the Sun Credit Agreement on behalf of each of the FFO Entities, as borrowers and guarantors, and on behalf of Note Holdings, as lender."[292]

- "On September 13, 2019, Sun Capital funded an additional $1 million to FFO without any documentation."[293]

- "[N]either the [FFO] Boards, nor anyone unaffiliated with Sun Capital, approved or gave any formal consideration to the Sun Credit Agreement Amendments."[294]

- "Mullany signed the Sun Credit Agreement Amendments on behalf of each of the FFO Entities, as borrowers and guarantors and on behalf of Note Holdings, as lender."[295]

- "[D]uring this time FFO did not seek funding from any additional sources other than Sun Capital."[296]

These factual allegations give rise to plausible claims of failure to observe corporate formalities, absence of corporate records; and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders, in addition to plausible claims of undercapitalization. In addition, the Trustee has alleged that these actions by Sun Capital conferred an unfair advantage on Sun Capital (including as recipient of purported loans and consultation fees).[297] Thus, the Trustee has alleged each element of equitable subordination with plausible facts.

---

[291] Amend. Compl. ¶ 73.

[292] Amend. Compl. ¶ 73.

[293] Amend. Compl. ¶ 74.

[294] Amend. Compl. ¶ 74.

[295] Amend. Compl. ¶ 74.

[296] Amend. Compl. ¶ 74.

[297] *See* Amend. Compl. ¶¶ 52, 69, 71, 72-75.

For these reasons, the Court will deny the Sun Capital Motion to Dismiss regarding

Count 8 for equitable subordination.

## IV.    Count 10: Wrongful Distribution Count

Under section 18-607 of the Delaware Code, a member of a Delaware limited liability

company is liable for distributions to that member if: (1) "after giving effect to the distribution,

all liabilities of the limited liability company, other than liabilities to members on account of

their limited liability company interests and liabilities for which the recourse of creditors is

limited to specified property of the limited liability company, exceed the fair value of the assets

of the limited liability company . . ." and (2) the member knew that the distribution would violate

those conditions at the time it was made.[298] "Section 18-607(b) provides that if an LLC member

receives a distribution that results in the LLC becoming insolvent, and knew at that time that the

LLC would become insolvent as a result of the distribution, the LLC member is liable to the LLC

for the amount of the distribution."[299]

Sun Capital seeks to dismiss the Wrongful Distribution Count on multiple grounds.  First,

Sun Capital argues that Delaware law shortens the limitations period to three-years for actions

brought by a Delaware LLC to recover money distributed to its LLC members;[300] and thus, the

Trustee is precluded from maintaining a claim for wrongful distribution for any transfer made on

or before November 5, 2017.  Second, Sun Capital contends that no named Sun Capital entity is

---

[298] 6 Del. Code § 18-607 (a) and (b).

[299] *Handy*, No. 1973-S, 2000 WL 364199 at *3.

[300] 6 Del. Code. §18-607(c); *In re Bos. Generating LLC*, 617 B.R. 442, 463 (Bankr. S.D.N.Y. 2020), *aff'd sub nom. Holliday v. Credit Suisse Sec. (USA) LLC*, No. 20 CIV. 5404 (GBD), 2021 WL 4150523 (S.D.N.Y. Sept. 13, 2021).

a "member" of the limited liability companies that issued the transfer.[301]  Third, Sun Capital

maintains that the Trustee summarily asserts that Sun Capital became a "*de facto* member of

Outlet, FFH, and Bedding" by virtue of the "wrongful transfers as well as FFO's reporting to and

taking direction" for the benefit of Sun Capital.[302]  Fourth, Sun Capital argues that the Trustee

has not adequately pled that Sun Capital "knew" that FFO's liabilities exceeded the fair market

value of its assets on the date of the various transfers.  Fifth, Sun Capital argues that the transfers

do not meet the definition of "distribution."[303]

The Trustee responds that: (i) the statute of repose is equitably tolled because the Trustee

is alleging claims that arise from Sun Capital's wrong acts and self-dealing; (ii) Sun Capital is a

"member" of the LLCs that issued the transfers; (iii) the Complaint adequately pleaded that Sun

Capital had knowledge of the transfers; and (iv) whether the transfers were "distributions"

(i.e. whether they were made for present or past services) is a question of fact that are not

properly decided in a motion to dismiss.

The Court begins with whether Sun Capital was a member of the LLCs.  The Trustee

appears to assert that "through its course of conduct, Sun Capital has become a member of FFO,

---

[301] *See* 6 Del. Code. § 18-101(13) ("'Member' means a person who is admitted to a limited liability company as a member as provided in § 18-301 of this title, and includes a member of the limited liability company generally and a member associated with a series of the limited liability company.  Unless the context otherwise requires, references in this chapter to a member (including references in this chapter to a member of a limited liability company) shall be deemed to be references to a member of the limited liability company generally and to a member associated with a series with respect to such series.").

[302] *See* Amend. Compl. ¶ 139.

[303] 6 Del. Code. § 18-607 ("[T]he term 'distribution' shall not include amounts constituting reasonable compensation for present or past services or reasonable payments made in the ordinary course of business pursuant to a bona fide retirement plan or other benefits program.").

74

notwithstanding any provisions of the relevant LLC Agreements."[304]  In *Mickman v. American Intern. Processing, L.L.C.*, the Delaware Court of Chancery held:

> Based on the flexible and less formal nature of LLCs, it is reasonable to consider evidence beyond the four corners of the operating agreement, where, as here, the plaintiff has presented admissible evidence that, notwithstanding the language of the operating agreement, suggests the parties to that agreement intended to make, and believed they had made, the plaintiff a member of the LLC.  There is no dispute that LFF's operating agreement does not list Plaintiff as a member.[305]

In *Mickman*, despite not actually making the plaintiff an LLC member, the Court found that the members of the LLC "intended to make" and "believed they had made" the *Mickman* plaintiff a member.[306]

Sun Capital asserts that the "intent" to make Sun Capital a member is what separates the present case from *Mickman*.  The Trustee alleges that Sun Capital was a *de facto* member of Outlet, FFH, and Bedding.[307]  The LLC Agreement states:

> In order for a Person to be admitted as a Member of the Company with respect to Additional Interests: (a) such person shall have delivered to the Company a written undertaking to be bound by the terms and conditions of this Agreement and shall have delivered such documents and instruments as the Board determines to be necessary or appropriate in connection with the issuance of such Additional Interest to such Person or to effect such Person's admission as a Member; and (b) the Board or an authorized Officer shall amend <u>Schedule 1</u> without further vote, act or consent of any

---

[304] *See* Adv. D.I. 35 at 13.

[305] *Mickman v. Am. Int'l Processing, L.L.C.*, No. CIV.A. 3869-VCP, 2009 WL 891807, at *2 (Del. Ch. Apr. 1, 2009).

[306] *See also In re Grupo Dos Chiles, LLC*, No. CIV.A. 1447-N, 2006 WL 668443, at *2 (Del. Ch. Mar. 10, 2006) ("[R]egardless of whether the parties intended Rivera to be the initial member or even the member of Grupo, the Agreement, entered into in March 2000, makes it clear that Shriver and Martinez are the members.").

[307] Amend. Compl. ¶ 140.

other Person to reflect such new Person as a Member.  Upon the amendment of Schedule 1, such Person shall be deemed to have been admitted as a Member and shall be listed as such on the books and records of the Company.[308]

Here, unlike *Mickman*, the Trustee has not pleaded "intent" to make Sun Capital a member of the LLCs, nor does the Complaint allege steps taken under the LLC Agreements to make Sun Capital a member.  Count 10 fails because the Complaint does not allege that Sun Capital was a member or that the LLCs *intended* Sun Capital to be a member.

Thus, the Court will grant the Sun Capital Motion to Dismiss Count 10 for Wrongful Distribution.

## CONCLUSION REGARDING THE SUN CAPITAL MOTION TO DISMISS

As set forth above, the Complaint pleads plausible claims for aiding and abetting breach of fiduciary duty, recharacterization, and equitable subordination; however, the Complaint does not plead the requisite factors for wrongful distribution.  As a result, the Sun Capital Motion to Dismiss will be denied as to Counts 4, 5, 6, 7, and 8 and the Sun Capital Motion to Dismiss will be granted as to Count 10 of the Complaint.

## CONCLUSION

For the reasons set forth above, the Motions to Dismiss will be granted in part and denied in part, as set forth in the accompanying order.

Dated:  August 31, 2023

J. Kate Stickles
United States Bankruptcy Judge

---

[308] Adv. D.I. 30, Ex. E (Furniture Factory Outlet, LLC Amended and Restated Limited Liability Company Agreement, dated Feb. 3, 2016) at § 7 (A185-86).