**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FURNITURE FACTORY ULTIMATE HOLDING, L.P., | Case No. 20-12816 (JKS) |
| **Debtor.**[1] | (Jointly Administered) |
| STEVEN BALASIANO, NOT INDIVIDUALLY BUT SOLELY IN HIS CAPACITY AS TRUSTEE OF THE LIQUIDATION TRUST OF FURNITURE FACTORY ULTIMATE HOLDING, L.P., *et al.*, | Adv. Proc. No. 22-50390 (JKS) |
| **Plaintiff,** | **Re: A.D.I. 27** |
| v. | |
| JONATHAN H. BORELL, CHAD CROSBY, JEFF FEINBERG, MELISSA KLAFTER, MICHAEL J. MCCONVERY, HANK MULLANY, DAVID ROGALSKI, LAWRENCE ZIGERELLI, SUN CAPITAL PARTNERS, INC., SUN CAPITAL PARTNERS MANAGEMENT VI, LLC, AND FURNITURE FACTORY NOTE HOLDING, LLC, | |
| **Defendants.** | |

## DEFENDANTS' ANSWER TO AMENDED COMPLAINT

Defendants Sun Capital Partners, Inc., Sun Capital Partners Management VI, LLC, and

Furniture Factory Note Holding LLC (collectively, the "Entity Defendants"), and Defendant

Directors and Officers Jonathan H. Borell, Chad Crosby, Jeff Feinberg, Margie Kaufman, Melissa

---

[1]    The Debtor's service address in the chapter 11 case is FFO Liquidation Trust, c/o Province, LLC, 16255 Ventura Blvd, Suite 440, Encino, CA 91436.

Klafter, Michael J. McConvery, Hank Mullany, Beth Neumann, David Rogalski, and Lawrence Zigerelli (the "D&Os," together with the Entity Defendants, the "Defendants"), hereby answer Plaintiff's Amended Complaint as follows:

**SUMMARY OF THE ACTION**

1. This Amended Complaint seeks to redress the harm inflicted on FFO by the Defendant Directors and Officers, namely Jonathan H. Borell, Chad Crosby, Jeff Feinberg, Melissa Klafter, Michael J. McConvery, Hank Mullany, David Rogalski, and Lawrence Zigerelli, (collectively the "D&Os"), Defendants Sun Capital Partners, Inc. ("Sun Capital Partners"), Sun Capital Partners Management VI, LLC ("Sun Management"), and Furniture Factory Note Holdings LLC ("Note Holdings" and together with Sun Capital Partners, Sun Management and any other of its affiliates, "Sun Capital" and, together with the D&Os, the "Defendants").

**ANSWER:   The allegations set forth in paragraph 1 of the Amended Complaint consist of plaintiff's characterization of his Amended Complaint to which no response is required. To the extent any response is required to the allegations at paragraph 1, they are denied.**

2. Prior to Sun Capital's involvement, FFO was a furniture retailer which targeted the middle-to-lower income market in 6-10 states in the southern and central United States. In early 2016, Sun Capital acquired FFO through the equivalent of a leveraged buyout, which burdened FFO with excessive debt and granted Sun Capital substantial control over FFO's business and operational decision-making. Shortly thereafter, in late 2017 and early 2018, Sun Capital caused FFO to expend critical cash to over-expand through the acquisition of two Kentucky-based retail businesses that were incompatible with FFO's existing

businesses and business model. This acquisition needlessly strained FFO's liquidity (due to, among other things, the unsupported and ill-researched purchase price of the transaction and related integration and conversion costs), forced FFO to take on significant and otherwise unnecessary debt, severely and irreversibly drained FFO's management and other resources, and directly resulted in FFO's bankruptcy.

**ANSWER:    Defendants admit that FFO was a furniture retailer which targeted the middle-to-lower income market in 6-10 states in the southern and central United States, but deny all remaining allegations in paragraph 2 of the Amended Complaint.**

3.      FFO's bankruptcy could have been avoided had the D&Os simply exercised their fiduciary duties and conducted appropriate due diligence with respect to the acquisition of the Kentucky businesses. To the contrary, as detailed below, the applicable D&Os failed to (i) conduct any meaningful analysis or diligence of the businesses they were acquiring, (ii) retain sufficient advisors to guide their review and analysis, or (iii) even question for one moment Sun Capital's flawed direction. Instead, the applicable D&Os, at the behest of Sun Capital (which initially proposed and then shepherded the transaction to consummation), blindly raced to complete the acquisition to suit Sun Capital's pursuit of growth and greater returns to equity, rather than to independently assess the benefit of the transaction to FFO.

**ANSWER:    Denied.**

4.      The D&Os and Sun Capital admit their failures in internal documents and presentations, including the failure to consider or even attempt to gather material and reasonably available information to inform their decision making. For example, the D&Os and Sun Capital collectively admit that they "**did not do a good job**" with the acquisition, giving "**inadequate consideration**" to the conflicting business models of the entities to be

acquired, while "**warning signals of declining core business were ignored**," and noting that going forward they should "**get the facts on shifts in the industry**" and "**spend more time upfront to understand the local model and market**." The limited internal documents obtained by FFO to date further reveal that the D&Os and Sun Capital ignored serious but readily apparent problems within FFO, including an ineffective, disorganized and uncommunicative management team, which proved grossly negligent and incapable of managing any integration of the newly acquired businesses. Despite acknowledging the deeply flawed and ill-informed acquisition process and the acquisition's utter failure, Sun Capital continued to siphon off crucial funds from FFO. While FFO bled cash attempting to salvage the business in the wake of the acquisition, Sun Capital, among other things, caused FFO to approve the payment of hundreds of thousands of dollars in so-called "consulting fees" and the distribution of nearly $1.5 million in connection with Sun Capital's "grid note loan." At the same time, FFO stretched or failed to make payment to their other creditors, including the creditors owed millions of dollars which are the beneficiaries of the Liquidation Trust. Not surprisingly, Sun Capital, the architect of the failed acquisition (designed to benefit Sun Capital as equity holder), was the only party who benefited.

**ANSWER:** **Denied.**

5. Plaintiff brings this Amended Complaint seeking, among other things: (i) damages for the D&Os' breaches of their fiduciary duties to FFO; (ii) damages for Sun Capital's aiding and abetting those breaches of fiduciary duties by the D&O's; (iii) equitable subordination of Sun Capital's claims to those of general unsecured creditors; (iv) recharacterization of the purported debt owed by FFO to Sun Capital to equity; (v) avoidance and recovery of

constructive fraudulent transfers made to Sun Capital; (vi) damages resulting from, and disgorgement of, wrongful distributions paid to Sun Capital; (vii) damages for the D&Os' breaches of Section 9 of the applicable Limited Liability Company agreements.

**ANSWER:** **The allegations set forth in paragraph 5 of the Amended Complaint consist of plaintiff's characterization of his Amended Complaint to which no response is required. To the extent any response is required to the allegations in paragraph 5, they are denied.**

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and Bankruptcy Rules 6009 and 7001.

**ANSWER:** **The allegations set forth in paragraph 6 of the Amended Complaint are legal conclusions to which no response is required.**

7. Venue of this adversary proceeding is proper pursuant to 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under title 11 and arises in and is related to FFO's bankruptcy cases pending in this Court.

**ANSWER:** **The allegations set forth in paragraph 7 of the Amended Complaint are legal conclusions to which no response is required.**

8. This adversary proceeding presents both "core" and "non-core" proceedings under 28 U.S.C. § 157(b).

**ANSWER:** **The allegations set forth in paragraph 8 of the Amended Complaint are legal conclusions to which no response is required.**

9. Plaintiff consents to entry of final orders and judgments by the Court in this adversary proceeding pursuant to Bankruptcy Rule 7008 and Local Rule 7008-1. Plaintiff also

consents to entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders on judgments consistent with Article III of the United States Constitution.

**ANSWER:** **The allegations set forth in paragraph 9 of the Amended Complaint are legal conclusions to which no response is required.**

**THE PARTIES**

10. Plaintiff is the Liquidation Trustee of the FFO Liquidation Trust (the "Liquidation Trust").

**ANSWER:** **Admitted.**

11. The companies making up the FFO enterprise (the "FFO Entities") are organized as limited partnerships or member-managed limited liability companies under Delaware law. FFO's principal place of business was Arkansas. As of the Petition Date, FFO's corporate structure was as follows: Holding LP owns 100% of the interests in Furniture Factory Holding, LLC ("FFH"), which itself owns 100% of the interests in Furniture Factory Intermediate Holding, LLC ("FFIH"), which itself owns 100% of the interests in Furniture Factory Outlet, LLC ("Outlet"), which itself owns 100% of the interests in Furniture Factory Outlet Transportation, Inc. Holding LP also owns 100% of the interests in Bedding Holding, LLC, which itself owns 100% of the interests in Bedding Intermediate Holding, LLC, which itself owns 100% of the interests in Bedding, LLC ("Bedding"). This corporate structure is illustrated in the following organizational chart:



**ANSWER:**   **Admitted.**

12. Upon information and belief, Defendant Jonathan H. Borell ("Borell") is domiciled in New York. Borell was a Managing Director at Sun Capital Partners from June 2006 through May 2019. He also was a member of the board of managers of each of the distinct FFO Entities (the "Boards") at all relevant times from February 2016 through February 2018.

**ANSWER:**   **Admitted.**

13. Upon information and belief, Defendant Chad Crosby ("Crosby") is domiciled in Florida. Crosby has been a Director at Sun Capital Partners since June 2008. At all relevant times

in 2019, Crosby served as Vice President and Assistant Secretary of multiple FFO Entities, including at least FFH and FFIH.

**ANSWER:    Defendants admit that Crosby is domiciled in Florida and served as Vice President and Assistant Secretary of at least FFH and FFIH, but deny all remaining allegations in paragraph 13 of the Amended Complaint.**

14.    Upon information and belief, Defendant Jeff Feinberg ("Feinberg") is domiciled in New York. He was a Managing Director at Sun Capital Partners and a member of the Boards at all relevant times from April 2018 through November 2019.

**ANSWER:    Defendants admit that Feinberg served as Managing Director at Sun Capital Partners and is domiciled in New York, but deny all remaining allegations in paragraph 14 of the Amended Complaint.**

15.    Upon information and belief, Defendant Melissa Klafter ("Klafter") is domiciled in Florida. From 2006 to 2021, Klafter was Managing Director and CFO at Sun Capital Partners. At all relevant times between 2016 and 2019, she was also Vice President and Assistant Secretary of at least FFH and FFIH. She became Assistant Treasurer of at least those entities beginning in 2019.

**ANSWER:    Admitted.**

16.    Upon information and belief, Defendant Michael J. McConvery ("McConvery") is domiciled in Virginia. At all relevant times between 2016 and July 2019, he was Vice President and Assistant Secretary of at least FFH and FFIH.

**ANSWER:    Defendants admit that McConvery is domiciled in Virginia and admit that he was a Vice President and Assistant Secretary of FFH and FFIH, but clarify that his**

**service as Vice President and Assistant Secretary of FFH and FFIH concluded on June 28, 2019.**

17. Upon information and belief, Defendant Hank Mullany ("Mullany") is domiciled in Pennsylvania. He was a member of the Boards from September 2019 through December 2020 and also served as CEO of at least FFH, FFIH, and Outlet from June 2019 through December 2020.

**ANSWER:** Admitted.

18. Upon information and belief, Defendant David Rogalski ("Rogalski") is domiciled in North Carolina. He was Chief Financial Officer of at least FFH, FFIH, and Outlet from December 2016 through August 2019. He was also a member of the Boards from in or around April 2019 through August 2019.

**ANSWER:** Admitted.

19. Upon information and belief, Defendant Lawrence Zigerelli ("Zigerelli") is domiciled in Louisiana. He was President and Chief Executive Officer of at least FFH, FFIH, and Outlet from 2012 to 2019. He also was a member of the Boards at all relevant times between February 2016 and March 2019.

**ANSWER:** Admitted.

20. Upon information and belief, Defendant Sun Capital Partners is incorporated and has its principal place of business in Florida.

**ANSWER:** Admitted.

21. Upon information and belief, Defendant Note Holdings is a Delaware limited liability company and has its principal place of business in Florida.

**ANSWER:** Admitted.

22.    Upon information and belief, Defendant Sun Management is a Delaware limited liability company and has its principal place of business in Florida.

**ANSWER:    Admitted.**

## PROCEDURAL HISTORY

23.    On November 5, 2020 (the "Petition Date"), FFO commenced their respective bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").

**ANSWER:    Admitted.**

24.    On July 28, 2021, FFO filed the *First Amended Joint Plan of Liquidation of Furniture Factory Ultimate Holding, L.P. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 430] (the "Plan").

**ANSWER:    Admitted.**

25.    On September 21, 2021, the Bankruptcy Court entered the *Findings of Fact, Conclusions of Law, and Order Confirming the First Amended Joint Plan of Liquidation of Furniture Factory Ultimate Holding, L.P. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 507] confirming the Plan, which became effective on November 3, 2021 (the "Effective Date").

**ANSWER:    The *Findings of Fact, Conclusions of Law, and Order Confirming the First Amended Joint Plan of Liquidation of the Furniture Factory Ultimate Holding, L.P. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 507] is a detailed legal pleading, the contents of which speaks for itself.  To the extent there are any remaining allegations contained in paragraph 25 of the Amended Complaint, they are denied.**

10

26.     The Plan provided for the establishment of the Liquidation Trust on the Effective Date, and the appointment of a liquidation trustee. On September 21, 2021, Plaintiff was designated and approved as the Liquidation Trustee of the Liquidation Trust.

**ANSWER:   The *First Amended Joint Plan of Liquidation of Furniture Factory Ultimate Holding, L.P. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 430] is a detailed legal pleading, the contents of which speaks for itself.  To the extent there are any remaining allegations contained in paragraph 26 of the Amended Complaint, they are denied.**

27.     Pursuant to the Liquidation Trust Agreement and Declaration of Trust (the "Trust Agreement"), the Liquidation Trustee is authorized to act on behalf of the Liquidation Trust and empowered to effectuate all actions and exercise all rights and privileges previously held by FFO that are necessary or convenient to implement the provisions of the Plan. With respect to trust assets, including the claims brought herein, the Liquidation Trustee has the authority to commence all proceedings and take all actions that could have been taken by any member, officer, director or shareholder of FFO.

**ANSWER:   Defendants refer to the Trust Agreement's terms, which speaks for itself. To the extent there are any remaining allegations contained in paragraph 27 of the Amended Complaint, they are denied.**

### STATEMENT OF FACTS

**A.     FFO's Background and Business**

28.     FFO was founded in 1984 in Muldrow, Oklahoma based on the original concept of providing quality furniture at highly competitive prices with the "everyday low price" guarantee—a differentiator from the competition, which traditionally encouraged

11

customers to negotiate down from an item's sticker price (referred to as a "high/low" pricing model).

**ANSWER:    Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 28 of the Amended Complaint.**

29.    FFO operated its Furniture Factory Outlet stores primarily in the South Central and Midwest United States, and offered products spanning every need for the home, including living room, dining room and bedroom furniture, mattresses, home décor and other accessories. FFO carried prominent furniture brands, including Serta, Jackson Catnapper and United/Lane, as well as a range of products under its Natural elements brand.

**ANSWER:    Admitted.**

30.    At its peak, FFO had annual revenues of approximately $143 million, operated 68 locations and employed approximately 675 employees. As of the Petition Date, FFO operated 31 retail locations across Arkansas, Missouri, Oklahoma, Kentucky and Indiana, in addition to a bedding manufacturing facility and a distribution facility and employed some 270 employees.

**ANSWER:    Admitted.**

31.    As of the Petition Date, FFO's capital structure consisted of funded-debt obligations in the aggregate principal amount of approximately $49.4 million. This was comprised of (i) $22.0 million outstanding under the Stellus Credit Agreement (defined below), (ii) $12.7 million outstanding under the Sun Credit Agreement (defined below) and (iii) $14.7 million outstanding under certain unsecured Grid Notes (defined below). Outstanding obligations also included unsecured trade debt of approximately $14.9 million, excluding lease termination and lease rejection claims.

**ANSWER:**    **Admitted.**

32.    On December 17, 2020, the Bankruptcy Court entered the *Order (A) Approving Asset Purchase Agreement; (B) Authorizing Sale of the Purchased Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; (C) Authorizing the Assumption and Assignment of Certain Executory Contracts and Leases in Connection Therewith; and (D) Granting Related Relief* [Docket No. 191], approving the sale of substantially all of FFO's assets to American Freight FFO, LLC for approximately $14 million, plus the assumption of certain liabilities. The sale closed on December 27, 2020.

**ANSWER:**    **The *Order (A) Approving Asset Purchase Agreement; (B) Authorizing Sale of the Purchased Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; (C) Authorizing the Assumption and Assignment of Certain Executory Contracts and Leases in Connection Therewith; and (D) Granting Related Relief* [Dkt. No. 191] is a detailed legal pleading, the contents of which speaks for itself.  To the extent there are any remaining allegations contained in paragraph 32 of the Amended Complaint, they are denied, except admit that the sale closed on December 27, 2020.**

**B.**    **Sun Capital's Acquisition of and Influence Over FFO**

33.    As of the Petition Date, the FFO Entities were portfolio companies of Sun Capital. Sun Capital acquired FFO on February 3, 2016, at an enterprise valuation of $34 million (the "Sun Acquisition"). The Sun Acquisition marked a significant shift in FFO's operations, typified by the incurrence of significant debt and decision-making designed to benefit one party: Sun Capital.

**ANSWER:**    **Defendants admit that the FFO Entities were portfolio companies of Sun Capital as of the Petition Date and that Sun Capital acquired FFO on February 3, 2016**

**at an initial enterprise valuation of $34 million.   To the extent there are any remaining allegations contained in paragraph 33 of the Amended Complaint, they are denied.**

34.     The Sun Acquisition was a typical acquisition for Sun Capital, whereby Sun Capital acquired all the outstanding equity of FFO without providing the majority of the capital required for the transaction. Instead, Sun Capital required FFO to pay for a substantial portion of its own acquisition. First, FFO repurchased all if its outstanding limited liability company interests for approximately $32 million (plus or minus certain adjustments). Thereafter, Sun Furniture Factory, LP, purchased an aggregate of 1,000,000 newly issued common units from FFO for a purchase price of $7.033 per common unit, or $7,033,826. Upon information and belief, other Sun Capital portfolio companies have been acquired in similar transactions.

**ANSWER:   Defendants Zigerelli, Rogalski, and Mullany deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 34 of the Amended Complaint.   The remaining Defendants admit FFO repurchased outstanding company interests for $28,824,935 and that Sun Furniture Factory, LP purchased an aggregate of 1,000,000 newly issued common units from FFO for a purchase price of $7.033 per common unit, or $7,033,826.63.   To the extent there are any remaining allegations contained in paragraph 34 of the Amended Complaint, they are denied.**

35.     In connection with and to finance the acquisition, Sun Capital (through its affiliate Note Holdings) made an additional capital investment into FFO styled as unsecured grid notes, pursuant to a note purchase agreement dated as of February 3, 2016 (as amended, modified or supplemented from time to time, the "Grid Notes") in the initial amount of $9,135,306.

The Grid Notes are unsecured, accrue interest in kind and can be prepaid prior to maturity without penalty.

**ANSWER:    Defendants refer to the note purchase agreement and Grid Notes for their terms, which speak for themselves.  To the extent there are any remaining allegations contained in paragraph 35 of the Amended Complaint, they are denied.**

36.    In order to further finance the Sun Acquisition, in addition to the Grid Notes, on June 10, 2016, FFO entered into a Credit Agreement (as amended, restated, supplemented, or otherwise modified, the "Stellus Credit Agreement") by and among (a) FFO, as borrower; (b) FFIH and certain subsidiaries of FFO from time to time party thereto, as guarantors; (c) Stellus Capital Investment Corporation ("Stellus"); and (d) each of the Lenders (as defined therein) party thereto, in the original principal amount of up to $23 million.

**ANSWER:    Defendants refer to the Stellus Credit Agreement for its terms, which speaks for itself. To the extent there are any remaining allegations contained in paragraph 36 of the Amended Complaint, they are denied.**

37.    At this time, Sun Capital transferred approximately 3.09% of its ownership interest in FFH to Stellus and certain of Stellus' affiliates pursuant to that certain Securities Purchase Agreement, by and among Sun Furniture Factory, LP, FFH and the purchasers thereto (the "Stellus Securities Purchase Agreement"). In connection with the Stellus Securities Purchase Agreement, Stellus also took a participation interest in the Grid Notes, pursuant to that certain Participation Agreement, by and among Note Holdings and each of the participants thereto (the "Stellus Participation Agreement"). As a result of the Stellus Participation Agreement, each of Sun Capital's and Stellus' respective interests in the Grid Notes were correlated to its equity interests in FFO.

**ANSWER:   Defendants refer to the Agreements for their terms, which speak for themselves.  To the extent there are any remaining allegations contained in paragraph 37 of the Amended Complaint, they are denied.**

38.   After the Sun Acquisition, FFO was saddled with new debt in the amount of $32,135,306, the amount under the Grid Notes and Stellus Credit Agreement, which greatly exceeded any previous obligations. Indeed, by comparison, as of the date of the acquisition, FFO's funded debt obligations had been just over $2.5 million. As a result of the indebtedness piled on in the Sun Acquisition, not only was FFO financially obligated to Sun Capital directly, but they were also directed to continue to incur significant debt to fund Sun Capital's desired expansion of the business until FFO filed for bankruptcy. This aggregate indebtedness allowed Sun Capital to wield significant financial leverage over FFO, which allowed them to effectively exercise *de facto* control over FFO's decision-making process—a process that inevitably led to its insolvency.

**ANSWER:   Denied.**

39.   In addition, Sun Capital exercised significant control over FFO's operations through a consulting agreement, dated February 3, 2016 (as amended, modified and supplemented from time to time, the "Consulting Agreement"). Pursuant to the Consulting Agreement, Sun Capital provided business consulting services to FFO in exchange for an aggregate annual fee, paid in quarterly installments, as well as the payment of success fees upon the consummation of certain transactions. Thus, while FFO's management, which consisted of, at various times relevant to this action, Defendants Crosby, Klafter, McConvery, Mullany, Rogalski and Zigerelli, was ostensibly responsible for day-to-day business operations, Sun Capital closely supervised and regularly directed FFO's management and operations,

including through monthly financial reviews attended by the management team and Sun Capital. Further, upon information and belief, certain types of transactions required Sun Capital's explicit approval.

**ANSWER:    Defendants refer to the Consulting Agreement for its terms, which speaks for itself. To the extent there are any remaining allegations contained in paragraph 39 of the Amended Complaint, they are denied.**

40.    Further, after Sun Capital's acquisition of FFO, Sun Capital dominated FFO's respective Boards, each of which were comprised by two Sun Capital appointees on a three-member board, with the third member being the CEO of FFO.

**ANSWER:    Denied.**

41.    In 2017, the members of each of the Boards consisted of Sun Capital appointees Donald V. Roach ("Roach") and Borell, as well as Zigerelli, FFO's CEO. Upon information and belief, as of April 2018, Feinberg replaced Borell as a Sun Capital representative on the Boards, and in or around November 2019, non-party Beth Neumann replaced non-party Roach as a Sun Capital representative on the Boards. In sum, Sun Capital exercised majority control of the Boards, and also utilized its influence over FFO's management and control of FFO's financial purse strings to effectively run FFO's business operations and influence major company transactions as it deemed fit.

**ANSWER:    Denied.**

C.    **Sun Capital Foists a New Opportunity on FFO**

42.    Upon information and belief, in September 2017, Sun Capital began to consider causing FFO to acquire two Kentucky-based retailers, Mattress & More and Furniture Liquidators (the "Kentucky Acquisition") as part of what it labeled a "Home Add-On Opportunity."

17

**ANSWER:    Denied.**

43.    Mattress & More was a retail mattress chain operating primarily in the Louisville metropolitan area, and Furniture Liquidators was, like FFO, a value-oriented home furnishing chain, operating in Kentucky and Indiana.

**ANSWER:    Admitted.**

44.    At this time, the Board members of each of the FFO Entities consisted of Roach, Borell, and Zigerelli, and the officers the FFO Entities consisted of Zigerelli, Klafter, McConvery, and/or Rogalski (collectively, the "Kentucky Acquisition D&Os"). Upon information and belief, each of these individuals was responsible for, and involved in, considering and conducting due diligence on and approving the Kentucky Acquisition.

**ANSWER:    Defendants admit that the Board members and the officers of the FFO Entities in 2017 consisted of Roach, Borell, Zigerelli, Klafter, McConvery and/or Rogalski, but deny any remaining allegations in paragraph 44 of the Amended Complaint.**

45.    Further, upon information and belief, in addition to serving on the Boards at this time, Borell also served on Sun's "Deal Team" that spearheaded the Kentucky Acquisition and presented it to FFO, and non-party Roach served on Sun's "Ops Team" that provided operational support, guidance, and counsel to FFO's management in connection with the Kentucky Acquisition.

**ANSWER:    Defendants admit that an internally circulated memorandum noted that Borell served on a "Deal Team" and Roach served on an "Ops Team" relating to FFO, but deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 45 of the Amended Complaint.**

18

46.   The Kentucky Acquisition D&Os and Sun Capital all ignored the stark cultural and deep operational differences between FFO and the targeted businesses. First, Mattress & More operated standalone mattress stores, whereas FFO sold a variety of furniture and accessories under one roof. Thus, FFO would be acquiring an entirely new category of retail stores dedicated to bedding and related accessories. Second, both Mattress & More and Furniture Liquidators utilized a "high/low" pricing strategy which encouraged in-store negotiations over the sticker price, and was fundamentally different than the everyday low price strategy utilized by FFO, where the prices were fixed and non-negotiable. Third, Mattress & More and Furniture Liquidators' customers skewed more middle-income, whereas FFO catered to a lower-to-middle income customer base. Fourth, and relatedly, there was an inventory mismatch among the businesses—specifically, the goods sold by Mattress & More and Furniture Liquidators were not suited to FFO's existing customer base. Finally, the original and acquired businesses utilized different methods of distribution, with Mattress & More and Furniture Liquidators shipping from outside warehouses, and FFO maintaining its inventory solely in stores. In sum, Mattress & More and Furniture Liquidators were fundamentally different in significant, and ultimately incompatible, ways with FFO's existing business.

**ANSWER:**   **Denied.**

47.   Despite these significant differences, Sun Capital – through FFO Board members Borell and Roach, as well as Jeff Feigenbaum, a senior associate at Sun Capital – aggressively pushed the Kentucky Acquisition on FFO, urging that the acquisition would "accelerate FFO store growth and market expansion" and that the "improved 'financiability' [sic]" of the combined business should enhance equity returns—which would benefit Sun Capital.

Sun Capital also represented to FFO's management, including Zigerelli, Klafter, McConvery, and Rogalski, that the Kentucky Acquisition would be a "strong fit with FFO in contiguous market," allowing FFO to rapidly expand their store base into surrounding states, representations that, upon information and belief, were accepted at face value and not challenged by the then-management team.

**ANSWER:    Defendants admit that an internally circulated Sun Capital draft memorandum dated September 9, 2017 stated the potential acquisition could "accelerate FFO Store growth (+29 units) and market expansion (+2 states)," that the "[i]mproved 'financeability' of combined business[es] should also enhance equity returns," and that the acquisition could be a "strong fit with FFO in contiguous markets."  To the extent there are any remaining allegations contained in paragraph 47 of the Amended Complaint, they are denied.**

48.    Approximately two months after it identified the Kentucky Acquisition as a possible target, and without having conducted adequate and appropriate due diligence, in November 2017, Sun Capital (again through Feigenbaum and FFO Board members Borell and Roach) recommended that FFO offer $6.75 million to purchase Mattress & More and Furniture Liquidators.

**ANSWER:    Denied.**

49.    The only diligence that Sun Capital appeared to conduct in connection with the Kentucky Acquisition was limited and based on flawed assumptions. For example, Sun Capital focused only on historical data related to Mattress & More and Furniture Liquidators and assumed that their past revenue and EBITDA would be indicative of future performance. However, Sun Capital failed to consider market trends, such as decreased in-store traffic

20

and migration to e-commerce, or the economic realities of the industry as a whole, which should have tempered overly aggressive assumptions. In addition, Sun Capital ignored that the mattress industry was "softening" at the time of the transaction, leading to aggressive price cuts and several notable bankruptcies by large mattress firms, which flooded the market with inexpensive competing products. Sun Capital likewise inexplicably failed to appreciate or consider the significant cultural differences between FFO and the target companies of the Kentucky Acquisition that, as set forth in further detail below, would cause significant, and ultimately insurmountable, problems when FFO attempted to integrate the new businesses into FFO. Instead, Sun Capital was singularly focused on one thing—the potential for a quick return on their investment in FFO.

**ANSWER:**   **Denied.**

50.   Upon information and belief, the Boards (of which two out of three members involved in the Kentucky Acquisition, Roach and Feinberg, were also Sun Capital employees) and management team (comprised of Zigerelli, Klafter, McConvery, and Rogalski) likewise failed to conduct their own appropriate due diligence with respect to the proposed Kentucky Acquisition and failed to appropriately assess the benefit of the transactions to FFO. The obligations of the Kentucky Acquisition D&Os to act in the best interest of FFO included, at a minimum, conducting adequate due diligence before agreeing to a major financial transaction, such as the Kentucky Acquisition, and overseeing and ensuring the integration of a newly acquired asset, such as Mattress & More and Furniture Liquidators, without deferring solely to Sun Capital's judgment. Upon information and belief, however, none of those individuals conducted sufficient diligence with respect to financial projections, business integration and synergy feasibility, customer research, industry trends or local

market conditions. The primary due diligence conducted by the foregoing Boards and management consisted of touring certain retail locations. Neither the Boards, nor the management team sought any advice from third-party advisors or any formal opinions regarding the proposed Kentucky Acquisition.

**ANSWER:   Denied.**

51.   On or about February 6, 2018, the Boards (comprised of Borell, Roach, and Zigerelli) and the management team (comprised of Zigerelli, Klafter, McConvery, and Rogalski), at the direction of Sun Capital, and despite their lack of sufficient diligence, approved FFO's purchase of Mattress & More and Furniture Liquidators for a base purchase price of approximately $7,250,000.

**ANSWER:   Denied.**

52.   In addition, FFO paid management fees to Sun Capital in the sum of at least $72,500 in connection with the consummation of the Kentucky Acquisition.

**ANSWER:   Defendants admit FFO paid a management fee of at least $72,500 to Sun Capital, but deny any remaining allegations in paragraph 52 of the Amended Complaint.**

53.   At this time, FFO's total enterprise value was approximately $60 million.

**ANSWER:   Admitted.**

**D.   FFO Struggles to Onboard the Kentucky Acquisition**

54.   The problems and miscalculations underlying the Kentucky Acquisition were laid bare just a few months after closing.

**ANSWER:   Denied.**

55.   First, and indicative of the failure of the Kentucky Acquisition D&Os to properly vet the transaction or prepare for its execution, Mattress & More stores consistently

underperformed the unrealistic and uninformed expectations under FFO's stewardship, and sales revenue declined substantially. Operational reviews presented by Sun Capital to FFO in mid-2018, mere months after the Kentucky Acquisition closed, revealed that this was due to "softness" in the mattress industry. Indeed, Mattress & More's competitors, including Mattress Firm and Sleep Outfitters, were offering aggressive price cuts and heavy promotions in attempts to stave off bankruptcy—industry vulnerabilities that a proper diligence process would have revealed. Simply put, Mattress & More could not compete.

**ANSWER:    The allegations in the second sentence of paragraph 55 contain legal conclusions to which no responsive pleading is required and is therefore denied on that basis. The remaining allegations of paragraph 55 are denied.**

56.    The problems with Furniture Liquidators were equally fatal. Upon information and belief, Sun Capital and the Kentucky Acquisition D&Os (in consultation with Sun Capital) had initially planned to liquidate certain of Furniture Liquidators' inventory through a "retirement sale," modify inventory investments and then rebrand the Furniture Liquidators' stores under the FFO banner. But Sun Capital and the Kentucky Acquisition D&Os failed to appreciate the significant cultural differences between Furniture Liquidators and FFO, which proved too great to overcome. For example, Furniture Liquidators' customers were confused by the change from a high/low ("haggling") pricing model to FFO's everyday low price strategy. Sun Capital and the Kentucky Acquisition D&Os also ignored the higher-end tastes and preferences of Furniture Liquidators' customers and eliminated many popular brands from the stores' inventory. Upon information and belief, these problems directly led to decreased sales and revenue. Upon further information and belief, the Kentucky Acquisition D&Os also were unprepared to address these issues because they

23

failed to properly perform due diligence for the transaction and thus did not adequately understand the business that was being purchased.

**ANSWER:**    **Denied.**

57.    In addition to this cultural mismatch, the "retirement sale" proved to be a crippling misstep. FFO sold Furniture Liquidators inventory at steep discounts, while purchasing significant inventory to replenish stores post-conversion. However, the retirement sale saturated the market and significantly reduced demand for newly acquired full-priced product after the stores reopened. As a result, FFO was saddled with excess inventory it was unable to sell.

**ANSWER:**    **Denied.**

58.    Borell, Zigerelli, Klafter, McConvery, and Rogalski also oversaw FFO's waste of significant time and resources attempting to convert and integrate the acquired Mattress & More and Furniture Liquidators stores. Costs associated with these efforts exceeded initial projections by millions of dollars, and the unrealistic anticipated and unsupported synergies between the businesses, predictably, never materialized.

**ANSWER:**    **Denied.**

59.    Further, the time and attention of FFO's management team was largely diverted to attempting to integrate the new businesses acquired in the Kentucky Acquisition and away from FFO's legacy business, which suffered significantly as a result. Upon information and belief, in mid-to-late 2018, FFO's management team that led this integration effort (to the detriment of FFO's legacy business) consisted of Defendants Zigerelli, Klafter, McConvery, and Rogalski.

**ANSWER:**    **Denied.**

24

60.    The singular focus of Zigerelli, Klafter, McConvery, and Rogalski on the newly acquired stores meant that critical, existing issues with FFO's core business, such as the need to expand FFO's digital marketing to respond to consumers' migration to online shopping, were largely ignored.

**ANSWER:    Denied.**

61.    Management issues at FFO were exacerbated by a leadership void at the top. Defendant Zigerelli, FFO's then-CEO and President, historically had significant latitude and freedom in running FFO. During the conversion and integration of the Kentucky Acquisition, however, Zigerelli was "checked out," "erratic" and "unsystematic," which led to strained relationships among the management team and created confusion around FFO's going-forward strategy.

**ANSWER:    Denied.**

62.    By early 2019, FFO was in crisis—it was rudderless, cash poor and unable to pay their vendors. Notably, FFO and Sun Capital acknowledged the gross missteps of the aforementioned FFO board members and management in contemporaneous correspondence. Internal Sun Capital presentations throughout 2019 conceded that pre-acquisition diligence was "inadequate" and that it had habitually "ignored" warning signs with FFO's business. The Kentucky Acquisition became an internal poster child within Sun Capital of what not to do when acquiring a business. For example, Sun Capital admitted that:

- FFO and the acquired Kentucky businesses were "too different to combine operationally" and there was a "marked difference in the two models and **inadequate consideration** given to that."

- Sun Capital "**underestimated** the complexity of the add-on, as well as the ability to manage and integrate it."

- Going forward, Sun Capital would need to improve its diligence, including by "**get[ting] the facts** on shifts in the industry . . . and the health of the core business," "spend[ing] **more time upfront** to understand the local model and market," and conducting "continuous" consumer research.

- "**[W]arning signals of declining core business were ignored**," and, in particular, Sun Capital had "**missed** that the customer was increasingly influenced by . . . digital marketing, and visiting fewer stores before purchase."

- Zigerelli "was not programmatic and **didn't really want help**," and "the more complex the issues and unsuccessful he was at resolving them, the more **erratic** and **unsystematic** he and the rest of the team became."

- Major key performance indicators "**didn't receive adequate attention** from [Sun Capital]" and were "**habitually dismissed** by the CEO."

**ANSWER:    Denied.**

63. As FFO failed to conduct its own independent diligence apart from the deficient Sun Capital Diligence, the above acknowledged failures by Sun Capital equally apply to FFO's board and managers.

**ANSWER:    Denied.**

64. Likewise, in a quarterly business review between Sun Capital and FFO, it was admitted that:

- They "**did not do a good job**" with the Kentucky Acquisition.

- They had "lost [their] way," "lost [their] brand identity," "lost [their] core customer with higher price points," and "**are confused;**"

- Zigerelli had been "checked out" and FFO was "**[v]oid of leadership**." Moreover, the "[s]enior team **[did] not work well together**," and "[r]elationships are **strained**. Not communicate with each other. Not sure who is responsible for what."

- FFO had "**no strategy – no vision**."

**ANSWER:    Defendants refer to the quarterly business review document, which speaks for itself.  To the extent there are any remaining allegations contained in paragraph 64 of the Amended Complaint, they are denied.**

26

65.    Upon information and belief, the "senior team" referenced in the above review included Borell, Zigerelli, Klafter, McConvery, and Rogalski.

**ANSWER:    Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 65 of the Amended Complaint.**

66.    Simply put, by FFO's and Sun Capital's own admissions, the Kentucky Acquisition was an abject failure of their own making caused by their failure to act on an informed basis and avail themselves of all material and reasonably available information, compounded by FFO's grossly negligent and deficient senior management (i.e., Zigerelli, Klafter, McConvery, and Rogalski). Indeed, by late 2019, FFO's total enterprise value declined by a shocking 83% (from approximately $60.2 million to approximately $10.3 million)—a loss in value of almost $50 million over the course of approximately 22 months.

**ANSWER:    Denied.**

67.    In a desperate attempt to salvage their losses, FFO completely overhauled the management team, and effectively terminated Zigerelli (vis-à-vis a "voluntary departure") from the Boards and management. FFO's new management team, consisting of, at various times, Defendants Rogalski, Crosby, Klafter, and Mullany, also attempted to implement various operational changes to the acquired businesses. But these changes were too little, too late, and on November 5, 2020, FFO filed for bankruptcy.

**ANSWER:    Denied.**

**E.    Sun Capital Profits Despite FFO's Failure**

68.    Despite the significant financial trouble that FFO faced due to the failed Kentucky Acquisition, Sun Capital continued to profit while burdening FFO with additional financial obligations. Indeed, over the course of 2018 and 2019, Sun Capital caused FFO to approve

the payment to Sun Capital of millions of dollars in consulting fees, expense reimbursements and distributions. FFO, strapped for cash due to the failed Kentucky Acquisition, had no choice but to borrow additional money from Sun Capital to stay afloat, saddling it with additional secured debt (to the detriment of FFO's unpaid creditors).

**ANSWER:    Denied.**

69.   Indeed, immediately following the close of the Kentucky Acquisition, FFO paid management fees to Sun Capital in the sum of at least $72,500. Upon information and belief, ironically, this was intended to be a "success fee" for completion of the acquisition.

**ANSWER:    Defendants admit FFO paid a management fee of at least $72,500 to Sun Capital, but deny any remaining allegations in paragraph 69 of the Amended Complaint.**

70.   Over the course of the next year, between April 5, 2018 and January 4, 2019, FFO paid to Sun Capital more than $665,000 in consulting fees and reimbursement of expenses under the oversight of Feinberg, Zigerelli, Klafter, McConvery, and Rogalski.

**ANSWER:    Defendants admit FFO paid $665,347 to Sun Capital in management fees and the reimbursement of expenses, but deny any remaining allegations in paragraph 70 of the Amended Complaint.**

71.   In addition, at an August 17, 2018, omnibus special meeting of the Boards, the Boards approved a payoff of the Grid Notes and paid $1,488,781.43 to Sun Capital. Feinberg, Zigerelli, and non-party Roach were all members of the Boards at this time. Borell and Rogalski also attended the meeting, with Rogalski presenting to the Board regarding the proposed distribution. Pursuant to a resolution of the Boards, Zigerelli, Rogalski, and Klafter were all authorized to take all actions necessary to implement the payoff of the Grid Notes.

28

**ANSWER:   Defendants admit FFO paid $1,488,781.43 as a partial repayment of the initial $9.1 million Grid Note loan to Sun Capital, but deny any remaining allegations in paragraph 71 of the Amended Complaint.**

72.   By early 2019, FFO owed at least $4.7 million in outstanding vendor payments. Between January and March 2019, FFO was clearly undercapitalized and had no choice but to borrow an additional $4 million from Sun Capital under the Grid Notes.

**ANSWER:   Denied.**

73.   Despite this borrowing, FFO needed additional liquidity—based in part on sales being down 30%, not "being good in city markets," and excessively stretching vendors. On May 1, 2019, Sun Capital provided FFO with $1.2 million, and on May 15, 2019, Sun Capital provided FFO with another $2.5 million (collectively, the "May 2019 Fundings"). At this time, the May 2019 Fundings were not documented. Subsequently, on June 28, 2019, Outlet and Bedding, as borrowers, Holding LP and certain of its subsidiaries, as guarantors (collectively with Outlet and Bedding, the "Sun Credit Agreement Loan Parties") and Sun Capital, through Note Holdings, entered into a Second Lien Credit Agreement (as amended, modified, or supplemented from time to time, the "Sun Credit Agreement" and together with all other loan documents related thereto, the "Sun Loan Documents"), for a $6 million loan purportedly secured by a second lien on all of FFO's assets, consisting of the May 2019 Fundings of $3.7 million, as well as $2.3 million in additional funding. Unlike prior secured debt, the Sun Credit Agreement accrued interest in-kind and could be repaid without any prepayment premiums or penalties. Upon information and belief, neither the Boards, nor anyone un-affiliated with Sun Capital, approved or gave any formal consideration to either the May 2019 Fundings or entry into the Sun Credit Agreement.

Rogalski signed the Sun Credit Agreement on behalf of each of the FFO Entities, as borrowers and guarantors, and on behalf of Note Holdings, as lender.

**ANSWER:   Defendants refer to the May 1, 2019 Funding, the May 15, 2019 Funding, the Second Lien Credit Agreement, and related loan documents and filings for their terms, which speak for themselves. To the extent there are any remaining allegations contained in paragraph 73 of the Amended Complaint, they are denied.**

74.   FFO would subsequently lean on this loan to try to dig out of the hole created by the Kentucky Acquisition, periodically incurring more debt which FFO could not afford to repay. On September 13, 2019, Sun Capital funded an additional $1 million to FFO without any documentation (the "September 2019 Funding"). It was not until September 18, 2019, the parties amended the Sun Credit Agreement to provide for an additional $3 million loan to FFO, of which $1 million was previously funded (the "Sun Credit Agreement First Amendment"). On November 27, 2019, the parties again amended the Sun Credit Agreement for an additional $2 million in funding to FFO (the "Sun Credit Agreement Second Amendment," and together with the Sun Credit Agreement First Amendment, the "Sun Credit Agreement Amendments"). Upon information and belief, neither the Boards, nor anyone un-affiliated with Sun Capital, approved or gave any formal consideration to the Sun Credit Agreement Amendments. Mullany signed the Sun Credit Agreement Amendments on behalf of each of the FFO Entities, as borrowers and guarantors, and on behalf of Note Holdings, as lender. Upon information and belief, during this time FFO did not seek funding from any additional sources other than Sun Capital. Sun Capital did not record any UCC financing statements on account of the Sun Credit Agreement until October 23, 2020, shortly before FFO filed for bankruptcy.

**ANSWER:   Defendants refer to the September 13, 2019 Funding, the Second Lien Credit Agreement, and related loan documents and filings for their terms, which speak for themselves. To the extent there are any remaining allegations contained in paragraph 74 of the Amended Complaint, they are denied.**

75.   By November 2020, FFO was suffering from a tremendous drain on cash flow and lacked both short and long-term liquidity. FFO owed approximately $14.9 million in outstanding vendor payments and trade debt, as well as approximately $27.4 million in outstanding funded-debt obligations to Sun Capital (excluding over $1 million in alleged unpaid "consulting fees" owed to Sun Capital). Predictably, the only party who came out on top of this distressed scenario was Sun Capital.

**ANSWER:   Denied.**

**F.   Sun Capital Claims**

76.   On February 26, 2021, Sun Capital filed a Proof of Claim against FFO setting forth the following claims (collectively, the "Claims"): (a) outstanding consulting and reimbursement obligations totaling approximately $1.2 million arising under the Consulting Agreement; (b) outstanding principal and interest payments totaling approximately $14.9 million under the Grid Notes; and (c) outstanding principal and interest payments totaling approximately $12.8 million under the Sun Credit Agreement.

**ANSWER:   Defendants refer to the Proof of Claims, the Consulting Agreement, the Grid Notes, and related loan documents and filings for their terms, which speak for themselves. To the extent there are any remaining allegations contained in paragraph 76 of the Amended Complaint, they are denied.**

**CAUSES OF ACTION**

31

**Count One**
**(Against Borell, Klafter, McConvery, Rogalski, Zigerelli, and Feinberg)**
**(Breach of Fiduciary Duty Pursuant to Delaware Law)**

77.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Amended Complaint as though set forth fully herein.

**ANSWER:    Defendants repeat and restate their answers to paragraph 1 through paragraph 76 of the Amended Complaint as if fully set forth herein.**

78.    The Kentucky Acquisition D&Os, comprised of Defendants Borell, Klafter, McConvery, Rogalski, and Zigerelli, owed fiduciary duties to FFO.

**ANSWER:    The allegations in paragraph 78 are not directed to the Entity Defendants or Defendants Crosby, Mullany, or Feinberg (who was dismissed from Count I pursuant to the Court's order on the D&Os' Motion to Dismiss) and therefore no response is required by these defendants.  The allegations set forth in paragraph 78 of the Amended Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 78 of the Amended Complaint, Defendants Borell, Klafter, McConvery, Rogalski and Zigerelli deny these allegations.**

79.    The Kentucky Acquisition D&Os, through the misconduct described above, breached their fiduciary duties to FFO by failing to inform themselves fully and in a deliberate manner of material and reasonably available information, including by failing to conduct sufficient industry, market and financial due diligence, or retaining appropriate and experienced advisors.

**ANSWER:    The allegations in paragraph 79 are not directed to the Entity Defendants or Defendants Crosby, Mullany, or Feinberg (who was dismissed from Count I pursuant to the Court's order on the D&Os' Motion to Dismiss) and therefore no response**

**is required by these defendants.  The allegations set forth in paragraph 79 of the Amended Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 79 of the Amended Complaint, Defendants Borell, Klafter, McConvery, Rogalski and Zigerelli deny these allegations.**

80.   The Kentucky Acquisition D&Os were grossly negligent in pursuing the Kentucky Acquisition without first informing themselves fully and in a deliberate manner of material and reasonably available information, including failing to perform any meaningful due diligence, availing themselves of all material and reasonably available information or retaining experienced independent advisors.

**ANSWER:   The allegations in paragraph 80 are not directed to the Entity Defendants or Defendants Crosby, Mullany, or Feinberg (who was dismissed from Count I pursuant to the Court's order on the D&Os' Motion to Dismiss) and therefore no response is required by these defendants.  The allegations set forth in paragraph 80 of the Amended Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 80 of the Amended Complaint, Defendants Borell, Klafter, McConvery, Rogalski and Zigerelli deny these allegations.**

81.   In addition, the Kentucky Acquisition D&Os were grossly negligent following the Kentucky Acquisition, including with respect to the integration and conversion of the stores acquired, as well as substantial neglect of FFO's core business.

**ANSWER:   The allegations in paragraph 81 are not directed to the Entity Defendants or Defendants Crosby, Mullany, or Feinberg (who was dismissed from Count I pursuant to the Court's order on the D&Os' Motion to Dismiss) and therefore no response is required by these defendants.  The allegations set forth in paragraph 81 of the Amended**

33

**Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 81 of the Amended Complaint, Defendants Borell, Klafter, McConvery, Rogalski and Zigerelli deny these allegations.**

82.    These fiduciary failures and grossly negligent acts were acknowledged by Sun Capital. Had the Kentucky Acquisition D&Os observed their fiduciary duties, they would have readily discovered that FFO and the acquired business were "too different to combine operationally" and that there was a "marked difference in the two models and inadequate consideration given to that" and would have understood the "complexity of the add-on, as well as the ability to manage and integrate it." The Kentucky Acquisition D&Os failed to engage in sufficient diligence and ignored their fiduciary duties, damaging FFO.

**ANSWER:   The allegations in paragraph 82 are not directed to the Entity Defendants or Defendants Crosby, Mullany, or Feinberg (who was dismissed from Count I pursuant to the Court's order on the D&Os' Motion to Dismiss) and therefore no response is required by these defendants.   The allegations set forth in paragraph 82 of the Amended Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 82 of the Amended Complaint, Defendants Borell, Klafter, McConvery, Rogalski and Zigerelli deny these allegations.**

83.    As a result, FFO, its estates, and its general unsecured creditors have all been damaged in an amount to be determined at trial, but no less than $50 million.

**ANSWER:   The allegations in paragraph 83 are not directed to the Entity Defendants or Defendants Crosby, Mullany, or Feinberg (who was dismissed from Count I pursuant to the Court's order on the D&Os' Motion to Dismiss) and therefore no response is required by these defendants.   The allegations set forth in paragraph 83 of the Amended**

34

**Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 83 of the Amended Complaint, Defendants Borell, Klafter, McConvery, Rogalski and Zigerelli deny these allegations.**

<u>Count Two</u>
<u>(Against Borell, Klafter, McConvery, Rogalski, Zigerelli, and Feinberg)</u>
<u>(Breach of Fiduciary Duty Pursuant to Delaware Law)</u>

84.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Amended Complaint as though set forth fully herein.

**ANSWER:   Defendants repeat and restate their answers to paragraph 1 through paragraph 83 of the Amended Complaint as if fully set forth herein.**

85.     Defendants Borell, Klafter, McConvery, Roglaski [sic], Zigerelli, and Feinberg, served as the D&Os of Furniture Factory Outlet, LLC and Furniture Factory Holdings, LLC during the relevant time period (the "<u>Transfer D&Os</u>").

**ANSWER:   Paragraph 85 is not directed to the Entity Defendants or Defendants Crosby and Mullany, and therefore, no response is required by these defendants. Defendants Borell, Klafter, McConvery, Rogalski, Zigerelli, and Feinberg deny the allegations in paragraph 85.**

86.     The Transfer D&Os failed to act in good faith and intentionally and knowingly permitted and, in certain instances, gave approval for, FFO to make Transfers (as defined below) to Sun Capital, which constituted unlawful fraudulent transfers, improper transfers and/or breaches of the LLC Agreements. These transactions were for the sole benefit of Sun Capital at a time when FFO was insolvent or in the zone of insolvency.

**ANSWER:   The allegations in paragraph 86 are not directed to the Entity Defendants or Defendants Crosby and Mullany, and therefore no response is required by**

35

**these defendants.  The allegations set forth in paragraph 86 of the Amended Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 86 of the Amended Complaint, Defendants Borell, Klafter, McConvery, Rogalski, Zigerelli and Feinberg deny these allegations.**

87.     As a result, FFO, its estates, and its general unsecured creditors have all been damaged in an amount to be determined at trial, but no less than $3 million.

**ANSWER:   The allegations in paragraph 87 are not directed to the Entity Defendants or Defendants Crosby and Mullany, and therefore no response is required by these defendants.  The allegations set forth in paragraph 87 of the Amended Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 87 of the Amended Complaint, Defendants Borell, Klafter, McConvery, Rogalski, Zigerelli and Feinberg deny these allegations.**

### Count Three
### (Against Borell, Crosby, Klafter, McConvery, Rogalski, Mullany, Zigerelli and Feinberg)
### (Breach of Fiduciary Duty Pursuant to Delaware Law)

88.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Amended Complaint as though set forth fully herein.

**ANSWER:   Defendants repeat and restate their answers to paragraph 1 through paragraph 87 of the Amended Complaint as if fully set forth herein.**

89.     Defendants Borell, Crosby, Klafter, McConvery, Rogalski, Mullany, Zigerelli and Feinberg served as the D&Os of the relevant FFO Entities during the relevant time period (the "Insider Loan D&Os").

**ANSWER:   Paragraph 89 is not directed to the Entity Defendants, and therefore, no response is required by these defendants. The D&Os deny the allegations in paragraph 89.**

90.   The Insider Loan D&Os failed to act in good faith and intentionally and knowingly permitted FFO to incur significant insider debt to Sun Capital in the form of the Grid Notes and the Sun Capital Credit Agreement, which were in reality equity contributions, for the sole benefit of Sun Capital at the expense of the estates at a time when FFO was undercapitalized, and was insolvent or in the zone of insolvency.

**ANSWER:   The allegations in paragraph 90 are not directed to the Entity Defendants, and therefore no response is required by these defendants.  The allegations set forth in paragraph 90 of the Amended Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 90 of the Amended Complaint, the D&Os deny these allegations.**

91.   As a result, FFO, its estates, and its general unsecured creditors have all been damaged in an amount to be determined at trial.

**ANSWER:   The allegations in paragraph 91 are not directed to the Entity Defendants, and therefore no response is required by these defendants.  The allegations set forth in paragraph 91 of the Amended Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 91 of the Amended Complaint, the D&Os deny these allegations.**

**Count Four**
**(Against Sun Capital)**
**(Aiding and Abetting Breach of Fiduciary Duty Pursuant to Delaware Law)**

37

92.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Amended Complaint as though set forth fully herein.

**ANSWER:    Defendants repeat and restate their answers to paragraph 1 through paragraph 91 of the Amended Complaint as if fully set forth herein.**

93.    The Kentucky Acquisition D&Os conduct, as set forth above, was in breach of their fiduciary duties to FFO.

**ANSWER:    The allegations in paragraph 93 are not directed to the D&Os, and therefore no response is required by these defendants.  The allegations set forth in paragraph 93 of the Amended Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 93 of the Amended Complaint, the Entity Defendants deny these allegations.**

94.    Sun Capital met regularly with the Kentucky Acquisition D&Os, was deeply involved in managing FFO's day-to-day business, and knew that the Kentucky Acquisition D&Os were engaged in breaches of their fiduciary duties to FFO and other misconduct.

**ANSWER:    The allegations in paragraph 94 are not directed to the D&Os, and therefore no response is required by these defendants.  The allegations set forth in paragraph 94 of the Amended Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 94 of the Amended Complaint, the Entity Defendants deny these allegations.**

95.    Sun Capital knowingly participated in the Kentucky Acquisition D&Os' breaches of fiduciary duties to FFO by creating an informational vacuum and actively encouraging the Kentucky Acquisition D&Os to move forward with the Kentucky Acquisition without itself

conducting any meaningful due diligence or recommending that the D&Os conduct their own due diligence, or retain independent experts to advise on the transaction.

**ANSWER:   The allegations in paragraph 95 are not directed to the D&Os, and therefore no response is required by these defendants.  The allegations set forth in paragraph 95 of the Amended Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 95 of the Amended Complaint, the Entity Defendants deny these allegations.**

96.    After the Kentucky Acquisition closed, Sun Capital directed FFO's plans to convert and integrate the newly acquired Mattress & More and Furniture Liquidators stores—plans that were based on false premises and a lack of information, and, which, as a result, wasted significant time and resources. Sun Capital focused solely on FFO's growth, and ignored critical existing issues within FFO's core business, which only became exacerbated.

**ANSWER:   Paragraph 96 is not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 96.**

97.    Indeed, Sun Capital itself admitted the failures caused by its insufficient diligence that it thrust upon FFO, stating they "did not do a good job" with the Kentucky Acquisition, gave "inadequate consideration" to key issues needed to assess the business model being acquired, and ignored "warning signals" of the core business being acquired being on the decline.

**ANSWER:   Paragraph 97 is not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 97.**

98.    Accordingly, Sun Capital is jointly and severally liable for the damages caused by the Kentucky Acquisition D&Os' wrongful conduct, in an amount no less than $28 million.

39

**ANSWER:** **The allegations in paragraph 98 are not directed to the D&Os, and therefore no response is required by these defendants.  The allegations set forth in paragraph 98 of the Amended Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 98 of the Amended Complaint, the Entity Defendants deny these allegations.**

**Count Five**
**(Against Sun Capital)**
**(Aiding and Abetting Breach of Fiduciary Duty Pursuant to Delaware Law)**

99.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Amended Complaint as though set forth fully herein.

**ANSWER:** **Defendants repeat and restate their answers to paragraph 1 through paragraph 98 of the Amended Complaint as if fully set forth herein.**

100.    The Transfer D&Os conduct, as set forth above, was in breach of their fiduciary duties to FFO.

**ANSWER:** **The allegations in paragraph 100 are not directed to the D&Os, and therefore no response is required by these defendants.  The allegations set forth in paragraph 100 of the Amended Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 100 of the Amended Complaint, the Entity Defendants deny these allegations.**

101.    Sun Capital met regularly with the Transfer D&Os, was deeply involved in managing FFO's day-to-day business and business decisions, and knew that the Transfer D&Os were engaged in breaches of their fiduciary duties to FFO and other misconduct.

**ANSWER:   The allegations in paragraph 101 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 101.**

102.   Sun Capital knowingly participated in the Transfer D&Os' breaches of fiduciary duties to FFO by causing FFO, through the Transfer D&Os, to incur significant insider debt to Sun Capital in the form of the Grid Notes and the Sun Capital Credit Agreement, which were in reality equity contributions, for the sole benefit of Sun Capital at the expense of the estates.

**ANSWER:   The allegations in paragraph 102 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 102.**

103.   Accordingly, Sun Capital is jointly and severally liable for the damages caused by the Transfer D&Os' wrongful conduct, in an amount no less than $3 million.

**ANSWER:   The allegations in paragraph 103 are not directed to the D&Os, and therefore no response is required by these defendants.  The allegations set forth in paragraph 103 of the Amended Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 103 of the Amended Complaint, the Entity Defendants deny these allegations.**

**Count Six**
**(Against Sun Capital)**
**(Aiding and Abetting Breach of Fiduciary Duty Pursuant to Delaware Law)**

104.   Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Amended Complaint as though set forth fully herein.

41

**ANSWER:   Defendants repeat and restate their answers to paragraph 1 through paragraph 103 of the Amended Complaint as if fully set forth herein.**

105.   The Insider Loan D&Os conduct, as set forth above, was in breach of their fiduciary duties to FFO.

**ANSWER:   The allegations in paragraph 105 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 105.**

106.   Sun Capital met regularly with the Insider Loan D&Os, was deeply involved in managing FFO's day-to-day business and business decisions, and knew that the Insider Loan D&Os were engaged in breaches of their fiduciary duties to FFO and other misconduct.

**ANSWER:   The allegations in paragraph 106 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 106.**

107.   Sun Capital knowingly participated in the Insider Loan D&Os' breaches of fiduciary duties to FFO by causing the Insider Loan to D&Os.

**ANSWER:   The allegations in paragraph 107 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 107.**

108.   Accordingly, Sun Capital is jointly and severally liable for the damages caused by the Insider Loan D&Os' wrongful conduct, in an amount to be determined at trial.

**ANSWER:   The allegations in paragraph 108 are not directed to the D&Os, and therefore no response is required by these defendants.  The allegations set forth in paragraph 108 of the Amended Complaint are legal conclusions to which no response is required. To**

42

**the extent there are any remaining allegations contained in paragraph 108 of the Amended Complaint, the Entity Defendants deny these allegations.**

**Count Seven**
**(Against Sun Capital)**
**(Recharacterization of Debt Owed by FFO to Sun Partners, 11 U.S.C. § 105)**

109.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Amended Complaint as though set forth fully herein.

**ANSWER:    Defendants repeat and restate their answers to paragraph 1 through paragraph 108 of the Amended Complaint as if fully set forth herein.**

110.    Sun Capital was at all relevant times an "insider" of FFO. Sun Capital, at all relevant times, was the ultimate 96% equity owner of the FFO Entities and had access to and monitored FFO's financial information, and exercised a high degree of control and influence over FFO's business decisions. At all relevant times, Sun Capital controlled FFO's decision making process related to entry into the Grid Notes and the Sun Credit Agreement and sat on both sides of the transactions.

**ANSWER:    The allegations in paragraph 110 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 110.**

111.    As more fully described above, the purported loans created by the Grid Notes and Sun Credit Agreement do not contain the hallmarks of loans; instead (i) they bear interest in kind, obviating regular interest payments, (ii) can be repaid at any time without the payment of premium or penalty, suggesting that maturity dates and interest accrual were illusory; and (iii) as applicable, are either unsecured or unperfected. Moreover, the Grid Notes were issued in connection with the Sun Acquisition, to acquire capital assets, and all advances

made under the Grid Notes were in proportion to Sun Capital's equity interest in FFO. In addition, a significant portion of the fundings under the Sun Credit Agreement, including the May 2019 Fundings and the September 2019 Funding, were made without contemporaneous loan documentation, set repayment terms or an agreed rate of interest.

**ANSWER:   The allegations in paragraph 111 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 111.**

112.   Moreover, the purported loans created by the Grid Notes and the Sun Credit Agreement were made at a time when FFO was undercapitalized, and no other creditor was willing to extend credit.

**ANSWER:   The allegations in paragraph 112 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 112.**

113.   Pursuant to the equitable powers conveyed to the Court by 11 U.S.C. § 105, the Court can look beyond the form of the transaction and consider the transaction's substance to determine whether it should be recharacterized from debt to equity.

**ANSWER:   The allegations in paragraph 113 are not directed to the D&Os, and therefore no response is required by these defendants.  The allegations set forth in paragraph 113 of the Amended Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 113 of the Amended Complaint, the Entity Defendants deny these allegations.**

114.    In order to achieve justice, the Claims of Sun Capital against FFO's bankruptcy estates in respect of the Grid Notes or the Sun Credit Agreement should be deemed based on equity, not debt.

**ANSWER:    The allegations in paragraph 114 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 114.**

### Count Eight
### (Against Sun Capital)
### (Equitable Subordination of Sun Capital's Claims, 11 U.S.C. § 510(c))

115.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Amended Complaint as though set forth fully herein.

**ANSWER:    Defendants repeat and restate their answers to paragraph 1 through paragraph 114 of the Amended Complaint as if fully set forth herein.**

116.    Sun Capital was at all relevant times an "insider" of FFO. Sun Capital was the ultimate 96% equity owner of the FFO Entities at all relevant times and had access to and monitored FFO's financial information, and exercised a high degree of control and influence over FFO's business decisions.

**ANSWER:    The allegations in paragraph 116 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 116.**

117.    Based on the conduct set forth above, namely aiding and abetting breaches of fiduciary duties of the Kentucky Acquisition D&Os to FFO, along with entering into multiple loan and credit agreements with FFO despite being aware of its declining financial health and

45

undercapitalization, as well as multiple bankruptcies of comparable businesses in the industry, Sun Capital has engaged in inequitable conduct.

**ANSWER:** **The allegations in paragraph 117 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 117.**

118. As a result of Sun Capital's misconduct, FFO, its estates and its general unsecured creditors have been injured.

**ANSWER:** **The allegations in paragraph 118 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 118.**

119. Equitably subordinating Sun Capital's Claims is consistent with the provisions of the bankruptcy code.

**ANSWER:** **The allegations in paragraph 119 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 119.**

120. Sun Capital's Claims should be recharacterized as unsecured claims and should be equitably subordinated to the claims of the general unsecured creditors pursuant to 11 U.S.C. §510.

**ANSWER:** **The allegations in paragraph 120 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 120.**

**Count Nine**
**(Against Sun Capital)**
**(Avoidance and Recovery of the Constructive Fraudulent Transfer to Sun Capital,**
**Arkansas Code §§ 4-59-204(A)(2), 4-59-205; 11 U.S.C. § 544; 11 U.S.C. § 550)**

121.  Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Amended Complaint as though set forth fully herein.

**ANSWER:    Defendants repeat and restate their answers to paragraph 1 through paragraph 120 of the Amended Complaint as if fully set forth herein.**

122.  Upon information and belief, FFO Entities transferred to Sun Capital: (a) from January 2017 through January 2018, not less than $750,934 on account of management fees and reimbursement of expenses; (b) on February 6, 2018, $72,500 management fee in connection with the Kentucky Acquisition; (c) from April 2018 through January 2019, not less than $665,347 on account of management fees and reimbursement of expenses; and (d) on August 17, 2018, $1,488,781 as repayment for the Grid Notes, which constitute equity (collectively, the "Transfers").

**ANSWER:    The allegations in paragraph 122 are not directed to the D&Os, and therefore no response is required by these defendants.  The allegations set forth in paragraph 122 of the Amended Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 122 of the Amended Complaint, the Entity Defendants deny these allegations.**

123.  The Transfers were made within four years prior to the Petition Date.

**ANSWER:    The allegations in paragraph 123 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants admit the allegations in paragraph 123.**

124.  The Transfers were transfers of interest of one or more FFO Entities in property.

**ANSWER:    The allegations in paragraph 124 are not directed to the D&Os, and therefore no response is required by these defendants.  The allegations set forth in paragraph**

**124 of the Amended Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 124 of the Amended Complaint, the Entity Defendants deny these allegations.**

125.     The Transfers were made to, or for, the benefit of Sun Capital.

**ANSWER:    The allegations in paragraph 125 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 125.**

126.     The FFO Entities received less than a reasonably equivalent value in exchange for the Transfers.

**ANSWER:    The allegations in paragraph 126 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 126.**

127.     On the date of each of the Transfers, each of the FFO Entities: (a) were insolvent or became insolvent as a result of such Transfer and had outstanding liabilities to unsecured creditors; (b) were engaged in business or a transaction, or about to engage in business or transactions, for which any property remaining with was an unreasonably small capital at the time of, or as a result of, the Transfers; and/or (c) intended, at the times relevant to this Amended Complaint, to incur, or believed it would incur, debts that would be beyond its ability to pay as such debts matured.

**ANSWER:    The allegations in paragraph 127 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 127.**

128. Based upon the foregoing, the Transfers constitute avoidable fraudulent conveyances pursuant to Arkansas Law.

**ANSWER:   The allegations in paragraph 128 are not directed to the D&Os, and therefore no response is required by these defendants.  The allegations set forth in paragraph 128 of the Amended Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 128 of the Amended Complaint, the Entity Defendants deny these allegations.**

129. The Plaintiff is entitled to avoid the Transfers pursuant to Sections 544 of the Bankruptcy Code.

**ANSWER:   The allegations in paragraph 129 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 129.**

130. Sun Capital was the initial transferee of the Transfers, or the entity for whose benefit the Transfers were made, or was the immediate or mediate transferee of the initial transferee receiving the Transfers.

**ANSWER:   The allegations in paragraph 130 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 130.**

131. Pursuant to Section 550(a) of the Bankruptcy Code, Plaintiff is entitled to recover the Transfers (or the value of such property) from Sun Capital, plus interest thereon to the date of payment and the costs of this action.

**ANSWER:   The allegations in paragraph 131 are not directed to the D&Os, and therefore no response is required by these defendants.  The allegations set forth in paragraph**

49

**131 of the Amended Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 131 of the Amended Complaint, the Entity Defendants deny these allegations.**

132. By reason of the foregoing, the said transfer is voidable pursuant to Section 550(a) of the Bankruptcy Code.

**ANSWER:    The allegations in paragraph 132 are not directed to the D&Os, and therefore no response is required by these defendants.  The allegations set forth in paragraph 132 of the Amended Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 132 of the Amended Complaint, the Entity Defendants deny these allegations.**

**Count Ten**
**(Against Sun Capital)**
**(Wrongful Distributions, *6 Del. C.* § 18-607)**

133. Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Amended Complaint as though set forth fully herein.

**ANSWER:    Defendants repeat and restate their answers to paragraph 1 through paragraph 132 of the Amended Complaint as if fully set forth herein.**

134. The FFO Entities, including Outlet, FFH and Bedding, provided cash and/or property to Sun Capital as a result of the Transfers set forth above.

**ANSWER:    The allegations in paragraph 134 are not directed to the D&Os, and therefore no response is required from these defendants. The Entity Defendants admit that certain Sun Capital entities received cash payments from certain FFO entities, but deny that these payments were wrongful distributions under Delaware law.**

135.   At the time of such Transfers, the liabilities of each of Bedding, Outlet and FFH exceeded the fair market value of the assets of each of Bedding, Outlet and FFH.

**ANSWER:** **The allegations in paragraph 135 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 135.**

136.   At all relevant times, Sun Capital was the ultimate 96.91% equity owner of the FFO Entities.

**ANSWER:** **The allegations in paragraph 137 are not directed to the D&Os, and therefore no response is required by these defendants. The Entity Defendants admit the allegations in Paragraph 137.**

137.   Under Delaware law, limited liability company interests are not required for an individual or entity to become a member of the limited liability company.

**ANSWER:** **The allegations in paragraph 137 are not directed to the D&Os, and therefore no response is required by these defendants.  The allegations set forth in paragraph 137 of the Amended Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 137 of the Amended Complaint, the Entity Defendants deny these allegations.**

138.   The applicable limited liability agreements incorporate this concept. This includes Section 6 of the Limited Liability Company Agreements of Bedding (the "Bedding LLC Agreement"), Outlet (the "Outlet LLC Agreement") and FFH (the "FFH LLC Agreement"), each of which provides that Bedding, Outlet and FFH may provide for additional interests in each entity.

**ANSWER:** **The allegations in paragraph 138 are not directed to the D&Os, and therefore no response is required by these defendants.  The Entity Defendants refer to the**

**Agreements for their terms, which speak for themselves. To the extent there are any remaining allegations contained in paragraph 138 of the Amended Complaint, the Entity Defendants deny these allegations.**

139. Upon information and belief, Defendants' conduct, including the wrongful transfers as well as FFO's reporting to and taking direction of for the benefit of Sun Capital, demonstrates that Sun Capital was a *de facto* member of the Outlet, FFH and Bedding.

**ANSWER:    The allegations in paragraph 139 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 139.**

140. To the extent such cash or property is deemed to be *de facto* wrongful distributions on account of Sun Capital's equity interest in Bedding, Outlet and FFH, Sun Capital is obligated to disgorge such wrongful distributions that were in violation of the Delaware Limited Liability Company Act. Upon information and belief, Sun Capital knew at the time of the distributions that the liabilities of each of Bedding, Outlet and FFH exceeded the fair market value of the assets of each of Bedding, Outlet and FFH.

**ANSWER:    The allegations in paragraph 140 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 140.**

**Count Eleven**
**(Against Borell, Klafter, McConvery, Rogalski, Zigerelli, and Feinberg)**
**(Breach of LLC Agreements)**

141. Plaintiff repeats and realleges the allegation contained in each preceding paragraph of the Amended Complaint as though set forth fully herein.

**ANSWER:   Defendants repeat and restate their answers to paragraph 1 through paragraph 140 of the Amended Complaint as if fully set forth herein.**

142. The FFO Entities, including Bedding, Outlet, and FFH, provided cash and/or property to Sun Capital as a result of the Transfers set forth above. At the time of such Transfers, the liabilities of each of Bedding, Outlet, and FFH exceeded the fair market value of the assets of each of Bedding, Outlet, and FFH. To the extent such cash or property is deemed to be *de facto* wrongful distributions on account of Sun Capital's equity interest in Bedding, Outlet, and FFH the Transfer D&Os (comprised of Borell, Klafter, McConvery, Rogalski, Zigerelli, and Feinberg) are liable to the FFO Entities for damages resulting from the breach of Section 9 of the Bedding LLC Agreement, Outlet LLC Agreement, and the FFH LLC Agreement.

**ANSWER:   The allegations in paragraph 142 are not directed to the Entity Defendants or Defendants Crosby and Mullany, and therefore no response is required by these defendants.  Defendants Borell, Klafter, McConvery, Rogalski and Zigerelli deny the allegations in paragraph 142.**

143. Specifically, Section 9 of the Bedding, Outlet, and FFH LLC Agreements each provides that distributions shall only be made to "the Members in accordance with their Percentage Interests at the times and in the aggregate amounts determined by the Board." Bedding LLC Agreement, § 9, Outlet LLC Agreement, § 9, FFH LLC Agreement, § 9. Section 9, however, is clear that "[n]otwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make a distribution to the Members on account of their interest in the Company *if such distribution would violate Section 18-607 of the Act or any other applicable law*." *Id.* (emphasis added).

53

**ANSWER:    The allegations in paragraph 143 are not directed to the Entity Defendants or Defendants Crosby and Mullany, and therefore no response is required by these defendants.  Defendants Borell, Klafter, McConvery, Rogalski and Zigerelli refer to the Agreements for their terms, which speak for themselves. To the extent there are any remaining allegations contained in paragraph 143 of the Amended Complaint, the Entity Defendants deny these allegations.**

144.    Section 18-607 imposes liability for improper distributions if "at the time of the distribution, after giving effect to the distribution, all liabilities of the limited liability company, other than liabilities to members on account of their limited liability company interests and liabilities for which the recourse of creditors is limited to specified property of the limited liability company, exceed the fair value of the assets of the limited liability company" and the member receiving the distribution "knew that the distribution would violate those conditions at the time it was made." 6 *Del. C.* § 18-607(a)-(b).

**ANSWER:    The allegations in paragraph 144 are not directed to the Entity Defendants or Defendants Crosby and Mullany, and therefore no response is required by these defendants.  The allegations set forth in paragraph 144 of the Amended Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 144 of the Amended Complaint, Defendants Borell, Klafter, McConvery, Rogalski, Zigerelli and Feinberg deny these allegations.**

145.    Upon information and belief, the Transfer D&Os knew at the time of the distributions to Sun Capital that the liabilities of each of Bedding, Outlet and FFH exceeded the fair market value of the assets of each of Bedding, Outlet and FFH.

54

**ANSWER:   The allegations in paragraph 145 are not directed to the Entity Defendants or Defendants Crosby and Mullany, and therefore no response is required by these defendants.  Defendants Borell, Klafter, McConvery, Rogalski and Zigerelli deny the allegations in paragraph 145.**

146.  Despite this knowledge, the Transfer D&Os caused the wrongful distribution to be made to Sun Capital.

**ANSWER:   The allegations in paragraph 146 are not directed to the Entity Defendants or Defendants Crosby and Mullany, and therefore no response is required by these defendants.  Defendants Borell, Klafter, McConvery, Rogalski and Zigerelli deny the allegations in paragraph 146.**

147.  By causing the wrongful distribution to be made to Sun Capital, the Transfer D&Os violated of Section 9 of the respective Bedding, Outlet and FFH LLC Agreements.

**ANSWER:   The allegations in paragraph 147 are not directed to the Entity Defendants or Defendants Crosby and Mullany, and therefore no response is required by these defendants.  The allegations set forth in paragraph 147 of the Amended Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 147 of the Amended Complaint, Defendants Borell, Klafter, McConvery, Rogalski, Zigerelli and Feinberg deny these allegations.**

148.  Further, and in the alternative, to the extent Sun Capital is deemed to not be a member of Bedding, Outlet or FFH, then the Transfer D&Os breached Section 9 by causing unlawful distributions to a non-member.

**ANSWER:   The allegations in paragraph 148 are not directed to the Entity Defendants or Defendants Crosby and Mullany, and therefore no response is required by**

**these defendants.  Defendants Borell, Klafter, McConvery, Rogalski and Zigerelli deny the allegations in paragraph 148.**

149.   As a result, the FFO Entities, their estates, and its general unsecured creditors have all been damaged in an amount to be determined at trial.

**ANSWER:   The allegations in paragraph 149 are not directed to the Entity Defendants or Defendants Crosby and Mullany, and therefore no response is required by these defendants.  Defendants Borell, Klafter, McConvery, Rogalski and Zigerelli deny the allegations in paragraph 149.**

**Count Twelve
(Against Sun Capital)
(Avoidance of Preferential Transfer 11 U.S.C. § 547)**

150.   Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Amended Complaint as though set forth fully herein.

**ANSWER:   Defendants repeat and restate their answers to paragraph 1 through paragraph 149 of the Amended Complaint as if fully set forth herein.**

151.   The Sun Credit Agreement Loan Parties and Sun Capital entered into the Sun Loan Documents on June 28, 2019, which purported to grant Sun Capital a security interest over substantially all the Sun Credit Agreement Loan Parties' property (the "Sun Capital Lien") to secure the obligations owed under the Sun Loan Documents. The Sun Capital Lien was not recorded with the Delaware Department of State until October 23, 2020.

**ANSWER:   The allegations in paragraph 151 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants admit the Sun Capital Lien was recorded with the Delaware Department of State on October 23, 2020. For**

56

**all other allegations contained in paragraph 151, the Entity Defendants refer to the documents for their terms, which speak for themselves.**

152. The recording of the Sun Capital Lien is a transfer of an interest in the Sun Capital Loan Parties' property for the benefit of Sun Capital on account of antecedent debt.

**ANSWER:** **The allegations in paragraph 152 are not directed to the D&Os, and therefore no response is required by these defendants. The allegations set forth in paragraph 152 of the Amended Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 152 of the Amended Complaint, the Entity Defendants deny these allegations.**

153. The recording of the Sun Capital Lien was made during the 90 days prior to the Petition Date and while the Sun Credit Agreement Loan Parties were insolvent.

**ANSWER:** **The allegations in paragraph 153 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 153.**

154. This transfer would enable Sun Capital to receive more than it would receive in a hypothetical chapter 7 liquidation if the transfer had not been made, and Sun Capital received payment on its claims to the extent provided by the provisions of the Bankruptcy Code.

**ANSWER:** **The allegations in paragraph 154 are not directed to the D&Os, and therefore, no response is required by these defendants. The Entity Defendants deny the allegations in paragraph 154.**

155. Based on the foregoing, the Sun Capital Lien is avoidable pursuant to 11 U.S.C. § 547(b).

**ANSWER:**   The allegations in paragraph 155 are not directed to the D&Os, and therefore no response is required by these defendants.  The allegations set forth in paragraph 155 of the Amended Complaint are legal conclusions to which no response is required. To the extent there are any remaining allegations contained in paragraph 155 of the Amended Complaint, the Entity Defendants deny these allegations.

## AFFIRMATIVE DEFENSES

Without assuming the burden of proof where such burden is otherwise on plaintiff as a matter of applicable substantive or procedural law, Defendants assert the following affirmative defenses and reserve the right to assert additional defenses as information becomes available:

### Affirmative Defense 1 — Exculpation of Fiduciary Duties

Plaintiff's claims of breach of fiduciary duty are barred by reason of exculpation. Each relevant LLC Agreement eliminates all fiduciary duties in accordance with Delaware law, and therefore plaintiff's fiduciary duty claims against the individual D&O defendants have been eliminated as a matter of contract, and should be barred.

### Affirmative Defense 2 — Exculpation of Damages

Plaintiff's damages claims are barred by reason of exculpation. Each relevant LLC Agreement eliminates any liability directors may have for any breach of fiduciary duty or contract. Since plaintiff has not alleged actual fraud, willful misconduct, or intentional and material breach, any damages arising from any alleged breach by the individual D&O defendants have been eliminated, and plaintiff's claims against the individual D&O defendants should therefore be barred.

### Affirmative Defense 3 — Business Judgment Rule

Plaintiff's claims are barred by Delaware's business judgment rule. Defendants are presumed to have acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company. Accordingly, any of plaintiff's claims for breach of fiduciary duty should be barred.

**Affirmative Defense 4 — Failure to Establish Causation with Reasonable Certainty**

Under Delaware Law, in order to recover damages for breach of contract, plaintiffs must establish with reasonable certainty that the alleged damages suffered were caused by defendant's breach. Plaintiff has failed (and will fail) to establish that any alleged damages were caused by defendants' actions or omissions rather than some other cause like the global COVID-19 pandemic and related government shutdown orders, which forced the debtors to close all of their retail stores.

**Affirmative Defense 5 — Failure to State a Claim**

Plaintiff's claims should be dismissed for failure to state a claim upon which relief may be granted.

WHEREFORE, Defendants request: (i) judgment denying all relief requested by plaintiff and (ii) any such other and further relief as this Court deems just and equitable.

Dated: October 12, 2023
       Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

**OF COUNSEL:**

**BAKER & MCKENZIE LLP**
Michael Duffy (admitted *pro hac vice*)
Michael McCutcheon (admitted *pro hac vice)*
Michael Lehrman (admitted *pro hac vice*)
Laura Kelly (admitted *pro hac vice*)
300 East Randolph Street, Suite 500
Chicago, Illinois 60601
Telephone:(312) 861-8000
michael.duffy@bakermckenzie.com
michael.mccutcheon@bakermckenzie.com
michael.lehrman@bakermckenzie.com
laura.kelly@bakermckenzie.com

 */s/ John P. DiTomo*
John P. DiTomo (No. 4850)
Courtney Kurz (No. 6841)
1201 N. Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
jditomo@morrisnichols.com
 ckurz@morrisnichols.com

*Attorneys for Defendants*